**David D. Park**, OSB #803358
ELLIOTT & PARK, P.C.
Abernethy House
324 S. Abernethy Street
Portland, OR 97239-8529
Telephone:    (503) 227-1690
Facsimile:    (503) 274-8384
E-mail: dave@elliott-park.com

**J. Ashlee Albies**, OSB #051846
**Maya Rinta,** OSB #195058
Albies, Stark & Guerriero
1500 SW First Ave, Suite 1000
Portland, Oregon 97201
Telephone: (503) 308-4770
Email: ashlee@albiesstark.com

        Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| ESTATE OF AARON D. STANTON, by DOUGLAS STANTON, Personal Representative, and A. S., a minor, by and through her Guardian ad Litem, DOUGLAS STANTON,<br><br>                    Plaintiffs,<br><br>        v.<br><br>JOSHUA DYK and CITY OF PORTLAND, a municipal corporation,<br><br><br>                    Defendants. | Case No.<br><br>**COMPLAINT**<br><br>Civil Rights Violations:  42 USC §1983, Fourth Amendment Excessive Deadly Force; Wrongful Death (Battery and Negligence); Intentional and Negligent Infliction of Emotional Distress on behalf of A.S.<br><br>**PLAINTIFFS DEMAND A JURY TRIAL** |

        Plaintiffs allege as follows:

Page 1 - **COMPLAINT**

## CORE FACTS COMMON TO ALL CLAIMS

1.      On July 22, 2022, at approximately 8:53 p.m., City of Portland Police Officer Joshua Dyk, a member of the Portland Police Bureau's Focused Intervention Team (FIT), shot Aaron D. Stanton with an assault rifle from a position of concealment and cover within a fraction of a second following Aaron Stanton discharging a semi-automatic pistol into the air from the front porch of his home, 125 SE 126th Avenue, Portland, Oregon.

2.      Prior to killing Aaron Stanton, defendant Dyk knew that Aaron Stanton had been discharging firearms into the air intermittently over a period of approximately one hour's time and had visually observed Stanton firing rounds into the air in a similar manner on prior occasions.  Defendant Dyk further knew at the time of the killing that Stanton, at no time, had verbally or physically threatened violence against any person and had not leveled a gun in any direction.

3.      Prior to killing Aaron Stanton, defendant Dyk knew that A. S., a child of approximately 6 years of age, was present with Aaron Stanton and would likely witness her father's injury and/or death were he to be shot and killed by City of Portland police.

4.      Present with defendant Dyk at the time of the killing were Portland police patrol officers Mark Piombo and Lino Pavon, each of whom were aiming rifles at Aaron Stanton, officer Nicholas Wambold, East Precinct Sgt. Michael Pool, and FIT team members Sgt. James Townley and officers Gabe Hertzler, Dominic Lovato, and John Bartlett (collectively the "non-shooting officers").

5.      Prior to killing Aaron Stanton, Dyk and the non-shooting officers articulated and agreed to the following plan to guide their interaction with Aaron Staton:  If Stanton shows himself, defendants would loud hail as police and command Staton to surrender; if Stanton

continued to shoot in the air, defendants would continue to "challenge" Stanton and try to get him to put the gun down and surrender; if Stanton levels the gun, defendants would "do what we need that is reasonable."

6.    At the time defendant Dyk killed Aaron Stanton, defendants Piombo and Pavon each had Stanton in their sights but did not fire.

## JURISDICTION AND VENUE

7.    Plaintiff Estate brings this action for damages against defendants Joshua Dyk and City of Portland pursuant to 42 U.S.C. §1983 for violation of Aaron Stanton's rights under the Fourth Amendment to the United States Constitution to be free of unreasonable seizure of his person by the use of excessive lethal force. This court has jurisdiction over plaintiff's claims against these defendants pursuant to 28 U.S.C. §§1331 and 1343.

8.    Plaintiff Estate and Plaintiff A. S. bring this action for damages under state law against defendants Joshua Dyk and City of Portland for battery and negligence.  The court has jurisdiction over plaintiffs' pendent state law claims under 28 U.S.C. §1367(a).  The state law claims of Plaintiff Estate and Plaintiff A.S. against defendants City of Portland and Dyk are transactionally related to the Plaintiff Estate's federal law claims, such that those claims form part of the same case or controversy under Article III of the United States Constitution.

