Carey Caldwell, OSB #093032
Deputy City Attorney
carey.caldwell@portlandoregon.gov
William W. Manlove, OSB #891607
Senior Deputy City Attorney
william.manlove@portlandoregon.gov
Portland City Attorney's Office
1221 SW 4th Ave., Rm. 430
Portland, OR 97204
Telephone: (503) 823-4047
Facsimile: (503) 823-3089
*Of Attorneys for Defendants*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **ESTATE OF AARON D. STANTON, BY DOUGLAS STANTON, PERSONAL REPRESENTATIVE, AND A. S., A MINOR, BY AND THROUGH HER GUARDIAN AD LITEM, DOUGLAS STANTON,** | **3:23-cv-01767-AN** |
| PLAINTIFFS, | **DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' COMPLAINT** |
| v. | |
| **JOSHUA DYK and CITY OF PORTLAND,** | |
| **DEFENDANTS.** | |

In accordance with Fed. R. Civ. P. 15(a)(1)(A), Defendants Joshua Dyke ("Dyk") and the City of Portland ("City"; collectively "Defendants") file Defendants' Answer and Affirmative Defenses to Plaintiffs' Complaint in correspondingly numbered paragraphs as follows:

### CORE FACTS COMMON TO ALL CLAIMS

1.          Defendants admit that on the time and date, Officer Dyk shot Aaron Stanton after Stanton lowered his weapon and fired toward officers.

2.          Defendants admit that Officer Dyk was aware that Stanton had fired his weapon numerous times prior to lowering it toward officers. Otherwise deny.

3.          Defendants admit that Dyk knew a child was at the home.

Page 1 – DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' COMPLAINT

4.          Defendants deny that the named officers were with Dyk at the time of the shooting.

5.          Defendants admit that there was a plan and that this paragraph captures some part of the plan but deny it encompasses the whole plan and that the officers were involved as alleged.

6.          Defendants deny.

## JURISDICTION AND VENUE

7. – 9.          Defendants admit that jurisdiction and venue are proper.

## PARTIES

10. – 13.          Defendants admit the parties are as named.

## ADDITIONAL FACTS COMMON TO ALL CLAIMS

14.          Defendants admit.

15. – 16.          Defendants are without sufficient information to admit or deny the allegations in these paragraphs and therefore deny.

17.          Defendants admit that it received a 911 call and the caller could not tell if Stanton was aiming the gun at anyone and that this was the first time this had happened.

18.          Defendants deny.

19. – 22.          Defendants admit that the sequence in these paragraphs is more or less as alleged.

23.          This paragraph is compound and contains conclusions to which a response is not required. Upon information and belief, no responding officer had prior contact with Stanton. There is also no evidence that Stanton had alcohol or mental health issues and, regardless, no officer had any knowledge of such or reported observing Stanton experiencing the same.

24.          Defendant City admits that officers located a potential contact number but deny there was a request to make contact. Defendants further admit that Officer Ramic, pursuant to command instruction, sent over radio, "don't call yet."

25. – 28.        Defendants admit that for some time in the referenced period, Stanton and A.S. were inside and Defendants did not call Stanton. Defendants further admit that around the time referenced, Stanton exited and began firing his weapon or weapons again and that Defendant Dyk observed the same.

29. – 33.        Plaintiffs use an undefined term "de-escalating dialogue" and therefore Defendants deny that allegation absent additional information. Defendants admit PPB officers gave Stanton directives and that he ignored them, ultimately leveling his weapon toward the officers and firing. Defendants otherwise admit the sequence of events as similar to Plaintiffs' allegations.