9.    Venue is proper under 28 U.S.C. §1391(b), in that the claims and events giving rise to this action occurred in Multnomah County, Oregon.

## PARTIES

10.    Douglas Stanton is a citizen and resident of the State of Oregon and the United States, is the father of Aaron D. Stanton, the grandfather of A. S., is the duly appointed Personal Representative of the Estate of Aaron D. Stanton (the "Estate"), Multnomah County Circuit

Page 3 - **COMPLAINT**

Court Probate Case No. 22PB07771. Doug Stanton is the grandfather of plaintiff A. S., the minor daughter of Aaron Stanton, and seeks appointment by this court as guardian *ad litem* for A.S. in this lawsuit pursuant to FRCP 17(c)(2).

11.    A. S. is the minor daughter of Aaron D. Stanton.

12.    Defendant Joshua Dyk is an individual and employee of City of Portland, Portland Police Bureau. At all times material Dyk was acting under color of law and within the course and scope of his employment. Defendant Dyk is sued in his individual capacity.

13.    Defendant City of Portland is a political subdivision of the State of Oregon. The Portland Police Bureau is a department or division of the City of Portland. Defendant City of Portland is responsible under state law, ORS 30.265(1), for the acts and omissions of its employees, inclusive of defendant Dyk.

<strong>ADDITIONAL FACTS COMMON TO ALL CLAIMS</strong>

14.    At all times material Aaron D. Stanton, age 40, was a citizen of the United States and a resident of Portland, Multnomah County, Oregon, and was the father of A.S., a minor child.

15.    At all times material Aaron Stanton had been diagnosed with episodic mood disorder, chronic pain, traumatic brain injury and bipolar disorder. These medical conditions intermittently manifested themselves in alcohol abuse, substance abuse, psychotic behavior, and medication noncompliance and, at times, necessitated hospitalization for mental health evaluations.

16.    On the evening of July 22, 2022, Aaron Stanton was at home with his 6-year-old daughter, A. S., consumed alcohol to the point of severe intoxication and commenced firing lawfully owned firearms into the air from the front porch of his home, alarming the neighbors.

Page 4 - **COMPLAINT**

17.     At approximately 8:17 p.m., defendant City's Bureau of Emergency Communications ("BOEC") received the first of several 9-1-1 calls from a neighbor of Stanton reporting that he was discharging firearms on his property, but not aiming the gun at anyone.

18.     At no time on July 22, 2022 had any Portland police officer observed or received information from any source that Aaron Stanton had pointed a gun or otherwise physically or verbally threatened harm to anyone.

19.     At approximately 8:20 p.m., PPB Officers were dispatched by BOEC to investigate the reports of shots fired.

20.     At approximately 8:37 p.m., PPB Officers were informed by "Air One" that Stanton was observed to fire about 30 shots into the air and then had gone inside his house.

21.     At approximately 8:40 p.m., at least five PPB officers took positions of hard cover and concealment at the north end of SE 126th Avenue.

22.     At approximately 8:40 p.m., a BOEC dispatch operator informed responding police officers that the subject's name was Aaron Stanton.

23.     Upon information and belief, one or more responding officers had prior contact with Stanton, knew that Stanton had alcohol abuse and mental health conditions and knew that Stanton had not threatened persons or police during prior contacts.  Regardless of any responding officer's prior knowledge of Stanton addiction and mental health challenges, one or more officers observed Stanton to be "extremely intoxicated" and communicated that observation via radio to all responding officers.

24.     Upon information and belief, PPB Officer Jeffrey Haagenson, located phone numbers for Aaron Stanton and a woman believed to be Stanton's wife.  At approximately 8:44 p.m. Officer Haagenson announced via radio that he located a phone number for Aaron Stanton

and requested permission to contact Stanton. Another PPB officer responded over radio "don't call yet." Upon information and belief, the officer giving the no-contact order was PPB Officer Adi Ramic.

25.    Between 8:37 p.m. and 8:51 p.m., Aaron Stanton and A. S. were inside their residence.

26.    Defendants never attempted communication with Stanton by phone.

27.    At approximately 8:51 p.m., Aaron Stanton and A. S. emerged from their house onto their front porch and Aaron Stanton fired several shots into the air with a handgun.