34.        Defendants admit.

35. – 36.        Defendants admit that, in 2010, Defendant City invited the United States Department of Justice (DOJ) to investigate its Bureau of Police and make recommendations for improvements in its policies and procedures. DOJ conducted a lengthy review of police use of force in Portland and issued a findings letter in 2012, asserting that the Police Bureau had a pattern or practice of unconstitutionally using excessive force on people who either were, or were perceived to be, mentally ill or in mental health crisis. Defendant City denied, and continues to deny, that any such pattern or practice existed or exists. Defendant City nevertheless embarked on extended negotiations with DOJ to agree on improvements that the City could implement to improve the interactions between the police and people with mental illness or in mental health crisis, to enhance transparency, and further trust and legitimacy with the community. The United States and Defendant City reached a settlement agreement wherein the City agreed to make changes to its police policies, practices and training, and to enhance public oversight, transparency and accountability for incidents involving use of force by Portland Police. The agreement also provided for enhanced data collection and reporting. The City and the United States further agreed that DOJ could file, and then conditionally dismiss, a federal court action to ensure that the district court would have jurisdiction to enforce the parties' settlement

agreement, should that prove necessary.

Defendants further admit that, since 2012, Defendant City has revised its Use of Force policies and trainings in accordance with the settlement with the United States, and that those policies and trainings require de-escalation in appropriate circumstances. Further, Defendant City affirmatively alleges that the U.S. Department of Justice has reviewed and approved of these revisions to the City's Police Bureau's Use of Force policies and trainings. Otherwise, any documents, publications, or findings speak for themselves. Defendants otherwise deny any allegations inconsistent with the above.

37.        Any document referenced speaks for itself. Defendant City admits that there have been multiple officer involved shootings since 2003 and that PPB has disciplined some officers for some shootings.

a.        Defendant City admits that on May 5, 2003, shortly after 2:52 a.m., Officer Scott McCollister responded to a call for assistance on a traffic stop involving a driver and two passengers. The passenger in the rear seat of the vehicle was Kendra James. The officers took the driver and other passenger into custody without incident. Ms. James, however, resisted the efforts of the officers, refused to get out of the car, moved into the driver's seat, started the vehicle, and began to drive away. As the car lurched forward and began to move away, and believing he was about to be dragged under the moving vehicle and about to be killed or seriously injured, Officer McCollister shot Ms. James. Defendant City affirmatively alleges that subsequent to Ms. James' shooting, a federal court jury explicitly found no liability for Officer McCollister on the claim of excessive deadly force. Portland Police Bureau ("PPB") found Officer McCollister's actions to be a violation of PPB Directive 315.30, and the City imposed discipline on him by suspending him for 900 hours without pay. The Portland Police Association pursued an appeal of the City's decision to suspend Officer McCollister. An arbitrator who adjudicated the case ultimately ordered the City to expunge Officer

McCollister's suspension and give him back pay. Defendant City admits McCollister is currently a detective with the Police Bureau. Otherwise, Defendant City denies.

      b.      Defendant City admits that on March 24, 2004, at approximately 5:07 p.m., Officers Sean Macomber and Jason Sery stopped a motor vehicle driven by James Perez for a traffic violation and having unlawful tinted windows. During the traffic stop, Mr. Perez physically struggled with Officer Macomber, and ignored repeated commands from both officers to show his hands. Instead, during the physical struggle, Mr. Perez reached for the center console of the vehicle and then his right front pocket, while staring at and appearing to target Officer Macomber. After explicitly warning Perez that he would be shot if he did not show his hands and believing that Mr. Perez was reaching for a weapon about to shoot him and/or Officer Macomber, Officer Sery shot Perez. Later, it was learned Mr. Perez had a near lethal dose of cocaine in his system at the time of his death. Defendant City admits Officer Sery later resigned from the Portland Police Bureau, on information and belief, to work as a pastor. Defendant City lacks information sufficient at this time to admit or deny Jason Sery's present employment status, whether the bureau-imposed discipline, or whether Sery received any de-briefing or counseling after the shooting, and therefore deny those allegations. Defendant City affirmatively alleges that a Multnomah County Grand Jury returned a Not True Bill for Officer Sery of criminal wrongdoing. Defendant City affirmatively alleges that after the Grand Jury proceeding the Multnomah County District Attorney's Office convened a public inquest into the Perez shooting, which was supported by Portland Police Bureau Chief Derrick Foxworth. After the inquest, Chief Foxworth asked the Portland office of the Federal Bureau of Investigation to open a civil rights investigation into the Perez shooting.