28.    Defendant Dyk announced via radio that Aaron had shot in air with a handgun and that he was shooting in the air.

29.    At approximately 8:51 p.m. a Portland Police officer yelled at Aaron from a distance of more than 250 feet "police, put your hands up." The officer never called Aaron by his name nor attempted de-escalating dialogue.

30.    At approximately 8:52 p.m., Aaron fired several shots into the air from the front porch while A.S. was standing close to him.

31.    At approximately 8:53 p.m., just prior to Aaron being shot, A.S. left the front porch.

32.    At the time Aaron was shot, A.S. had moved to the driveway, northwest of the front porch and behind her father's parked car.

33.    After Aaron was shot, A.S. ran back to the front porch and knelt beside her father until removed by a police officer.

34.    On April 4, 2023, plaintiffs timely served tort claim notice as required by ORS 30.275 on defendants City of Portland and Joshua Dyk by certified mail addressed to Ted

Wheeler, Mayor of Portland, Robert L. Taylor, City Attorney for the City of Portland and City of Portland, Risk Management.

35.    In 2012, the United States Department of Justice ("DOJ") commenced a lawsuit against the City of Portland "to remedy a pattern or practice of unconstitutional uses of force by officers of the Portland Police Bureau." [1]  The Settlement Agreement negotiated, pre-filing, by the City and the DOJ included terms related to the City's use of force policies, practices, and training, enhancement of its data collection and accountability practices.

36.    In order to address the allegations of the pattern or practice of excessive use of force articulated in the DOJ lawsuit, the Portland Police Bureau has revised its use of force policies and training to emphasize de-escalation and accountability when policies and training intended to mitigate use of force are violated. In practice, however, the Portland Police Bureau does not effectively discipline officers who fail to de-escalate confrontations, does not effectively discipline officers who use excessive force, inclusive of excessive deadly force and does not effectively discipline supervisors who fail to follow the use of force review and reporting procedures essential to the accountability (disciplinary) process. The most recent Periodic Compliance Assessment Report filed by the DOJ concerning the City's compliance with the Settlement Agreement confirms that, ten years post-settlement, "accountability remains a primary source of compliance concerns …"[2]

---

[1]    United States of America v. City of Portland, 3:12-cv-02265-SI, Complaint, ECF 1, page 2, filed 12/17/12.
[2]    Seventh Periodic Compliance Assessment Report, page 3.  ECF 369, filed 8/8/23. Indeed, the Bureau has a achieved a rating of "substantial compliance" with Section VIII ["Officer Accountability"] in only one of the seven periodic reporting periods.  *Id*., pages 56 and 60.

37.     With specific reference to deadly force, since 2003, Portland Police Bureau members have been involved in not less than 60 officer-involved shootings.[3]  The Bureau has determined that the actions of the involved officers have been "out of policy" and disciplined the involved officer on only three occasions.[4]   In two of those the discipline was subsequently invalided in union grievance arbitration.  Between 2008 and 2018, 33 of 57 (58%) of Portland Police Bureau officer-involved shootings and in-custody deaths involved persons in mental health crises.

a.     In 2003, Officer Scott McCollister shot and killed Kendra James during a traffic stop.  James was unarmed and attempting to drive away from the officers.  McCollister was never disciplined. He has now been promoted to detective.

b.     In 2004, Officer Jason Sery shot and killed James Perez during a traffic stop. Perez was unarmed. Sery was never disciplined. He later resigned from the Portland Police Bureau. He was hired to work as a police officer by the City of Beaverton in 2008.

c.     In 2005, Officer Leo Besner shot Raymond Gwerder in the back while he was on the phone with a police hostage negotiator, killing him. Besner was not disciplined. Instead, he was promoted to Sergeant.

d.     In 2006, Officer Christopher Humphreys, Multnomah Sherriff Deputy Bret Burton, and Portland Police Sergeant Kyle Nice tackled and beat to death James Chasse, an unarmed man with mental illness who was trying to run away from the officers on foot. He died from blunt force chest injuries, sustaining twenty-seven fractures of

---

[3]     City of Portland, Portland Police Bureau Officer-Involved Shootings and Critical Incidents, Eighth Report/January 2023, OIR Group, Table of Critical Incidents Reviewed by OIR Group 2004-2019, pp. 95-100.
[4]     *Id*.