      c.      Defendant City admits that on November 5, 2005, Officer Leo Besner heard a gunshot, which he believed came from Mr. Gwerder, and then later saw Mr. Gwerder pointing a firearm in a manner indicating that Gwerder was looking for

someone to shoot. Fearing for the safety of other officers and citizens, Besner then shot Mr. Gwerder.  Officer Besner was later promoted to sergeant. Defendant City lacks information sufficient at this time to admit or deny the remainder of the allegations and therefore deny.

d.      Defendant City admits that the allegations in this paragraph are nearly a verbatim recitation from Willamette Week and other articles. Defendant City further admits that on September 17, 2006, Officer Humphreys, Deputy Burton, and Sergeant Nice attempted to take Mr. Chasse into custody. During the attempted arrest, Mr. Chasse attempted to elude the officers and was brought to the ground. While on the ground Mr. Chasse violently resisted and fought against the officers, including attempting to bite them. Officers used focused strikes to subdue Mr. Chasse. At one point Mr. Chasse went limp but quickly regained composure. Nonetheless, officers called for medical assistance. AMR arrived and officers conveyed a history of the custody, including the physical engagement with Mr. Chasse. Mr. Chasse was cleared by AMR paramedics at the scene, as his vital signs were all within the normal range. Staff at MCDC declined to accept him into the jail because jail nurses observed a brief seizure like activity and his generally poor physical condition. He died while Portland Police officers were then transporting him to the hospital.

The remaining allegation in this paragraph do not relate to the parties, allegations, claims, or defenses and therefore do not require a response. To the extent a response is required, the Defendant City admits that at one point Saltzman was removed as commissioner, Sizer was fired, and Burton, Nice, and Humphreys worked for the PPB. Defendants are otherwise unaware of subsequent employment.

e.      Defendant City admits that on January 4, 2006, at approximately 2:17 a.m., Lt. Jeff Kaer was investigating a suspicious vehicle and suspected drunk driver. While stopped, but with the engine running, the driver Dennis Young failed to obey

Kaer's commands, put the car in gear, drove a short distance, ran over a curb, and crashed into a small tree. The driver suddenly put the car in reverse and drove the car directly at Kaer. Believing his life was in danger, Kaer fired two shots at the vehicle was he was side-stepping to his left to get out of the vehicle's path. PPB found Lt. Kaer's actions to be violations of PPB Directives 315.30 and 1010.10 and the City imposed discipline on Lt. Kaer by terminating Lt. Kaer's employment with the Portland Police Bureau. Defendant City admits that the Portland Police Commanding Officer's Association pursued an appeal of the City's decision to terminate Mr. Kaer. The arbitrator also awarded Mr. Kaer back pay. Defendant City admits that an arbitrator who adjudicated the case ultimately ordered the City to set aside Mr. Kaer's termination and instead impose a 30-calendar day suspension on Mr. Kaer. Defendant City otherwise denies the allegations contained in this paragraph.

   f.  Defendant City admits that January 29, 2010, PPB officers including Officer Ronald Frashour and Officer James Quackenbush responded to a welfare check call concerning Aaron Campbell. The caller stated that Mr. Campbell was suicidal and armed with a gun. Defendant City admits on information and belief that Aaron Campbell was African-American and that he was 25-years old at the time. Officers who responded confirmed that Mr. Campbell was inside an apartment with his three children. Officer Quackenbush established cell phone contact with Mr. Campbell. Mr. Campbell sent his children out of the apartment and then later exited the apartment himself, walking backwards with his hands on his head. Officer Ryan Lewton gave Mr. Campbell verbal commands and warnings that officers could potentially use force. Officer Lewton, believing that Mr. Campbell was not complying with those commands and warnings and also believing that Mr. Campbell was a threat because he was potentially armed and not complying, fired his less lethal shotgun at Mr. Campbell. Mr. Campbell then began running back toward the apartment. Officer Frashour, the AR-15 operator for the custody