fourteen ribs and a punctured lung. The officers did not tell paramedics what happened and instead of having Mr. Chasse transported to the emergency room, the officers tried to have him booked into jail. City Commissioner Dan Saltzman ordered two-week suspensions for Nice and Humphreys. But in July 2012, after the PPA challenged the disciplinary action, the suspensions were dismissed and the City awarded Nice and Humphreys back pay. In 2009, while the Chasse-related discipline still pending, the police patrol office union, the Portland Police Association ("PPA") held a rally in downtown Portland after Chief Sizer and Saltzman placed Humphreys on paid administrative leave for shooting a 12-year-old Black girl with a bean-bag shotgun on a TriMet platform. The PPA held rally in downtown Portland, bussing in its members and their families, distributing "I am Chris Humphreys" tee-shirts, and calling for a no-confidence vote in Sizer and Saltzman. An hour before the PPS planned to release the results of this vote, Saltzman reinstated Humphreys. Nevertheless, Saltzman was removed as police commissioner by Mayor Adams who also fired Chief Sizer in May 2010. Burton, the sheriff's deputy, was hired by the Portland Police in 2013 and was assigned to the unit dealing with mental illness. Sergeant Kyle Nice continued to have a successful career with Portland Police, awarded and honored in 2017 for his work on the Rapid Response Team with Fire. Christopher Humphreys continued his career at PPB until he was elected Sheriff of Wheeler County.

e.       In 2006, Lieutenant Jeff Kaer shot and killed unarmed Dennis Young. Mayor Tom Potter, a former PPB police chief, terminated Lt. Kaer, finding that Lt. Kaer displayed poor judgment and decision-making leading up to the use of deadly force. The PPA appealed the termination to an arbiter, arguing, among other things, that the training

principles and techniques were never intended to be rules of conduct and that no PPB

officer had ever been disciplined for tactics leading up to a critical incident. The

termination was reduced to a thirty-day suspension and the City was required to pay Lt.

Kaer almost a whole year of back pay.

f.      In 2010, Officer Ronald Frashour shot Aaron Campbell, a twenty-five-year-old

African-American man, with his AR-15 rifle. The killing happened after Mr. Campbell

communicated with Officer James Quackenbush by text and call, agreeing to come

outside, came out walking backward with his hands locked behind his head. But the text

communication with Campbell was not relayed to the five officers standing outside, so

they were surprised to see Campbell come out. A grand jury opined that Campbell's

death was caused by critical police errors, including no central command, a lack of

communication between officers and poor training. Officer Frashour was terminated by

Mayor Sam Adams after Police Chief Mike Reese argued that it was unreasonable for

Frashour to believe that Campbell posed an immediate threat to the officers. However,

after the PPA appealed the termination decision, Officer Frashour was reinstated by

Mayor Adams and awarded two years of back pay.

g.      On May 12, 2010, members of PPB's Hotspot Enforcement Action Team

("HEAT") pulled over 25-year-old African-American Keaton Otis for a minor traffic

violation. Otis was experiencing a mental health crisis. One officer reached in the car

window and grabbed and tased Otis, and ultimately, officers fired 23 shots into Otis' car

when they claim he reached for a gun, killing him. Every aspect of this shooting was

found in policy. No officer was disciplined as a result of this shooting.

h.     In 2011, Officer Dane Reister mistakenly fired lethal rounds from his beanbag shotgun at William Monroe, a man diagnosed with bipolar disorder, who was permanently disabled as a result. Monroe was running away from the officers when Reister shot him in the back five times. Mayor Charlie Hales terminated Reister and the District Attorney's office filed third and fourth-degree assault charges against him. This was the only effective termination of an officer for using deadly force. Officer Reister committed suicide in 2015 while criminal charges were still pending against him.

i.     In 2012, Officer Justin Clary shot his AR-15 six times and killed Billy Simms who was driving away from the officer. The supervising sergeant failed to formulate a plan for the high-risk arrest. None of the involved officers were disciplined for this shooting.