Page 7 – DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' COMPLAINT

team, observed Mr. Campbell's left hand reaching into the back of his waistband while he was running. Believing that Mr. Campbell was armed, that there was a possibility that there could be people potentially still in the apartment and also believing that Mr. Campbell presented an immediate threat of death to officers on the scene, Officer Frashour fired his AR-15 at Mr. Campbell. Mr. Campbell died as a result of the shooting. PPB found Officer Frashour's actions to be violations of PPB Directives 315.30, 1010.10, and 1010.20, and the City imposed discipline on Officer Frashour by terminating Officer Frashour's employment with the Portland Police Bureau. The City also imposed discipline on other officers involved with the incident. Defendant City admits that the Portland Police Association pursued an appeal of the City's decision to terminate Mr. Frashour. Defendant City admits that an arbitrator who adjudicated the case ultimately ordered the City to reinstate Mr. Frashour to his former position as police officer and to make him whole for wages lost during the period of his unemployment. The City appealed the arbitrator's decision to the Employment Relations Board, who upheld the arbitrator's decision. The City then appealed the decision to the Oregon Court of Appeals, and the Court of Appeals also upheld the decision. Defendant City otherwise denies the allegations in this paragraph.

g.      Defendant City admits that on or about May 12, 2010, Portland Police Officers on the Hotspot Enforcement Action Team initiated a stop of a vehicle operated by Keaton Otis, who was exhibiting suspicious behavior and had committed multiple traffic infractions. The City admits on information and belief that Mr. Otis was African American and was 25-years old at the time. Defendant City lacks information sufficient at this time to admit or deny whether Mr. Otis was experiencing any mental health crisis and therefore deny that allegation. Officers stopped Mr. Otis's vehicle and approached him. Mr. Otis reacted with hostility to the officers and refused to comply with verbal commands to show officers his hands. Officers developed a plan to remove Mr. Otis from

the vehicle and handcuff him so officers could complete the traffic stop. An officer attempted to apply a control hold on Mr. Otis's left arm. Mr. Otis pulled away from the officer and reached towards the glove box of his vehicle. Mr. Otis then opened the glove box, retrieved a firearm, and shot the PPB officer who had previously attempted a control hold on Mr. Otis. Following that, PPB officers, perceiving a significant and immediate threat of death or serious bodily injury, shot and killed Mr. Otis. Defendant City admits that the incident was reviewed by and found within policy. Defendant City admits that no officer was disciplined. Defendant City otherwise denies the allegations contained in this paragraph.

   h. Defendant City admits that on June 30, 2011, Officer Dane Reister responded to reports of a suspicious person who was intoxicated and harassing children in a park. Officer Reister approached Mr. Monroe and observed Mr. Monroe holding a knife. Mr. Monroe then ran away from Officer Reister. Officer Reister chased Mr. Monroe for a short distance while giving him verbal commands. Because he was concerned that Mr. Monroe was armed and running towards a residential community, Officer Reister fired his less-lethal shotgun at Mr. Monroe, wounding him. Subsequent investigation revealed that Officer Reister had mistakenly loaded buckshot rounds into his less-lethal shotgun. The Oregon State Medical Examiner later identified shotgun wounds on Mr. Monroe's right buttock, the back of his left thigh, and a grazing wound to the front of his right thigh. Defendant City admits that the Portland Police Bureau investigated the incident. PPB found Officer Reister's actions to be violations of PPB Directives 315.30 and 1050.00 and the City imposed discipline on Officer Reister by terminating Officer Reister's employment with the Portland Police Bureau. Defendant City admits that the District Attorney pursued criminal charges of Assault in the Third Degree and Assault in the Fourth Degree against Mr. Reister. City Defendants admit that Mr. Reister died in 2015 and that the criminal case against him was on appeal at the time.