j.     In 2013, Officer Andrew Hearst shot his AR-15 at Merle Hatch.  Hatch was experiencing a mental health crisis and was unarmed at the time. Hatch died from gunshot wounds inflicted by other officers at the scene. The City did not discipline Hearst for this shooting. The City rewarded him by allowing a waiver to apply for membership on the Bureau's SERT team as a direct result of his choice to use deadly force against an unarmed mentally ill man.

k.     In 2015, Portland Police decided to perform a box-in maneuver of Ryan Sudlow's car in a busy gas station. Sergeant Gonzalez viewed the gas station as a "perfect" location for the box-in, despite the risk of death to several civilians. Officer Charles Asheim fired at Sudlow's car, the bullets ricocheting off the windshield. When Asheim fired, he was at an angle to Sudlow's windshield and there was an occupied car on the other side of the gas pumps, a passenger in Sudlow's car, and a gas station attendant nearby. Although the

initial training division analysis found Asheim's backdrop to be "almost a worst-case scenario" in addition to discussing the danger in choosing to make a high-risk arrest in a public place, the Commander's review found Asheim's use of deadly force to be within policy and Officer Asheim was never disciplined.

l.      On February 9, 2017, Officer Andrew Hearst fired three rounds from his AR-15 rifle, killing Quanice Hayes, a 17 year-old Black teenager, within one minute of encountering him.  At the time of the shooting, Quanice was unarmed, on his knees and not a threat to any officer or other person.  At the time of the shooting, police officers were seeking a suspect in a reported armed robbery. This led them to a residence off NE 82nd Ave in Portland. Officers tracked the suspect to this residence and proceeded to station themselves outside trying to determine whether the person they were looking for was inside the residence. As they walked around the residence, an officer spotted Quanice hiding in an alcove between the house and the garage. When the officers came upon Quanice, they were surprised to see him. Despite there being two sergeants on scene, neither took command of the arrest team. Each of the officers involved remained out in the open, leaving themselves exposed to the potential threat posed by Quanice. There was no clear plan for how they would take Quanice into custody. Instead, different police officers shouted contradictory commands at him. He obeyed the commands of Officer Robert Wullbrandt, and crawled on his hands and knees as ordered, coming to a stop when ordered to do so. He was then ordered to "get down on his face." When he started to comply with that order, Hearst shot him.  An internal affairs investigation concluded that every aspect of the shooting was "in policy." The training division review

of the shooting found almost every aspect of it demonstrated "sound and effective tactics." No officer was disciplined.

m.      On July 30, 2019, Porland Police Officer Gary Doran fired eleven rounds at Lane Christopher Martin, striking him nine times and killing him. At the time he was shot, Mr. Martin was in the midst of a mental health crisis, was surrounded by police, had previously responded to use of less lethal force by dropping a camping hatchet that he was holding and by running away and was in possession of a small pocketknife with keys attached. Officer Doran was the only officer to use lethal force, although at least two other officers had their weapons aimed at Martin and did not fire. PPB trains its officers to fire their weapons in short bursts, stop and assess for effect. Officer Doran did not follow that training. Internal Affairs and Training Division reviews nevertheless concluded that Officer Doran's actions were within policy. Officer Doran was not disciplined.

n.      On April 16, 2021, Officer Zachary DeLong fired two shots from his AR-15, one of which struck and killed Robert Delgado. At the time of the shooting, Mr. Delgado was houseless, camped in Lents Park, was not suspected of committing a crime, but was displaying erratic and irrational behavior consistent with an emotional or mental health crisis that included picking up and scattering his personal property and telling DeLong to "just fucking shoot me." When Delgado was non-compliant with Officer Delong's verbal commands to "get his ass on the ground", Officer DeLong took cover behind a tree, and pointed his AR-15 in Mr. Delgado's direction. Mr. Delgado was shot the next time he reached for something near his tent. Officer DeLong was not disciplined and was later promoted to Detective.

38.     Common threads define the City's on-going pattern or practice of tolerating and ratifying unconstitutional use of deadly force and include, but are not limited to:  a) repeated failures by reviewing supervisory Bureau members and command staff to conduct investigations into matters which call the honesty or integrity of involved and witness officers into question, inclusive of contradictory physical, audio or video evidence; b) failure to effectively discipline officers when their statements of "justification" for their actions lack credibility, c) failure to effectively discipline officers for disregarding signs and symptoms suggesting a subject is mentally ill and/or experiencing a mental health crisis; d) failure to effectively discipline officers who fail to recognize opportunities to de-escalate confrontations and employ de-escalation techniques before resort to tactics likely increase the risk that force will be used..