Page  9 – DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' COMPLAINT

Defendant City lacks information sufficient at this time to admit or deny whether Mr. Monroe was diagnosed with bipolar disorder or whether he was permanently disabled as a result of the shooting and therefore deny that allegation. Defendant City otherwise denies the allegations in this paragraph.

　　　　i.　　　Defendant City admits that on or about July 28, 2012, Billy Simms was implicated in a road-rage incident in which a handgun was discharged at an occupant of another vehicle. During the subsequent investigation, PPB officers including Officer Justin Clary located Mr. Simms' vehicle parked and unoccupied in the lot of a 7-Eleven store. PPB officers approached Mr. Simms and issued him verbal commands to stop and place his hands in the air. Mr. Simms did not comply, and instead entered the driver's side of his vehicle and attempted to flee the scene. PPB officers were able to move a police vehicle behind Mr. Simms' car to prevent him from backing out of the parking space. Mr. Simms then pulled his car forward and drove over the parking spot block and onto the store front sidewalk. Mr. Simms then drove directly at the officers, forcing one officer to lunge out of the way of the vehicle, and officers observed Mr. Simms reaching downwards for something in his vehicle and then reaching his right arm upwards from below the vehicle's dashboard. Officer Justin Clary, who was using an AR-15 rifle, believed that Mr. Simms was attempting to reach and fire a handgun. Believing that his life and the life of other officers were in danger, Officer Clary fired his AR-15 rifle at Mr. Simms, killing him. A .22 caliber pistol was found on Mr. Simms' body, inside of his waistband. An Oregon State Medical Examiner later found six gunshot wounds on Mr. Simms' body. Defendant City admits that it investigated the incident and concluded that no discipline of the involved offices was warranted, and therefore no discipline occurred. Defendant City otherwise denies the allegations contained in this paragraph.

　　　　j.　　　Defendant City admit that in 2013 Officer Hearst, along with two other Portland police officers, shot at Merle Hatch after Mr. Hatch had taken hostages at a local

hospital, was reported to have pointed a gun at persons in the hospital parking lot, and charged at Hearst and the other two police officers. Defendant City admits Mr. Hatch was killed during the encounter with the police. Defendant City admits the City did not impose discipline on Hearst or the other officers related to the shooting of Mr. Hatch. Defendant City lacks information sufficient at this time to admit or deny whether Mr. Hatch was experiencing any mental health crisis, and therefore denies that allegation. Defendant City otherwise denies the allegations contained in this paragraph.

      k.      Defendant City admits that on February 17, 2015, PPB officers including Sgt. Jose Gonzalez and Officer Charles Asheim conducted a mission to arrest Ryan Sudlow on outstanding felony warrants for probation violation and attempt to elude. After officers observed Mr. Sudlow driving into a Safeway gas station, officers boxed Mr. Sudlow's vehicle in at the gas station. Officer Asheim immediately exited his patrol vehicle, unholstered his gun, and began giving Mr. Sudlow verbal commands. In response, Mr. Sudlow accelerated his vehicle in reverse and then forward, hitting two police cars. Officer Asheim observed Mr. Sudlow reaching into the center console area of his vehicle and then holding a dark object. Believing that his life and the lives of others were in jeopardy, Officer Asheim fired one shot which did not penetrate the windshield of Mr. Sudlow's vehicle. Defendant City admits the police bureau investigated the incident and did not impose discipline on Officer Asheim, but the bureau debriefed and counseled him regarding the box-in and his communication with other officers during the incident. Defendant City otherwise denies the allegations contained in this paragraph.