39.     With regard to the factual "justification" for defendant Dyk's use of deadly force against Aaron Stanton, the City was at all times material in possession of and/or had access to evidence which contradicted the narrative of witness officers and defendant Dyk that Aaron Stanton "leveled" his gun prior to defendant Dyk's application of deadly force and failed to conduct a bona fide investigation into that evidence.  With regard to the pre-shooting tactics employed during defendants' officers contact with Aaron Stanton, the City was at all times material in possession of and/or had access to evidence that there were opportunities for de-escalation which its officers recognized but failed to take and, in their place, employed tactics likely to increase the risk of use of deadly force against Aaron Stanton.   Despite the City's possession of and/or access to such evidence, neither defendant Dyk nor any other officer was effectively disciplined for their conduct in connection with the death of Aaron Stanton.

Page 14 - **COMPLAINT**

## CLAIMS FOR RELIEF

### FIRST CLAIM, DEFENDANTS JOSHUA DYK AND CITY OF PORTLAND
Estate's Claim of Violation of 4th Amendment; 42 U.S.C. §1983; Excessive Deadly Force

40.     Plaintiff Estate realleges paragraphs 1 through 39, above, and incorporates same by reference as though fully set forth.

41.     At all times material Aaron Stanton had a protected liberty interest under the Fourth Amendment to the United States Constitution not to be subjected to an unreasonable seizure of his person through the application of excessive deadly force.

**Count 1:  Individual Liability of Joshua Dyk**

42.     Defendant Dyk violated Stanton's Fourth Amendment rights by intentionally shooting Aaron without an objectively reasonable belief that Aaron presented an immediate threat of serious bodily harm to defendant Dyk or any other person.

**Count II:  Municipal Liability – Custom and Practice of Failure to Investigate and Discipline for Use of Excessive Deadly Force**

43.     Defendant City of Portland maintained a policy, custom or practice of deliberate indifference to Portland police officers' violations of the Fourth Amendment by use of excessive deadly force which policy was a substantial factor in defendant Dyk's deprivation of Aaron Stanton's Fourth Amendment rights described above and, following an internal investigation of defendant Dyk's shooting of Aaron and with full knowledge of the circumstances of Dyk's conduct, ratified, condoned and approved said defendant's conduct.

**Relief Sought**

44.     As a result of defendants' violations of Aaron's rights under the Fourth Amendment, Aaron died, and his parents and minor daughter, as beneficiaries of his Estate, are

entitled to recover compensatory noneconomic and economic damages in such amount as, upon proof at trial, the jury may determine reasonable and just.

45.     Plaintiffs should be awarded their attorney fees and costs against defendants pursuant to 42 U.S.C. §1988.

## SECOND CLAIM, DEFENDANT CITY OF PORTLAND, ONLY
### State Law Claim of Estate for Wrongful Death/Battery

46.     Plaintiff Estate realleges paragraphs 1 through 34, above, and incorporates same by reference as though fully set forth.

47.     Defendant Joshua Dyk, while acting within the course and scope of his employment for defendant City of Portland, intentionally engaged in harmful or offensive contact with Aaron Stanton, by shooting him.

48.     As a result of this battery, Aaron died, and his parents and minor daughter, as beneficiaries of his Estate, are entitled to recover compensatory noneconomic and economic damages in such amount as, upon proof at trial, the jury may determine reasonable and just.

## THIRD CLAIM, DEFENDANT CITY OF PORTLAND, ONLY
### State Law Claim of Estate for Wrongful Death/Negligence

49.     Plaintiff Estate realleges paragraphs 1 through 34, above, and incorporates same by reference as though fully set forth.