      l.      Defendant City admits that on February 9, 2017, Portland police were searching for a suspect who committed armed robbery by pointing a gun in the face of the victim and threatened to shoot him, broke into and stole property from a parked car, trespassed into the backyard of a residential home, attempted entry into that home, lied to police officers who questioned his presence at the home, ran from those officers who

observed him to be holding an object at his waist as he ran away, trespassed into another backyard of a home while eluding police officers, broke into that home. Officers discovered Mr. Hayes as he exited the home he broke into. Officers directed him to crawl from the home on his hands and knees toward them. Officers instructed Mr. Hayes to lie prone for custody. Mr. Hayes began to reach toward his waist band as officers went to arrest him. As officers renewed their approach to arrest, Mr. Hayes again reached to his waistband as if for a weapon and Officer Hearst, the lethal cover officer, shot Mr. Hayes three times. Upon approach, officers discovered a realistic replica 9mm CZ P-09 handgun near Mr. Hayes's right hand. The IA investigation speaks for itself. Defendant City otherwise denies the remaining allegations in this paragraph.

m.      Defendant City admits that on July 30, 2019, PPB was dispatched to a 911 call regarding Mr. Martin casing vehicles, acting erratically, and threatening the caller and nearby citizens with a weapon in the area of NE 122nd Ave and NE Davis St. Mr. Martin was reported as having a knife in his pocket and carrying a hatchet. When officers arrived they observed Mr. Martin menacing pedestrians with the raised hatchet and claiming to be a federal agent. Officers described Mr. Martin as "seething angry." The officers attempted to communicate with Mr. Martin from a safe distance and tried to de-escalate the situation, but were met with threats, menacing of the hatchet, and incoherent statements about murder and federal agents. Mr. Martin then began to run away, still wielding the hatchet and in possession of the pocket knife. Multiple officers followed Mr. Martin from a safe distance as they attempted to de-escalate. Officers were unable to establish any line of communication with Mr. Martin and Mr. Martin ignored all commands.

Officers continued to use de-escalation communication, and eventually used less lethal tools without success or compliance from Mr. Martin. Instead, he answered with intense anger, aggression, threats of murder, statements that he had cut his girlfriend's

head off and put it in a box, statements that he was a federal agent, and menacing with the hatchet. After being struck a second time with a less lethal round, Mr. Martin again ran away, dropping the hatchet, but keeping the knife. At one point, Mr. Martin turned back toward police again threatening a fight. Consistent with his training, as Mr. Martin ignored commands and approached in a threatening and deadly manner, Officer Doran fired an initial burst of four to five bullets at Mr. Doran. The shots did not stop Mr. Martin's approach or behavior so, consistent with training, he fired another burst of four to five bullets. The last burst was successful in stopping Mr. Martin. Other officers were about to fire but waited until the outcome of Officer Doran's shots. Officer Doran was not disciplined and the IA file speaks for itself. Defendant City otherwise denies the allegations contained in this paragraph.

       n.        Defendant City admits that on April 16, 2021, Police encountered Mr. Delgado in Lents Park. They responded to a call of an individual doing quick draws and pointing a handgun in the park. One of the responding officers, DeLong, attempted to communicate with Mr. Delgado and deescalate the situation. Instead, the situation escalated and Mr. Delgado became more threatening and aggressive, threatening to shoot and kill the officers. When Mr. Delgado pulled a replica weapon and pointed it at the officers, Officer DeLong believed Delgado was about to shoot at the officers and therefore fired, striking and killing Delgado. Officer Delong was not disciplined and later became a detective.

38. – 39.      Defendant City denies.

**CLAIMS FOR RELIEF**

**FIRST CLAIM, DEFENDANTS JOSHUA DYK AND CITY OF PORTLAND**

**Estate's Claim of Violation of 4th Amendment; 42 U.S.C. §1983; Excessive Deadly Force**

    40.        Defendants adopt the responses to Plaintiffs' allegations in paragraphs 1-39.

    41.        Defendants admit.

**Count 1: Individual Liability of Joshua Dyk**

42.          This paragraph contains legal conclusions or opinions to which a response is not required. To the extent a response is required, deny.