50.     Each of the following acts of one or more of defendant City of Portland's police officers responding to and participating in the seizure of Aaron Stanton were taken within the course and scope of their employment for defendant City of Portland, created an unreasonable and foreseeable risk of injury to Aaron Stanton, and were substantial factors in causing Aaron's death:

a)      Failure to summon and await the arrival of Portland's Behavioral Health Unit, Tactical Negotiations Team and/or other officers with greater knowledge, skill, education, training and experience in behavioral health, crisis intervention and de-escalation.

b)      Failure to place present and available officers with Enhanced Crisis Intervention Skills in charge of the plan and tactics for initiating and conducting communications with Aaron Stanton.

c)      Failure to employ crisis intervention and de-escalation communication tactics and training to attempt to calm, de-escalate and reason with Aaron Stanton including, but not limited to attempting contact with Aaron Stanton by telephone and attempting use of verbal de-escalation techniques before verbally escalating the conflict by issuing verbal "challenges" and "force warnings".

d)      Plaintiff gives notice of his intent and reserves all rights to supplement his specifications of negligence following the completion of fact discovery.

51.     As a direct result of the negligence of defendant's employees, Aaron Stanton died, and his parents and minor daughter, as beneficiaries of his Estate, are entitled to recover compensatory noneconomic and economic damages in such amount as, upon proof at trial, the jury may determine reasonable and just.

**FOURTH CLAIM FOR RELIEF, DEFENDANT CITY OF PORTLAND, ONLY**
**State Law Claim of A.S. for Intentional Infliction of Emotional Distress**

52.     Plaintiff A.S. realleges paragraphs 1 through 34, above, and incorporates same by reference as though fully set forth.

53.     Defendant City of Portland, acting through one or more of its police officer employees who took physical custody of A.S., engaged in the following act which constitutes an

extraordinary transgression of the bounds of socially tolerable conduct, namely, such officer or officers told A.S. that "your father wanted to die."

54.    At the time defendant engaged in the foregoing conduct, defendant's employee(s) were substantially certain that A.S. would suffer severe emotional distress from such conduct or made such statement with reckless disregard whether A.S. would suffer severe emotional distress.

55.    As a direct result of the intentional and socially intolerable conduct of defendant's employees, plaintiff A.S, suffered severe emotional distress, which has included, but is not limited to, anxiety and nightmares, and will suffer future severe emotional distress, grief, and loss the scope and extent of which is presently unknown.

56.    Plaintiff is entitled to recover non-economic damages in such amount as the jury determines reasonable and just.

### FIFTH CLAIM FOR RELIEF, DEFENDANT CITY OF PORTLAND, ONLY
### State Law Claim of A.S. for Negligent Infliction of Emotional Distress

57.    Plaintiff A.S. realleges paragraphs 1 through 34, 50 and 51, above, and incorporates same as though fully set forth.

58.    Plaintiff A.S. was present in the driveway adjacent to the front yard when her father was shot, heard the loud rapport of defendant Dyk's AR-15, heard her father collapse on the front porch, went to his aid and saw him lose consciousness from the fatal wound.

59.    As a direct result of defendant's negligence, plaintiff A.S. witnessed the sudden fatal injury to her father, suffered severe emotional distress, which has included, but is not limited to, anxiety and nightmares, and will suffer future severe emotional distress, grief, and loss the scope and extent of which is presently unknown.

Page 18 - **COMPLAINT**

60.     Plaintiff A.S. is entitled to recover non-economic damages in such amounts as the jury determines reasonable and just.

**WHEREFORE**, plaintiffs pray for a judgment against defendants as follows:

1.      Economic and noneconomic damages to the Plaintiff Estate for the pecuniary loss to the estate and for the loss of society, companionship and services of Aaron Stanton suffered by Stanton's parents and his daughter in amounts to be proved at trial.

2.      Noneconomic damages to Plaintiff A.S. in an amount to be proved at trial.

3.      Plaintiff Estate's attorney fees and costs under 42 U.S.C. §1988.

4.      Plaintiffs' recoverable costs and disbursements.

5.      Such other and further relief as the court may deem equitable and just.

**PLAINTIFFS DEMAND A JURY TRIAL.**

DATED:          November 28, 2023

ELLIOTT & PARK, P.C.


By:     s/ David D. Park
        _____
        David D. Park, OSB #803358
        (Mr./he/him)
        E-mail:  dave@elliott-park.com

ALBIES, STARK & GUERRIERO

By:     s/ J. Ashlee Albies
        _____
        J. Ashlee Albies, OSB #051846
        Maya Rinta, OSB # 195058
        (Ms./she/her)
        E-mail: ashlee@albiesstark.com

        Attorneys for Plaintiffs