**Count 2: Municipal Liability Custom and Practice of Failure to Investigate and Discipline for Use of Excessive Deadly Force**

43.          This paragraph contains legal conclusions or opinions to which a response is not required. To the extent a response is required, deny.

**Relief Sought**

44. – 45.      These paragraphs contain legal conclusions or opinions to which a response is not required. To the extent a response is required, deny.

### SECOND CLAIM, DEFENDANT CITY OF PORTLAND, ONLY

#### State Law Claim of Estate for Wrongful Death/Battery

46.          Defendant City adopts its responses to Plaintiffs' allegations in paragraphs 1-39 above.

47.          Defendant City admits Officer Dyk intentionally shot Stanton.

48.          This paragraph contains legal conclusions or opinions to which a response is not required. To the extent a response is required, deny.

### THIRD CLAIM, DEFENDANT CITY OF PORTLAND, ONLY

#### State Law Claim of Estate for Wrongful Death/Negligence

49.          Defendant City adopts its responses to Plaintiffs' allegations in paragraphs 1-39 above.

50.          This paragraph, and its subparts, contain legal conclusions or opinions to which a response is not required. To the extent a response is required, deny.

51.          This paragraph contains legal conclusions or opinions to which a response is not required. To the extent a response is required, deny.

/ / /

**FOURTH CLAIM FOR RELIEF, DEFENDANT CITY OF PORTLAND, ONLY**

**State Law Claim of A.S. for Intentional Infliction of Emotional Distress**

52.        Defendant City adopts its responses to Plaintiffs' allegations in paragraphs 1-39 above.

53.        Defendant City admits that officers placed A.S. in their care until she could be united with her family. Defendant City otherwise denies any such statement, as alleged, was made by any officer or agent of the City.

54. – 56.        These paragraphs contain legal conclusions or opinions to which a response is not required. To the extent a response is required, deny.

**FIFTH CLAIM FOR RELIEF, DEFENDANT CITY OF PORTLAND, ONLY**

**State Law Claim of A.S. for Negligent Infliction of Emotional Distress**

57.        Defendant City adopts its responses to Plaintiffs' allegations as presented above.

58.        Defendant City admits A.S. was in the driveway at the time of the shooting. Defendant City is without sufficient information to admit or deny the remaining allegations and therefore denies.

59.        Defendant City is without sufficient information to admit or deny the allegations in this paragraph and therefore denies.

60.        This paragraph contains legal conclusions or opinions to which a response is not required. To the extent a response is required, deny.

**Damages**

61.        Defendants lack sufficient information at this time to admit or deny the nature or extent of Plaintiffs' alleged damages, and therefore deny those damages.  In any event, Defendants deny that they are legally responsible for any such damages.

62.        Except as expressly admitted above, Defendants deny each and every remaining allegation of Plaintiffs' Complaint, because those allegations are untrue, or because

Defendants are without knowledge or information sufficient to form a belief as to the truth of those allegations at the present time. Defendants specifically deny that their actions were unreasonable or unlawful in any manner.

63.          Defendants request a jury trial.

### FIRST AFFIRMATIVE DEFENSE

(Failure to State a Claim)

64.          Plaintiffs have failed to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

(Qualified Immunity)

65.          Officer Dyk is entitled to qualified immunity from liability under 42 USC § 1983 because he acted in good faith, and a reasonable police officer in his situation would not have known that any of his actions would violate a clearly established constitutional or federally protected right of Plaintiffs.

### THIRD AFFIRMATIVE DEFENSE

(Objective Reasonableness)

66.          Officer Dyk's use of lethal force against Aaron Stanton was objectively reasonable under the totality of the circumstances because Mr. Stanton's conduct and actions created an immediate threat of death or serious bodily injury to other officers, civilians, and himself.

### FOURTH AFFIRMATIVE DEFENSE

(Justification-Common Law)

67.          Any use of control or force by Officer Dyk or any of the City's other police officers was justified, as those actions were necessary to carry out their duties as law enforcement officers.

### FIFTH AFFIRMATIVE DEFENSE

(Privilege)

68.          Any use of control or force by Officer Dyk or any of the City's other police

officers was privileged, as those actions were necessary to carry out their duties as law
enforcement officers.

## SIXTH AFFIRMATIVE DEFENSE

### (Good Faith)

69.          Any use of control or force by Officer Dyk or any of the City's other
police officers was done in good faith.

## SEVENTH AFFIRMATIVE DEFENSE

### (Self-Defense)

70.          Officer Dyk was justified and privileged to use lethal force to protect
himself from a reasonable belief of an immediate threat of death or serious bodily injury from
Mr. Stanton.

## EIGHTH AFFIRMATIVE DEFENSE

### (Defense of Others)

71.          Officer Dyk was justified and privileged to use lethal force to protect other
persons from a reasonable belief of an immediate threat of death or serious bodily injury from
Mr. Stanton.

## NINTH AFFIRMATIVE DEFENSE

### (Comparative Fault - ORS 31.600 – Decedent Mr. Stanton)

72.          Defendants are not at fault in the action pled by Plaintiffs because the death of
Mr. Stanton was his sole and exclusive fault. Plaintiffs' injuries and resulting damages, if any,
were caused, in whole or substantial part, by Mr. Stanton's own criminal, reckless and negligent
actions as follows:

          (a)     Firing a long rifle and handgun in a heavily populated area, creating a
          threat of serious bodily injury or death to the public;

          (b)     Firing a long rifle and handgun in a heavily populated area, creating public
          alarm;

(c)      Failing to obey the lawful commands of uniformed police officers to drop his weapon/s;

(d)      Failing to obey the lawful commands of uniformed police officers to stop firing his weapon/s;

(e)      Failing to obey the lawful commands of uniformed police officers by firing at police officers; and

(f)      In consuming or abusing substances so as to affect his judgment and decision-making.

## TENTH AFFIRMATIVE DEFENSE

### (ORS 31.180 – Certain Felonious Conduct as Bar to Civil Action)

73.      Plaintiffs' state law claims are barred by ORS 31.180, as Mr. Stanton's felonious conduct was a substantial factor contributing to his death.

## ELEVENTH AFFIRMATIVE DEFENSE

### (Oregon Tort Claims Act – ORS 30.260 *et seq.*)

74.      Plaintiffs' claims are subject to all limitations, conditions, and immunities contained in Oregon's Tort Claims Act, ORS 30.260 *et seq.*

## TWELFTH AFFIRMATIVE DEFENSE

### (No Duplicative Damages)

75.      Plaintiffs are not entitled to recover duplicative damages.

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Right to Assert Additional Affirmative Defenses)

76.      Defendants reserve the right to assert additional affirmative defenses which discovery or other investigation may determine to be appropriate.

/ / /

/ / /

/ / /

WHEREFORE, having fully answered Plaintiffs' Complaint, Defendants ask for the following relief:

A.      That judgment be entered in favor of Defendants and against Plaintiffs;

B.      That Defendants be awarded their reasonable costs incurred herein; and

C.      That Defendants be awarded such other relief as the Court deems just and equitable.

DATED: July 8, 2024.

Respectfully submitted,

*/s/ Carey Caldwell*
Carey Caldwell, OSB #093032
Deputy City Attorney
carey.caldwell@portlandoregon.gov
William W. Manlove, OSB #891607
Senior Deputy City Attorney
william.manlove@portlandoregon.gov
*Of Attorneys for Defendants*