Carey Caldwell, OSB #093032
Deputy City Attorney
carey.caldwell@portlandoregon.gov
Caroline Turco, OSB #083813
Senior Deputy City Attorney
caroline.turco@portlandoregon.gov
Portland City Attorney's Office
1221 SW 4th Ave., Rm. 430
Portland, OR 97204
Telephone: (503) 823-4047
Facsimile: (503) 823-3089
*Of Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| ESTATE OF AARON D. STANTON, BY DOUGLAS STANTON, PERSONAL REPRESENTATIVE, AND A. S., A MINOR, BY AND THROUGH HER GUARDIAN AD LITEM, DOUGLAS STANTON,<br><br>        PLAINTIFFS,<br><br>    v.<br><br>JOSHUA DYK and CITY OF PORTLAND,<br><br>        DEFENDANTS. | 3:23-cv-01767-AN<br><br>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>**(REQUEST FOR ORAL ARGUMENT)** |

# TABLE OF CONTENTS

**MOTION** ................................................................................................................ 1


**MEMORANDUM OF LAW** ...................................................Error! Bookmark not defined.

I.    INTRODUCTION ............................................................................................. 2
II.   FACTUAL BACKGROUND .............................................................................. 2
    **A.    Actions Subsequent to Shooting.** ........................................................... 7
    **B.    Mr. Stanton's History.** .......................................................................... 8
    **C.    Subsequent Investigation and Discipline.** ............................................. 9
III.  LEGAL STANDARD ....................................................................................... 10
IV.   ARGUMENT .................................................................................................... 12
    **A.    Officer Dyk's Use of Force Was Reasonable.** ....................................... 13
        *i.    Mr. Stanton Was an Immediate Threat.* ........................................ 14

        *ii.   More Warnings and Less Force Was Not Feasible.* ......................... 16

        *iii.  Any Mental Health or Intoxication Was not Material.* ..................... 17

    **B.    Officer Dyk is Entitle to Qualified Immunity.** ...................................... 17
    **C.    Plaintiffs Cannot State a Monell Claim.** .............................................. 19
        *i.    Felonious Conduct.* ....................................................................... 20

        *ii.   Justification.* ................................................................................. 22

    **E.    Defendants Did not Cause Mr. Stanton to Point His Gun at Police.** ......... 23
    **F.    Plaintiffs Cannot Support an IIED Claim.** ........................................... 25
        *i.    The Evidence Does Not Support an IIED Claim.* .............................. 25

        *ii.   The Allegation Is Not Sufficiently Outrageous to Support an IIED Claim.* ..... 29

    **G.    Plaintiffs Cannot Support an NIED Claim.** ........................................... 29


**CONCLUSION** ..................................................................................................... 30

# TABLE OF AUTHORITIES

Federal Cases

*Addison v. City of Baker City*,
258 F. Supp. 3d 1207 (D. Or. 2017) ........................................................ 10

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ................................................................ 10, 11

*Arpin v. Santa Clara Valley Transp. Agency*,
261 F.3d 912 (9th Cir. 2001) ........................................................ 11

*Bryan v. MacPherson*,
630 F.3d 805 (9th Cir. 2010) ........................................................ 17

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ................................................................ 10, 11

*City & Cnty. of San Francisco, Calif. v. Sheehan*,
135 S. Ct. 1765 (2015) ........................................................ 16, 17, 18

*City of Escondido v. Emmons*,
139 S. Ct. 500 (2019) ................................................................ 18

*City of Los Angeles v. Heller*,
475 U.S. 796 (1986) ................................................................ 19

*Crawford-El v. Britton*,
523 U.S. 574 (1998) ................................................................ 11

*Cruz v. City of Anaheim*,
765 F.3d 1076 (9th Cir. 2014) ........................................................ 16

*District of Columbia v. Wesby*,
138 S. Ct. 577 (2018) ........................................................ 18, 19

*Dougherty v. City of Covina*,
654 F.3d 892 (9th Cir. 2011) ........................................................ 19

*Elifritz v. Fender*,
460 F. Supp. 3d 1088 (D. Or. 2020) ........................................................ 20, 23

*Est. of Strickland v. Nevada Cnty.*,
69 F.4th 614 (9th Cir. 2023) ........................................................ 16

*Estate of Lopez ex rel. Lopez v. Gelhaus*,
871 F.3d 998 (9th Cir. 2017) ........................................................ 15, 17

*Forrester v. City of San Diego*,
25 F.3d 804 (9th Cir. 1994) ........................................................ 13

*George v. Morris*,
736 F.3d 829 (9th Cir. 2013) ........................................................ 16

*Glenn v. Wash. Cty.*,
673 F.3d 864 (9th Cir. 2011) ........................................................ 13, 14

*Gonzalez v. City of Anaheim*,
747 F.3d 789 (9th Cir. 2014) ........................................................ 14

*Graham v. Connor*,
490 U.S. 386 (1989) ........................................................ 13, 14, 15

*Hicks v. City of Portland*,
No. CV 04–825–AS, 2006 WL 3311552 (D. Or. Nov. 8, 2006) ........................................................ 11

*Horton v. City of Santa Maria,*
  915 F.3d 592 (9th Cir. 2019) ................................................................ 19
*Hughes v. Kisela,*
  841 F.3d 1081 (9th Cir. 2016) .............................................................. 15
*Jimmie's Limousine Service, Inc. v. City of Oakland, No. C,*
  04-03321 WHA, 2005 WL 2000947 (N.D. Cal. Aug. 18, 2005)............. 12
*Keenan v. Allen,*
  91 F.3d 1275 (9th Cir. 1996) ................................................................ 12
*Kisela v. Hughes,*
  138 S. Ct. 1148 (2018)..................................................................... 15, 18
*Lal v. California,*
  746 F.3d 1112 (9th Cir. 2014) ........................................... 15, 16, 17, 24
*Los Angeles v. Mendez,*
  137 S. Ct. 1539 (2017)........................................................................... 14
*Lowry v. City of San Diego,*
  858 F.3d 1248 (9th Cir. 2017) .............................................................. 15
*Martinez v. City of Los Angeles,*
  No. 2:23-cv-09491-SVW-SK, 2024 WL 4438889 (C.D. Cal. June 20, 2024) ...... 11
*Mattos v. Agarano,*
  661 F.3d 433 (9th Cir. 2011) ................................................................ 14
*Miller v. Clark Cty.,*
  340 F.3d 959 (9th Cir. 2003) ................................................................ 13
*Mullenix v. Luna,*
  136 S. Ct. 305 (2015)............................................................................. 18
*S.B. v. Cty. of San Diego,*
  864 F.3d 1010 (9th Cir. 2017) ......................................................... 14, 18
*Sabbe v. Washington Cnty. Bd. of Commissioners,*
  84 F.4th 807 (9th Cir. 2023) ................................................................. 14
*Saberi v. City of Portland,*
  2006 WL 2707995 (D. Or. Sept. 18, 2006) .......................................... 30
*Saucier v. Katz,*
  533 U.S. 194 (2001)............................................................................... 18
*Scott v. Harris,*
  550 U.S. 372 (2007)............................................................................... 14
*Scott v. Henrich,*
  39 F.3d 912 (9th Cir. 1994) .................................................................. 15
*Scouller v. Maxfield,*
  No. Civ. 01-431 HA, 2003 WL 194690 (D. Or. Jan. 16, 2003) ....... 22, 23
*Sereno-Morales v. Cascade Food Inc.,*
  819 F. Supp. 2d 1148 (D. Or. 2011) ..................................................... 11
*Sinaloa Lake Owners Ass'n,*
  70 F.3d 1095 (9th Cir. 1995) ................................................................ 22
*Smith v. City of Hemet,*
  394 F.3d 689 (9th Cir. 2005) ................................................................ 14
*Smith v. City of Los Angeles,*
  686 F. App'x 509 (9th Cir. 2017) ......................................................... 11

*Soremekun v. Thrifty Payless, Inc.*,
   509 F.3d 978 (9th Cir. 2007) ........................................................................ 11
*Sternberg v. Town of Danville*,
   2015 WL 9024340 (N.D. Cal. Dec. 16, 2015) ........................................... 19
*Tennessee v. Garner*,
   471 U.S. 1 (1985) ......................................................................................... 13
*United States v. Carmichael*,
   232 F.3d 510 (6th Cir.2000) ....................................................................... 28
*United States v. Joe*,
   8 F.3d 1488 (10th Cir.1993) ....................................................................... 29
*United States v. Lentz*,
   282 F. Supp. 2d 399 (ED Va. 2002) ........................................................... 28
*White v. Pauly*,
   137 S. Ct. 548 (2017) .............................................................................. 17, 18

State Cases

*Clemente v. State*,
   227 Or. App. 434 (2009) ............................................................................. 26
*Delaney v. Clifton*,
   180 Or. App. 119 (2002) ............................................................................. 26
*Denton v. Arnstein*,
   197 Or. 28 (1952) ............................................................................. 22, 29, 30
*Harryman v. Fred Meyer, Inc.*,
   289 Or App 324 (2017) ............................................................................... 21
*House v. Hicks*,
   218 Or. App. 348 (2008) ......................................................................... 26, 29
*Kasnick v. Cooke*,
   116 Or App 580 (1992) ............................................................................... 29
*Kraemer v. Harding*,
   159 Or. App. 90 (1999) ............................................................................... 26
*McGanty v. Staudenraus*,
   321 Or. 532 (1995) ...................................................................................... 26
*Patton v. J. C. Penney Company*,
   301 Or. 117 (1986) ...................................................................................... 26
*Schiele v. Montes*,
   231 Or. App. 43 (2009) ............................................................................... 26
*Schoen v. Freightliner LLC*,
   224 Or. App. 613 (2008) ............................................................................. 26
*Shay v. Paulson*,
   131 Or. App. 270 (1994) ............................................................................. 29
*Son v. Ashland Cmty. Healthcare Servs.*,
   239 Or. App. 495 (2010) ............................................................................. 23
*State v. Oliphant*,
   347 Or. 175 (2009) ...................................................................................... 22
*State v. Smith*,

21 Or. App. 270 (1975) ................................................................................................ 21

State Statutes

ORS 31.180 ................................................................................................... 20, 21, 23
ORS 161.085(7) .......................................................................................................... 21
ORS 161.209 .............................................................................................................. 22
ORS 161.219 .............................................................................................................. 22
ORS 161.239 .............................................................................................................. 23
ORS 161.242 ........................................................................................................ 22, 23
ORS 161.242(2) .......................................................................................................... 22
ORS 161.405(2)(b) ..................................................................................................... 21
ORS 163.107(1)(g) ..................................................................................................... 21
ORS 163.107(1)(g)(a) ................................................................................................. 21
ORS 163.118(1) .......................................................................................................... 21
ORS 163.118(1)(a), (b) .............................................................................................. 21
ORS 163.185(1) .......................................................................................................... 21
ORS 163.185(1)(a) ..................................................................................................... 21
ORS 166.220 .............................................................................................................. 15

Federal Rules

Fed. R. Civ. P. 56 ......................................................................................................... 1
Fed. R. Civ. P. 56(a) ............................................................................................... 1, 10
Fed. R. Evid. 802 ....................................................................................................... 28
FRCP 30(b)(6) ........................................................................................................ 4, 25
FRE 803 ...................................................................................................................... 28

Other Authorities

Pursuant to,
L.R. 7-1 ......................................................................................................................... 1
Restatement (Second) of Torts §8A (1965) .............................................................. 26

**L.R. 7-1 Certification**

Pursuant to L.R. 7-1(a), counsel for Defendants City of Portland and Joshua Dyk ("Defendants") certify conferral with Plaintiffs' counsel multiple times to resolve the claims but were unable to do so.

**MOTION**

Pursuant to Fed. R. Civ. P. 56(a), Defendants move the Court for Summary Judgment in their favor because there is no genuine issue of material fact and they are entitled to summary judgment as a matter of law. The Court should dismiss all of Plaintiffs' claims against Defendants for the following reasons:

1. Defendant Dyk acted objectively reasonably when using force against Mr. Stanton and did not violate Mr. Stanton's Fourth Amendment rights (Claim 1, Count 1; Claim 2; Claim 5);

2. Defendant Dyk did not violate any clearly established rights of Mr. Stanton so he is entitled to Qualified Immunity (Claim 1, Count 1, Count 2);

3. Defendant Dyk did not violate Mr. Stanton's Fourth Amendment rights and Plaintiffs have no evidence the City has a policy or practice of deliberate indifference that caused injury (Claim 1, Count 2);

4. The City was not negligent and did not cause Mr. Stanton death; he is the but for cause of his own death (Claim 3, Claim 5);

5. Plaintiffs have no admissible evidence to support any allegations to support Intentional Infliction of Emotional Distress (Claim 4); and

6. Defendant Dyk's actions to prevent an immediate threat of death or serious bodily harm preclude a claim for negligent infliction of emotional distress (Claim 5).

This Motion is based on Fed. R. Civ. P. 56, the Court's file and records, the below Memorandum of Law, and the Declarations of Carey Caldwell, John Bartlett, Jeffrey Bell, Joshua Dyk, Gabri Hertzler, Dominic Lovato, Mark Piombo, Lino Pavon, Adi Ramic, Brian

Page  1 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Sims and Nicholas Wambold, and related exhibits.

## **MEMORANDUM OF LAW**

### I.    INTRODUCTION

On a summer evening in July of 2022, in a densely populated area of Southeast Portland, Aaron Stanton walked outside and started firing high powered guns into the neighborhood. He switched back and forth between a semi-automatic AR-15 style rifle and 9mm handgun. Mr. Stanton's six-year-old daughter was next to him, moving around as he continued to fire.

The Bureau of Emergency Communications ("BOEC") began to receive numerous 911 calls. Police dispatched in response to the dangerous situation of a man repeatedly firing a gun in the neighborhood with a little girl nearby. When police were able to contact Mr. Stanton and instruct him to put down his weapon, he was defiant and aggressive, refused to give up his gun, and instead hurled insults. Ultimately, after further commands to put down his gun and surrender, Mr. Stanton pointed his gun at a group of officers huddled behind a car in the driveway of a home and fired. As Mr. Stanton pointed his gun at those officers, Defendant Officer Dyk, seeing that Mr. Stanton represented an immediate threat of death or serious bodily harm to the officers, fired one shot from his rifle to protect those officers and any neighbors that were in the houses near the officers. Two other officers would have fired as well but the little girl was between them and Mr. Stanton. The undisputed evidence demonstrates that the actions of Officer Dyk, and other officers, were objectively reasonable, and therefore constitutional under the Fourth Amendment, and justified under Oregon law. There is also no evidence to support any officer made anything other than comforting comments to the minor child. The Court should grant summary judgment to Defendants with respect to each of Plaintiffs' claims.

### II.    FACTUAL BACKGROUND

None of the underlying facts are in dispute in this matter. Those facts begin shortly after 8:15 on the evening of July 27, 2022, when 911 calls began to pour into BOEC. (*See* ECF 1, Complaint, ¶17). The callers reported gun shots fired at or near Southeast 126th Avenue between

Page  2 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Burnside and Stark. (*Id.*). Within minutes officers dispatched, with Officer Lino Pavon as the initial lead officer. (*Id.*, ¶19; Declaration of Lino Pavon (Pavon Dec), ¶4).

Approximately 10 minutes after the first 911 call, Officer Pavon set up a staging area on Southeast 122nd and Burnside for officers to gather and begin to form a plan to respond to the call. (Pavon Dec. ¶4; ECF 1, Complaint, ¶17). As officers arrived, they began to assist in gathering information and to formulate a plan on how to approach the situation. (*Id.*, ¶5; Declaration of Mark Piombo (Piombo Dec.), ¶4; Declaration of Joshua Dyk (Dyk Dec.), ¶7; Declaration of John Bartlett (Bartlett Dec.), ¶7; Declaration of Carey Caldwell (Caldwell Dec.), Ex. 1, Michael Pool Deposition (Pool Depo.), p.46:6-8).

Members of the Focused Intervention Team heard the call and variously began to drive to the staging area to assist assigned East Precinct officers. (*See* Bartlett Dec., ¶6; Declaration of Dominic Lovato (Lovato Dec.), ¶4). The Focused Intervention Team ("FIT") responds City wide to calls that involve gun violence. (*Id.*, ¶3).

Officers Dominic Lovato and Gabe Hertzler, FIT members, responded to the call together in a partner car. As they drove to the staging area, they discussed potential strategy, including contingencies and tolerances in approach to the shooting individual. (Declaration of Gabri Hertzler (Hertzler Dec.), ¶6; Lovato Dec., ¶5; Caldwell Dec., Ex. 2, Deposition of Gabri Hertzler (Hertzler Depo.), p.41:2-9; Caldwell Dec., Ex. 3, Deposition of Dominic Lovato (Lovato Depo.), p.48:15-22).

As Officers Lovato and Hertzler drove to the staging area at 122nd, the officers there heard numerous gun shots from the direction of 126th. (Piombo Dec., ¶4; Bartlett Dec., ¶8; Pavon Dec., ¶5; Caldwell Dec., Ex. 1, Pool Depo., p.45:21-23). Based on the escalating danger of a person shooting multiple rounds in a densely populated area, officers decided to move closer to the shooter to initiate containment, try to acquire additional information, assess any medical needs, and get eyes on the shooter. (Piombo Dec., ¶4; Bartlett Dec., ¶8; Pavon Dec., ¶5; Dyk Dec., ¶8).

Around that same time PPB Air support's plane ("AIR1") arrived on scene to provide information from above about the location of the shooter. (Lovato Dec., ¶18; Caldwell Dec., Ex.

Page 3 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1, Pool Depo, p.47:6-7; ECF 1, Complaint, ¶20). AIR1 reported that it saw the individual fire more than 30 shots. (*Id.*).

Many officers reconvened north of the shooting individual on 126th, including, but not limited to, Officers Pavon, Bartlett, Dyke, Piombo, Hertzler, Lovato, and Wambold, as well as Sergeants Townley and Pool. Sergeant Pool then did a consult with the Special Emergency Reaction Team ("SERT"). (*Id.*, p.47:17-19). There were too many unknown variables to activate SERT at that time – they had no confirmation of the shooting individual's identity, his precise residence, no confirmation of his condition, whether reports of a woman in the house were accurate, or that a little girl was with him. (*Id.*, pp.45:14-16, 57:4-9).

Around the same time, Officers Pavon and Piombo, each with a rifle, utilized cover to travel south on 126th and scout a location to put eyes on the individual. (Pavon Dec., ¶6). Officer Lovato moved with a ballistic shield to join with Pavon and Piombo as well as Officers Bartlett and Wambold with the intent to form a contact team. (Lovato Dec., ¶¶6, 8; Caldwell Dec., Ex. 3, Lovato Depo., p.60:4-7). Those five officers then moved together behind a vehicle in the driveway of a home approximately 70-80 yards northeast and across the street from the presumed location of the shooter. (Lovato Dec., ¶7; Bartlett Dec., ¶10; Pavon ¶¶7, 8; Piombo Dec., ¶6). This positioning provided the primary components of de-escalation in that there was distance and cover. (Bartlett Dec., ¶10; Caldwell Dec., Ex. 4, FRCP 30(b)(6) Deposition of Chase Bryson (Bryson 30(b)(6) Depo.), pp.34:25-35:9)

The team had a discussion behind the vehicle and each officer on the team had an assigned role: Lovato would be the sole communicator should they make contact with the individual; Bartlett would be less lethal operator with his 40mm if necessary or appropriate, as well as radio any updates from the team; Wambold had binoculars and would provide more detailed information to the team, and Pavon and Piombo would be lethal cover with their rifles. (*See* Lovato Dec., ¶¶8-13; Bartlett Dec., ¶¶11-14). The team discussion included similar evaluation as engaged in by Lovato and Hertzler previously; namely, contingencies around the individual's behavior, including

Page  4 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

potentially tolerating some shooting into the air, potential custody, instructions, and various other components they may encounter, including use of force. (*See id.*, ¶¶11-14; Lovato Dec., ¶¶8-14). All officers understood and agreed with the plan. (*Id.*, ¶¶14).

Just up the street, during the infancy of the Lovato team discussion, Officers Hertzler and Dyke, who had rifles, conferred with FIT team leader Sergeant Townley. They discussed finding a concealed position closer to the individual's location to assist Lovato's team. (Hertzler Dec., ¶7; Dyk Dec., ¶11). Dyk and Hertzler then moved to Lovato's team behind the vehicle and joined in the contingency discussion. (Dyk Dec., ¶12; Hertzler Dec., ¶8). They then moved east and proceeded south through back yards until they took a concealed position behind the fence of a house across the street from where they believed the shooter to be. (*Id.*; Dyk Dec., ¶13).

At this point Officer Lovato relied on information from Officers Hertzler and Dyk, AIR1, and the remainder of his team behind the vehicle. He reiterated his plan over the air so that other officers on scene would understand his plan. (Lovato Dec., ¶17). He also used AIR1 to assist in understanding the scene. (*Id.*, ¶18). At that time, no contingent of the team, be it the officers behind the car, or Hertzler and Dyk across from a home, could see the individual.

Ultimately the shooter followed a little girl through the front door, out of the house. (Wambold Dec., ¶10). None of the officers behind the vehicle or fence knew his name as Aaron Stanton at that time. With his binoculars Officer Wambold could see a gun tucked into the individual's waistline and shared that with his team. (*Id.*). Once Lovato saw the individual, Lovato identified himself as Portland Police, gave the person direction to put down his weapon, instructed the person to slowly come to him with his hands up, and provided force warnings. (Wambold Dec., ¶11; Piombo Dec., ¶8; Pavon Dec., ¶10; Bartlett Dec., ¶17; Lovato Dec.; ¶19). In response, the individual yelled, "Suck my dick!" and "Fuck You" at the police, pulled out a gun and fired multiple shots. (Wambold Dec., ¶12; Piombo Dec., ¶¶9-10; Pavon Dec., ¶10; Bartlett Dec., ¶17; Dyk Dec., ¶15; Hertzler Dec., ¶10). The bullets were in the direction of Dyk and Hertzler but over their heads. (Dyk Dec., ¶15). Dyk was concerned that the person may shoot

Page  5 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

him, but did not fire at the person at that time as he did not believe the person could see him. (*Id.*). The little girl was right next to the person at the time he yelled at police then fired. (*See* Bartlett Dec., ¶17). Lovato again gave warnings and instruction. (Lovato Dec., ¶23). At one point the person went back in the house, then reemerged with the gun and fired again. (*See* Pavon Dec., ¶11). The little girl remained near him the entire time.

Approximately three minutes after the team first laid eyes on the individual and Lovato first gave him instruction to surrender with warnings, the individual again fired the gun. (ECF 1, Complaint, ¶¶29-30). The little girl left the porch at that time. (*Id.*; Dyk Dec., ¶17). Lovato again gave instruction and force warnings. (Lovato Dec., ¶23). The individual again yelled profanities at the officers and refused to comply with Lovato's instructions. (*See* Caldwell Dec., Ex. 5, Witness Video (warning – graphic)). At that time all the officers behind the vehicle and Officer Dyk saw the individual point the gun at the officers behind the vehicle. (Wambold Dec., ¶15; Piombo Dec., ¶11; Pavon Dec., ¶16; Lovato Dec., ¶24; Bartlett Dec., ¶19; Dyk Dec., ¶19). All the officers who saw that believed he represented an immediate threat of death or serious bodily injury. (Dyk Dec., ¶¶23, 24; Bartlett Dec., ¶20; Pavon Dec., ¶16; Piombo Dec., ¶¶11, 13; Wambold Dec., ¶15). Because all of the officers behind the vehicle believed the shooter posed an immediate threat of death or bodily injury they ducked or crouched behind the vehicle for more cover. (*See* Piombo Dec., ¶13). Both Piombo and Pavon would have used lethal force at that time but the little girl was between them and the individual and Wambold had told them something to the effect of 'no shot' based on her vicinity. (Piombo Dec., ¶12; Pavon Dec., ¶16).

At that time, Officer Dyk knew the little girl was off the porch, to the north and no longer close to the individual. (Dyk Dec., ¶17). He had a clear view of the individual, saw him focus on the team behind the vehicle, hurl insults and profanities at them with aggression and disdain, and ignore their instructions and warnings. (*Id.*, ¶¶19, 21). Dyk had seen him fire the gun into the neighborhood, even over his own head, and was using real bullets and those bullets were coming down somewhere. (*Id.*, ¶20). The manner in which the individual pointed the gun this time was

different than those other times. (*Id.*, ¶22). Dyk reasonably believed, along with the other offices, that with this shot, the individual was pointing his gun at the officers to kill them. (*Id.*, ¶23).

Consistent with the team behind the vehicle and Dyk's beliefs, the individual fired at the officers. (*See* Bartlett Dec., ¶19; Pavon Dec., ¶15; Wambold Dec., ¶15). Officer Bartlett immediately heard the loud thud of a bullet strike near their position. (Bartlett Dec., ¶19).

Just after the individual fired at the officers, Dyk fired a lethal shot to protect the officers behind the vehicle and any community members that may have been in the houses behind and near them. (Dyk Dec., ¶¶23, 24).

### A.     Actions Subsequent to Shooting.

Just before Officer Dyk shot Mr. Stanton, Officer Hertzer moved south to find a better position. (Hertzler Dec., ¶11). As he approached a different portion of fence, he heard a shot. (*Id.*). When he looked at Mr. Stanton's home, he saw the individual down on the porch and the little girl starting to run from the driveway to the porch. (*Id.*, ¶12). Concerned for her safety he ran across the street and called her to come to the street. (*Id.*, ¶13; Caldwell Dec., Ex. 6, Deposition of A.S. (A.S. Depo.), p.24:4-8l). She continued to the porch, so he ran to pick her up and took her toward the north portion of the property. (*Id.*, p.27:11-15 (officer carried her like a baby); Caldwell Dec., Ex. 5, Witness Video). He held her, took off his helmet, and attempted to soothe her. (Hertzler Dec., ¶13). He did not know who Mr. Stanton was or what their relationship was – he never told her that her father wanted to die, or anything remotely close to that. (*Id.*, ¶14; Caldwell Dec., Ex. 2, Deposition of Gabri Hertzler, p.94:4-13).

During the brief time Lovato's team attempted to get eyes on the shooter, FIT member officer Adi Ramic assisted officers north, on 126th. (Declaration of Adi Ramic (Ramic Dec.), ¶¶5, 6). At some point he heard shots and then a call for officers to move to the scene. (*Id.*, ¶¶6, 7). He heard a little girl was on scene and he had a little girl himself. (*Id.*, ¶¶8, 9). So, when he arrived, he took the little girl from an officer at the north corner of the property and brought her to his vehicle. (*Id.*). He did not know the man who had been with her or if there was a relationship. (*Id.*, ¶9). He

Page 7 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

just knew that a man had been shot, she was nearby when it happened, and he wanted to get her to a safe space. (*Id.*). Again, he had a similarly aged daughter and treated her with the same concern and comfort that he hoped somebody would show his daughter. (*Id.*). He ultimately brought her to East Precinct and spent nearly every subsequent moment with her, reassuring her, feeding her, drawing with her, arranging to have her dog brought to the precinct, and otherwise entertaining her until her mom and grandparents arrived. (*Id.*, ¶¶10, 11). At no time did he mention her father, say he wanted to die, or anything close to that. ((*Id.*, ¶¶11, 12).

Officers Hertzler and Ramic's recitations are consistent with A.S.'s recent testimony. First, she did not recall what, if anything, any officer said to her. (Caldwell Dec., Ex. 6, A.S. Depo., pp.29:17-30:3, 37:4-19, 41:10-13). Further, no adult, much less police officer, mentioned suicide to her. (*Id.*, pp.42:15-43:13). In fact, A.S., based on interactions with her dad, came to believe he was suicidal, and may have even wanted her to die with him. (*Id.*, pp.43:14-24, 44:8-16). In any case, even at her recent deposition, A.S. was unsure if police killed her father and thought it was more likely he killed himself. (*Id.*, pp.23:10-12, 36:1-4, 39:7-14, 41:2-6).

### B.    Mr. Stanton's History.

Again, none of the officers behind the vehicle or fence knew his name as Aaron Stanton at the time he was shot. Nor is there any evidence that *any* officer on scene ever had contact with him before. Nor did any officer have knowledge about any potential mental health history – his own parents testified Mr. Stanton did not have any diagnoses for more than 12 years and unaware of any medications for any health issues whatsoever – mental, physical, or otherwise. (Caldwell Dec., Ex. 7, Deposition Douglas Stanton (D. Stanton Depo.), pp.36:7-11; 46:19-21; Ex. 8, Karen Stanton Deposition (K. Stanton Depo.), pp.68:23-69:2, 114:3-11 (testifying she had no concerns about Mr. Stanton's mental health for more than a decade)). There is simply no evidence that on July 27, 2022, Mr. Stanton had any present medical diagnoses or active prescriptions.

Ultimately, any diagnosis would not matter as, intoxicated, mentally ill, or completely healthy, when Mr. Stanton pointed a gun at officers, he was an immediate threat of death or

seriously bodily harm and it was reasonable to use lethal force to protect the officers and community.

### C.    Subsequent Investigation and Discipline.

Portland Police Bureau Directive 1010.10 "Deadly Force and In-Custody Death Reporting and Investigation Procedures" was in effect at the time of this incident. (Declaration of Jeffrey Bell (Bell Dec.), ¶ 2). That policy provided that, "It is the policy of the Bureau that uses of deadly force . . . be investigated with the utmost thoroughness, professionalism and impartiality so as to determine whether member actions comport with applicable law and Bureau policies and training." (Bell Decl., ¶3; Caldwell Dec., Ex. 10, Portland Police Bureau Directive 1010.10 ("Directive 1010.10")).

Directive 1010.10 sets forth procedures for on-scene responsibilities, follow-up responsibilities, reporting requirements, involved member responsibilities, supervisor responsibilities, detective division responsibilities, and professional standards division responsibilities. It also has specific requirements for the professional standards division review (commonly referred to as the internal affairs investigation) of every officer involved shooting. The policy requires communication restriction orders ("CROs") for all witness and involved officers immediately following the incident. (*Id.*, (8)). The CROs "prohibit direct or indirect communications among any and all involved and witness officers regarding the facts of the event." (*Id.* (8.2)). The CROs continue until conclusion of the grand jury proceedings.

PPB's Internal Affairs Unit conducts an internal investigation concurrent with the criminal investigation. (Bell Dec., ¶5). This administrative review of the incident includes, "the events preceding the use of deadly force, the decision making surrounding the use of deadly force, the management/supervision of the incident, and the events following the use of deadly force to determine whether members actions were consistent with policy and if there are policy deficiencies." (Bell Dec., ¶3, Caldwell Dec., Ex. 10, (6.3)). The internal affairs investigator provides the investigative materials to the appropriate Responsibility Unit ("RU") manager, who

Page  9 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

drafts "a findings memorandum to determine whether member actions were within policy." (Bell Dec., ¶5; Caldwell Dec., Ex. 10, (6.8.1)). The RU manager presents these findings to the Police Review Board.

The results of the internal affairs investigation are presented to the Police Review Board by internal affairs investigators and criminal homicide detectives. The RU manager presents findings to the Police Review Board, which includes a decision-point analysis of the event, as well as findings with respect to each officer's use of force. The Police Review Board, which for officer-involved shootings includes seven members, votes on each finding and makes recommendations to the Chief of Police. (Bell Dec., ¶5). The Chief of Police, at his or discretion, makes the final determination for each finding and any discipline. (Bell Dec., ¶6).

This has been the policy and procedure since September 6, 2001, with multiple revisions since, the most recent in 2018. (Bell Dec., ¶7). In that time, the reviews have in fact resulted in out of policy findings related to use of deadly force, with related discipline of multiple officers, including but not limited to firing of multiple officers. (Bell Dec., ¶8).

## III.    LEGAL STANDARD

Fed. R. Civ. P. 56(a) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to summary judgment as a matter of law. *See Addison v. City of Baker City*, 258 F. Supp. 3d 1207, 1215 (D. Or. 2017) (citing Fed. R. Civ. P. 56(a)). "The moving party has the burden of establishing the absence of a genuine dispute of material fact." *Addison*, 258 F. Supp. 3d at 1215 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If the moving party shows the absence of a genuine issue of material fact, the party opposing summary judgment "may not rest upon mere allegation or denials of his pleading but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

Summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial." *Sereno-Morales v. Cascade Food Inc.*, 819 F. Supp. 2d 1148, 1150 (D. Or. 2011) (quoting *Celotex*, 477 U.S. at 322). A plaintiff opposing a properly supported motion for summary judgment "may not respond simply with general attacks upon the defendant's credibility, but rather must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of proving" the elements of his or her claim. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. "If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case, and on which she bears the burden of proof at trial, summary judgment must be granted." *Hicks v. City of Portland*, No. CV 04–825–AS, 2006 WL 3311552, at *4 (D. Or. Nov. 8, 2006) (citing *Celotex*, 477 U.S. at 322-23).

In a police excessive force case, the plaintiff bears the burden of proving the force used was unreasonable. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001) ("Because [plaintiff] failed to meet her burden of proof of providing specific facts to show that the force used was unreasonable . . ., the district court did not err in granting summary judgment to the [defendants] on [plaintiff's] claim of unreasonable force."). The plaintiff similarly has the burden of proving the additional required elements of a *Monell* claim. *See Smith v. City of Los Angeles*, 686 F. App'x 509 (9th Cir. 2017) (explaining that for a *Monell* claim, Plaintiff must identify the policy, practice, or custom and has the burden of proof); *Martinez v. City of Los Angeles*, No. 2:23-cv-09491-SVW-SK, 2024 WL 4438889, at *19 (C.D. Cal. June 20, 2024) (explaining Plaintiff's burden of proof with respect to her *Monell* claim).

In a case like this one, where the nonmoving party will have the burden of proof at trial, "the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). It is not the task of the district court "to scour the record in search of a genuine issue of triable fact."

*Jimmie's Limousine Service, Inc. v. City of Oakland*, No. C 04-03321 WHA, 2005 WL 2000947

(N.D. Cal. Aug. 18, 2005), *aff'd*, 252 *F. App'x* 847 (9th Cir. 2007) (quoting *Keenan v. Allen*, 91

F.3d 1275, 1279 (9th Cir. 1996)). Instead, the nonmoving party has the burden of identifying with

reasonable particularity the evidence that precludes summary judgment. (*Id.*).

## IV.    ARGUMENT

Mr. Stanton fired more than 60 rounds into a neighborhood on July 27, 2022.

(Declaration of Brian Sims, ¶¶5-6). He disobeyed repeated force warnings and commands to put

down his weapon and surrender to police. Instead, he continued to fire into the neighborhood.

After yet another force warning and command, he yelled disparaging remarks, pointed his gun at

officers, and fired at them. Mr. Stanton created the situation that required use of force. All

officers that saw Mr. Stanton point his gun had the objectively reasonable belief, and fear, that he

represented an immediate threat of death or serious bodily injury. Therefore, when Officer Dyk

fired, his use of force was reasonable, justified, and did not violate Mr. Stanton's Fourth

Amendment Rights. Further, there is no precedent that would suggest Officer Dyk's use of force

violated a clearly established right so Officer Dyk is entitled to qualified immunity. In addition,

the City comprehensively investigates all uses of force by officers, with particularly high

scrutiny given to lethal force incidents, and disciplining officers when appropriate. Plaintiff

cannot offer any evidence that any such prior investigation was lacking, much less any related

legal finding of a violation of the Fourth Amendment through lethal force. Moreover, Mr.

Stanton's felonious conduct bars a wrongful death claim as Officer Dyk's action was justified. In

keeping, because Dyk's actions were reasonable and justified so no claim for negligent infliction

of emotion distress can attach. Finally, there is no evidence that any officer made any statement

other than soothing and comforting statements to A.S. Based on these reasons, and other

articulated below, all Plaintiffs' claims fail as a matter of law.

/ / /

/ / /

Page  12 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**A.      Officer Dyk's Use of Force Was Reasonable.**

Officer Dyk's use force against Mr. Stanton was objectively reasonable as a matter of law, and therefore did not violate Mr. Stanton's Fourth Amendment right against unreasonable seizure. *Graham v. Connor*, 490 U.S. 386, 397 (1989).

The Fourth Amendment allows police officers to use reasonable force in carrying out law enforcement duties. *See Graham*, 490 U.S. at 396. A claim for excessive force under the Fourth Amendment requires consideration of "whether the officers' actions [were] 'objectively reasonable' in light of the facts and circumstances confronting them[.]" *Id.* at 397; *see also Glenn v. Wash. Cty.,* 673 F.3d 864, 871 (9th Cir. 2011). Significantly, police officers are not "required to use the least intrusive degree of force possible" as long as the force used was reasonable. *Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994). And "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham,* 490 U.S. at 396.

Fundamentally, reasonableness involves balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham,* 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1 (1985)). Such an inquiry requires the Court to answer "whether the totality of the circumstances justified" the use of force. *Garner*, 471 U.S. at 9. An excessive force claim is analyzed in three steps. *Glenn,* 673 F.3d at 871. First, the Court evaluates the gravity of the intrusion with reference to "the type and amount of force inflicted." *Id.* Second, the Court identifies the government's interests that were furthered by the use of force. *Id.* In the final step, the Court balances "the gravity of the intrusion on the individual against the government's need for that intrusion." *Id.* (quoting *Miller v. Clark Cty.*, 340 F.3d 959, 964 (9th Cir. 2003)).

There are three primary factors courts consider when evaluating the government's interest: "(1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others; and (3) whether the suspect actively resisted arrest or

Page  13 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

attempted to escape." *S.B. v. Cty. of San Diego*, 864 F.3d 1010, 1013 (9th Cir. 2017)

(citing *Graham*, 490 U.S. at 396). The most important *Graham* factor is whether the suspect

posed an immediate threat to anyone's safety. *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir.

2011) (en banc).Whether a use of force was reasonable depends on the unique facts of each case

and "must embody allowance for the fact that police officers are often forced to make split-

second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the

amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. Only

information known to an officer at the time of the officer's conduct is relevant to the analysis.

*City of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1546-47 (2017); *Glenn v. Wash. City*, 673 F.3d

864, 873 n. 8 (9th Cir. 2011).1013 (quoting *Glenn*, 673 F.3d at 872).

    "The threshold question at the summary judgment stage of whether or not an officer's

actions were objectively reasonable under the Fourth Amendment is 'a pure question of law,' not

a question of fact reserved for a jury." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 800 (9th Cir.

2014) (quoting *Scott v. Harris*, 550 U.S. 372, n.8 (2007)).

    *i.*    **Mr. Stanton Was an Immediate Threat.**

    Officer Dyk allowed Mr. Stanton to shoot a gun inside a densely populated

neighborhood. Even though lethal projectiles flew above him, into the neighborhood and

represented an immediate threat, Dyk restrained from using force against Mr. Stanton. It was not

until Mr. Stanton pointed his gun at other officers that Dyk utilized lethal force to protect those

officers. The "case law is clear that when a suspect reaches for a gun or aims a weapon at

officers, responding with deadly force does not violate the Constitution." *Sabbe v. Washington

Cnty. Bd. of Commissioners*, 84 F.4th 807, 828 (9th Cir. 2023). *Smith v. City of Hemet*, 394 F.3d

689, 704 (9th Cir. 2005) ("Where a suspect threatens an officer with a weapon such as a gun or

a knife, the officer is justified in using deadly force."). Thus, "[t]he key issue ... is whether a

reasonable jury would necessarily find that [an officer] perceived an immediate threat of death or

serious physical injury at the time" the officer used deadly force. *Gonzalez*, 747 F.3d at 794. "All

Page  14 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

determinations of unreasonable force 'must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994) (quoting *Graham*, 490 U.S. at 396–97). "[O]fficers need not employ the least intrusive means available [] so long as they act within a range of reasonable conduct." *Estate of Lopez ex rel. Lopez v. Gelhaus*, 871 F.3d 998, 1006 (9th Cir. 2017) (quoting *Hughes v. Kisela*, 841 F.3d 1081, 1085 (9th Cir. 2016), *overruled on other grounds by Kisela v. Hughes*, 138 S. Ct. 1148 (2018)).

Here, officers responded to reports of potential criminal activity with related potential to become even more dangerous. (*See, e.g.*, ORS 166.220 (Unlawful Use of a Weapon)). This prior dangerous activity is both a unique factor under *Graham*, and it informs a reasonable officer's evaluation of the threat presented by the individual. *Lowry v. City of San Diego*, 858 F.3d 1248, 1258 (9th Cir. 2017) (potential seriousness of encounter is "dangerous because it can end in confrontation leading to violence."). His continued shooting and refusal to comply with police instruction demonstrated that he did not care if he was a danger to others, including his daughter, the police, and others in the neighborhood. *Cf. Lal v. California*, 746 F.3d 1112, 1117 (9th Cir. 2014).

Importantly, from the beginning, Mr. Stanton posed an immediate threat of death or bodily harm to police officers and community members. He was not isolated away from the public but in a densely populated neighborhood with many neighbors around. He had a vehicle in proximity that he could get into, and his daughter's proximity exacerbated the threat. Containment was of tantamount importance and disengaging or retreating was not an option because officers needed to maintain that containment. *See, e.g., Lal*, 746 F.3d at 117 (explaining officers did not need to disengage and wait for further resources when there was an immediate threat with potential to expand beyond the location).

The officers initially tolerated Mr. Stanton's non-compliance with instruction and continued shooting. It was only his action of pointing his gun at officers that terminated officers'

ability to wait him out – "he forced the issue." *Lal*, 746 F.3d at 1117. Officers Piombo, Pavon, Bartlett, Wambold, and Lovato all had immediate fear for the safety and lives. Piombo and Pavon made the immediate and simultaneous decision to shoot but could not based on the location of A.S. At the same time, Dyk made the same decision, and with a clear shot, he used lethal force to stop the immediate threat of death or serious bodily harm to the other officers and community members.

Under similar situations, the Ninth Circuit has found it objectively reasonable to view an individual like Mr. Stanton as an immediate threat. *See Sabbe*, 84 F.T 828 (noting that, "[w]hen a suspect is armed—or *reasonably suspected of being armed*, even a furtive movement can create an immediate threat sufficient to justify the use of deadly force") (citing *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013)) (emphasis added) (simplified); *see also Cruz v. City of Anaheim*, 765 F.3d 1076, 1078 (9th Cir. 2014) (noting that, where a suspect is engaged in "dangerous and erratic behavior" and police reasonably believe he is carrying a gun "[i]t would be unquestionably reasonable for police to shoot a suspect in [the decedent]'s position if he reaches for a gun in his waistband, or even if he reaches there for some other reason"); *Cf. Est. of Strickland v. Nevada Cnty.*, 69 F.4th 614, 618 (9th Cir. 2023) (noting that "the Constitution even allows for officer's action that resulted from a reasonable 'mistake of fact'" and finding that the "officers' mistaken belief that [the suspect] possessed a dangerous weapon was reasonable and they were justified in the use of deadly force when he pointed it at them").

### ii. *More Warnings and Less Force Was Not Feasible.*

Mr. Stanton had received multiple force warnings, instruction to put down his gun, and surrender. The team considered less lethal force, had a less lethal force operator as part of the strategy, but was not at an effective range. The moment Mr. Stanton pointed his gun at the officers, there was no time for any more tactics other than Officer Dyk's use of force – his degree of resistance had increased to the level of attack on officers. *City & Cnty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1775 (2015). Officers Piombo and Pavon also

Page  16 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

would have used lethal force at that point but for the safety of the little girl.

### iii.    Any Mental Health or Intoxication Was not Material.

As shown, Mr. Stanton had no current medical diagnoses, mental or otherwise. In any case, the Ninth Circuit has "refused to create two tracks of excessive force analysis, one for the mentally ill and one for serious criminals." *Bryan v. MacPherson*, 630 F.3d 805, 829 (9th Cir. 2010). When police use deadly force against a person who presents an immediate threat of serious injury or death to others, the presence of emotional disturbance does not reduce the governmental interest in using deadly force. *See Sheehan*, 135 S. Ct. at 1775; *Lal*, 746 F.3d at 1117-18.

Based on the foregoing, Officer Dyk's use of force was objectively reasonable and required under the circumstances to stop the immediate threat of Mr. Stanton shooting officers. That force was constitutional and for that reason alone the Court should grant Summary Judgment as to Claims 1, 2, and 3.

### B.    Officer Dyk is Entitle to Qualified Immunity.

"In determining whether an officer is entitled to qualified immunity, we consider (1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct." *Estate of Lopez by and through Lopez*, 871 F.3d at 1005 (quoting *Lal*, 746 F.3d at 1116). Here, as discussed above, Officer Dyk did not violate Mr. Stanton's constitutional rights, and that ends the inquiry. However, even if there were a Fourth Amendment violation–there was not–there is no clearly established right, based in existing precedent, that would have apprised Officer Dyk that his actions were unreasonable.

The Supreme Court emphasized that qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (citations omitted). "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be 'settled law,' which means it is dictated by 'controlling authority' or 'a robust consensus of cases of persuasive authority.'"

Page  17 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

*District of Columbia v. Wesby*, 138 S. Ct. 577, 589-90 (2018) (citations omitted). "[I]t is not enough that the rule is suggested by then-existing precedent." *Id.* The Supreme Court has repeatedly warned lower courts against denying qualified immunity to officers responding to unique and challenging situations, explaining that "qualified immunity is important to 'society as a whole,' and because as 'an immunity from suit,' qualified immunity 'is effectively lost if a case is erroneously permitted to go to trial.'" *Pauly*, 137 S. Ct. at 551 ("In the last five years, this Court has issued a number of opinions reversing federal courts in qualified immunity cases."); *see also Sheehan*, 135 S. Ct. at 1774, n.3 (collecting cases); *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019); *Kisela*, 138 S. Ct. at 1152.

The Ninth Circuit "acknowledge[d] the Supreme Court's frustration with failures to heed its holdings" on qualified immunity. *S.B.*, 864 F.3d at 1015. "Before a court can impose liability on [defendants], [it] must identify precedent as of . . . the night of the shooting—that put [defendants] on clear notice that using deadly force in these particular circumstances would be excessive." *Id*. "General excessive force principles" are not enough outside of the obvious cases. *Id.* "Instead, [the court] must 'identify a case where an officer acting under similar circumstances as [defendant] was held to have violated the Fourth Amendment.'" *Id*. at 1015-16 (quoting *Pauly*, 137 S. Ct. at 552). The Supreme Court again emphasized that "[e]xcessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela*, 138 S. Ct. at 1153.

Finally, "the clearly established right must be defined with specificity." *Emmons*, 139 S. Ct. at 503. "Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

Existing precedent from the Supreme Court, Ninth Circuit, and District Courts within the

Ninth Circuit demonstrate Officer Dyk's decisions to use force under the circumstances he faced was objectively reasonable and constitutional. Because he neither violated Mr. Stanton's Fourth Amendment rights, nor were the violations Plaintiffs' allege clearly established, Officer Dyk is entitled to qualified immunity. *Wesby*, 138 S. Ct. at 590 ("The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.") The Court should grant Summary Judgment on Claim 1.

### C.     Plaintiffs Cannot State a Monell Claim.

"To state a *Monell* claim, a plaintiff must establish: (1) that the plaintiff possessed a constitutional right of which he was deprived; (2) that the municipality had a policy, custom, or practice; (3) that the policy, custom, or practice amounted to deliberate indifference to the plaintiff's constitutional rights; and (4) that the policy, custom, or practice was the moving force behind the constitutional violation." *Sternberg v. Town of Danville*, 2015 WL 9024340, at *3 (N.D. Cal. Dec. 16, 2015) (citing *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (outlining these factors)).

As an initial and dispositive matter, Officer Dyk did not deprive Mr. Stanton of a constitutional right. On that basis alone, the Court should dismiss Plaintiffs' *Monell* claim against the City. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point.").

However, Plaintiffs similarly lack evidence to demonstrate that the City had a policy, custom, or practice amounting to deliberate indifference to Mr. Stanton's rights, which *caused* the alleged constitutional violation. In the context of *Monell*, municipal liability can arise from: "(1) an official policy; (2) a pervasive practice or custom; (3) a failure to train, supervise, or discipline; or (4) a decision or act by a final policymaker." *Horton v. City of Santa Maria*, 915 F.3d 592, 602-03 (9th Cir. 2019).

Page  19 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The gravamen of Plaintiffs *Monell* claim appears to be that the City's investigation and review of officer involved shootings is deficient. They cite a litany of incidents in their Complaint. (*See* ECF 1, ¶37). As a threshold issue, they provide no evidence, and cannot, that any of the cited incidents resulted in any tribunal or other finding of violation of any constitutional rights.[1]  Relatedly, they provide no evidence that any had improper review, investigation, or determination of fact; in fact they acknowledge that the City actually did discipline officer in the past and the only reason that discipline was unenforced was because a third party, unrelated to the city, made the determination to not impose the discipline. (ECF 1, ¶¶37(d), (e), (f)). As provided in Section I(C), *supra*, the process resulted multiple times in discipline, including firings. In any case, there is simply no evidence that shows any deficiency, much less deliberate indifference to reviews of officer involved shootings. In fact, this Court found that, during much of the same period as alleged here, there was no such deficiency and denied similarly unsupported claims, holding:

> PPB has a detailed written policy for investigating every use of deadly force, and the unrefuted evidence in the record suggests that PPB carries out that policy by thoroughly investigating each use of deadly force by its officers.

*Elifritz v. Fender*, 460 F. Supp. 3d 1088, 1119 (D. Or. 2020) (evaluating whether PPB fails to investigate deadly force incidents).

### D.    Officer Dyk's Actions Were Reasonable and Justified.

At the time Officer Dyk used lethal force, Mr. Stanton was engaged in felonious conduct that threatened the lives of other officers and the community. Therefore, Officer Dyk's use of force was reasonable and justified.

### i.    *Felonious Conduct.*

A decedent's felonious conduct is a complete defense to a wrongful death action. Pursuant to ORS 31.180, a defendant has a complete defense to a wrongful death claim if the

---

[1] Plaintiffs cite a case where a jury found no constitutional violation. United States District Court District of Oregon Case No. 6:03-cv-01371-AA (ECF 1, ¶37(a)).

decedent engaged in a Class A or Class B felony, and that felony was a substantial factor contributing to his death. The defense applies to injuries inflicted during a justifiable response to criminal conduct. *Harryman v. Fred Meyer, Inc.*, 289 Or App 324, 329 (2017). A response to criminal conduct occurs "at the time" of the commission of a felony when an individual engages in criminal conduct. *See Harryman*, 289 Or App at 329-330 (because the plaintiff had just shot someone and was armed when the defendant's employees used force, the court determined the plaintiff's injuries occurred "at the time" of the commission of a felony and his conduct contributed to the injury, therefore ORS 31.180 provided a complete defense).

Killing a police officer while they perform their official duties constitutes murder in the first degree, a Class A felony. ORS 163.107(1)(g)(a). Manslaughter in the first degree, a Class A felony, is an available charge when a person, recklessly commits a homicide or, under the influence of extreme emotional disturbance, intentionally commits a homicide. ORS 163.118(1)(a), (b). A person commits the crime of assault in the first degree, a Class A felony, if the person intentionally causes serious physical injury to another by means of a deadly or dangerous weapon. ORS 163.185(1)(a). Attempted murder, manslaughter, or assault in the first degree are Class B felonies. ORS 161.405(2)(b) ("An attempt is a: (b) Class B felony if the offense attempted is a Class A felony."); *see, e.g.*, *State v. Smith*, 21 Or. App. 270, 276 (1975) ("An unsuccessful attempt to cause intended physical injury is an attempted assault.").

Here, Mr. Stanton stood outside his home firing multiple rounds from multiple guns. When the responding officers took cover nearby, Stanton continued to fire with his daughter nearby. He then pointed the gun in the direction of the officers and fired. Pointing a gun toward individuals is certainly a substantial step toward an intentional[2], if not reckless and a manifest extreme indifference to, taking of human life or causing serious physical injury. ORS 163.107(1)(g); ORS 163.118(1); ORS 163.185(1).

Mr. Stanton's conduct meets the requirements of ORS 31.180, and the court should find

---

[2] ORS 161.085(7) defines intent as "act[ing] with a conscious objective to cause the result or to engage in the conduct described."

that conduct does not allow for a wrongful death or personal injury action to proceed.

### ii.    Justification.

Regardless, the claim still fails as a matter of law because Dyke's use of force was reasonable and justified. "When a defendant's conduct is willful and intentional, it is no longer negligence [.]" *See generally, Denton v. Arnstein*, 197 Or. 28, 45 (1952).[3]

Oregon statutes permit any person to use the degree of force the person reasonably believes necessary in self-defense or to defend a third person from what the person reasonably believes to be the imminent use of unlawful physical force. *See* ORS 161.209 (justified to use force to defend third person); ORS 161.219 (justified if reasonable belief of imminent threat of physical or deadly force); *State v. Oliphant*, 347 Or. 175, 191 (2009) ("It is the imminent danger, real or apparent, of great bodily injury [] which justifies a defendant in protecting himself.").

Pursuant to ORS 161.242, an officer is justified in using deadly force to defend against "an imminent threat of death or serious physical injury." The statute requires that the force be "objectively reasonable under the totality of the circumstances." Additionally, if there is "a reasonable opportunity to do so," the officer shall consider alternatives and give a verbal warning. ORS 161.242(2).

The reasonableness of Officer Dyk's use of force is discussed extensively in Section IV(A), *supra*, and should foreclose any further consideration of the issue. In any case, Officer Dyk knew that officers up the street and behind the vehicle had distance and cover, essential components of de-escalation. He was concealed so as to not have visible presence and exacerbate any issues, another de-escalatory strategy. (*See*, *e.g.*, Caldwell Dec., Ex. 4, Bryson 30(b)(6) Depo., pp.35:3-9, 38:20-39:7) (discussing barriers and visibility as de-escalation tools). He heard a member of his team give force warnings and instructions as well as Mr. Stanton's defiant and aggressive response to the same. He refrained from shooting despite bullets going over his head.

---

[3] Where the essential facts of what an officer knew or what the officer did are undisputed, the reasonableness of the officer's actions is properly determined by the Court.  *Scouller v. Maxfield*¸ No. Civ. 01-431 HA, 2003 WL 194690, at *5 (D. Or. Jan. 16, 2003) (citing *Sinaloa Lake Owners Ass'n*, 70 F.3d 1095, 1099 (9th Cir. 1995)).

He only used force when Mr. Stanton pointed his gun at officers directly after those officers once again gave force warnings and instruction to drop the gun. Based on the totality of the circumstances known to him and the immediate threat of death or bodily injury posed by Mr. Stanton to the officers up the road, Dyk used deadly force. Dyk had no reasonable opportunity to continue to use alternatives or give additional force warnings. Likewise, Officers Piombo and Pavon would have used the same force but did not have good shots based on the location of A.S. The use of force was reasonable as a matter of law. (*See also* §IV(A), *supra*).

This Court found under somewhat similar circumstances that a decedent's perceived attempt to harm police provided a complete defense to officers' use of force pursuant to ORS 31.180 and was reasonable and justified pursuant to the precursor to ORS 161.242.[4] *Elifritz*, 460 F. Supp. 3d at 1120; *see also Scouller*, 2003 WL 194690, at *6 (granting summary judgment on state law battery and negligence claims finding use of deadly force reasonable pursuant to ORS 161.242 precursor as a matter of law where officer reached inside window of van and shot person in head attempting to accelerate a van that was stuck in the mud).

Once more, Officer Dyk's use of force was reasonable and justified.

### E.     Defendants Did not Cause Mr. Stanton to Point His Gun at Police.

Should the Court look to the merits of Plaintiffs' negligence claim, Plaintiffs cannot present sufficient evidence for the claim to go forward.

To prove a negligence claim in Oregon, a plaintiff must show *inter alia* "(1) that defendant's conduct caused a foreseeable risk of harm, (2) that the risk is to an interest of a kind that the law protects against negligent invasion, (3) that defendant's conduct was unreasonable in light of the risk. *Son v. Ashland Cmty. Healthcare Servs.*, 239 Or. App. 495, 506 (2010).

Plaintiffs' Complaint states three specifications of negligence: (1) failure to summon and await arrival of Portland's Behavioral Health Unit, (2) failure to place present and available officers with Enhanced Crisis Intervention Skills in charge, and (3) failure to employ crisis

---

[4] Judge Hernandez evaluated the use of force under ORS 161.239, which was substantively similar to ORS 161.242.

intervention and de-escalation communication tactics and training. None of these allegations are supported by the evidence.

Plaintiffs' first specification has a fundamental misapprehension of how the Behavioral Health Unit ("BHU") performs – they are not deployed like an ECIT officer but instead requested in a follow up capacity. (*See*, *e.g.*, Caldwell Dec., Ex. 9, Deposition of Lino Pavon (Pavon Depo.), pp.7:3-11, 23:8-11). Regardless, there is no evidence that waiting for BHU would have resulted in a different outcome or should have been called to this event. Nor is there evidence that officers had time to "await" arrival of another unit. *See Lal*, 746 F.3d at 1117 (discounting the plaintiff's expert's bald assertion that waiting for other resources to arrive). This is consistent with the FIT commander, Sergeant Townley's, articulation of approach to the event:

> when you respond to a rapidly evolving event like this, somebody firing off a gun in a residential neighborhood, neighbors calling 911 because they're scared or concerned about what's happening, one of the things that we have to be concerned about is that person running off into the neighborhood, harming neighbors, any number of things that could happen. And so, the way that we try to mitigate that is by trying to establish containment on the incident, so that the incident cannot spread to a larger area.

(Caldwell Dec., Ex. 11, Deposition of James Townley (Townley Depo.), pp.96:25-97:9). In any case, as in *Lal*, waiting for another unit would not have changed Mr. Stanton's behavior in those moments, nor would he have even been aware of it happening.

Similarly, looking to the second specification there is no evidence that having ECIT officers in charge represents the standard of care. As a preliminary matter, all PPB officers receive Crisis Intervention Training ("CIT"). (Caldwell Dec., Ex. 4, Bryson 30(b)(6) Depo., pp.15:8-9, 24-16:1). The principals and fundamentals of ECIT are the same as CIT training and ECIT officers have that training reinforced, receive some additional nuanced training, learn about different resources, and meet people with lived experiences. (*Id.*, pp55:8-14, 63:20-64:2). All officers also receive mandatory in-service trainings annually to reinforce CIT skills in general. (*Id.*, pp.9:3-5, 16-10:2). Again, there is no evidence waiting would have changed the

outcome given how quickly the incident occurred. (*See* Bartlett Dec., ¶12 (so stating); Wambold Dec., ¶14 (same)).

Further ECIT officers are not required to respond to a critical incident. (Caldwell Dec., Ex. 12, F.R.C.P. 30(b)(6) Deposition of Dominic Lovato (Lovato 30(b)(6) Depo.), p.56:11-13). During "resource mapping" when responding to a critical incident, identifying ECIT officers is not a primary concern and an ECIT officer is not required as an initial communicator. (*Id.*, pp.56:14-17, 55:16-23). Lastly, looking to crisis intervention and de-escalation communication tactics, there is no evidence to support this specification of negligence. The crisis intervention discussed above in the context of ECIT officers and CIT training forecloses that component. There is no standard of care outside of speculation that requires crisis intervention skills that were not employed in this case–boots on the ground observations and impressions outweigh any hypothetical and conclusory opinion otherwise. As to de-escalation, officers testified that the employed de-escalation in the limited time available. (*See* Caldwell Dec., Ex. 9, Pavon Depo., pp.22:7-8,11-16 (distance, give instruction as de-escalation); Bartlett Dec., ¶¶10, 12 (used primary de-escalation techniques and would not have done anything different); Wambold Dec., ¶14 (would not have done anything different)). In addition, it is not always safe nor is there always time to implement multiple components of de-escalation. (Caldwell Dec., Ex. 3, Lovato Depo., p. 22:3-10 (at times not safe for verbal de-escalation); Ex. 11, Townley Depo., p.31:12-14 (sometimes not enough time)).

### F.    Plaintiffs Cannot Support an IIED Claim.

Plaintiffs' fourth claim for relief states a claim for intentional infliction of emotional distress ("IIED") on behalf of A.S. Specifically, the claim alleges that an unnamed officer, or officers, told A.S. that "'your father wanted to die.'" (ECF 1, ¶53). There is no admissible evidence to support this allegation and even if so, the evidence does amount to an IIED claim as a matter of law.

#### i.    *The Evidence Does Not Support an IIED Claim.*

To state a claim for IIED, a plaintiff must allege that: "(1) the defendant intended to

inflict severe emotional distress on the plaintiff, (2) the defendant's actions caused the plaintiff severe emotional distress, and (3) the defendant's actions transgressed the bounds of socially tolerable conduct." *Schiele v. Montes*, 231 Or. App. 43, 48 (2009) (citing *McGanty v. Staudenraus*, 321 Or. 532, 543 (1995)).

For purposes of IIED, "intent" means that the actor desired to inflict severe emotional distress, or that the actor knew that emotional distress was certain or substantially certain to result from the conduct. *McGanty*, 321 Or. at 550–551 (adopting definition of intent from Restatement (Second) of Torts §8A (1965)). Oregon "cases suggest that conduct that is negligent, mistaken, or otherwise remiss rather than deliberate, intentional, or engaged in by design will not support a claim for IIED." *Delaney v. Clifton*, 180 Or. App. 119, 136 (2002) ("[W]e have identified no Oregon case in which the conduct that was the basis for an IIED claim was alleged to have been merely negligent and nevertheless was determined to be actionable.").

Plaintiff must show conduct that is "extraordinarily beyond the bounds of socially tolerable behavior[.]" *House v. Hicks*, 218 Or. App. 348, 357 (2008). Socially intolerable conduct is conduct that is "outrageous in the extreme." *Patton v. J. C. Penney Company*, 301 Or. 117, 124 (1986), *ab'gated on other grds* by 321 Or. 532. "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Schoen v. Freightliner LLC*, 224 Or. App. 613, 626-27 (2008) (quoting *House*, 218 Or App at 358). Conduct that is merely "rude, boorish, tyrannical, churlish and mean" does not satisfy the high standard that the defendant's acts be an extraordinary transgression of the bounds of socially tolerable conduct. *Id.* (quoting *Kraemer v. Harding*, 159 Or. App. 90 (1999)). Determination of whether the conduct is an extraordinary transgression is a fact specific inquiry. "[I]n the context of an IIED claim, the court, functioning as a gatekeeper, performs that role in the first instance." *Clemente v. State*, 227 Or. App. 434, 442 (2009).

Here, Plaintiffs alleges an officer, or officers, told A.S. "your father wanted to die," but

there is no evidence to support that allegation. Regardless, Plaintiffs cannot meet the first component of intent – there is absolutely no evidence that any officer intended any harm of any sort to A.S.–quite the opposite.

Officers Hertzler and Ramic are the only two officers known to interact with A.S. Officer Hertzler "was incredibly concerned for her safety." (Hertzler Dec., ¶12). He was the officer that picked her up off the porch and brought her away from the scene. (*Id.*, ¶13; Caldwell Dec., Ex. 2, Hertzler Depo., pp.92:22-93:3). He did not mention Stanton, or say in any way that Stanton was dead, wanted to die, or anything "remotely close to those themes." (*Id.*, p.94:4-19; Hertzler Dec., ¶14). Instead, he attempted to comfort her. (*Id.*, p.93:7-9; Hertzler Dec., ¶14).

Officer Ramic spent the most time with her. He has a daughter about the same age as A.S. (Ramic Dec., ¶9). Throughout his time with A.S., he treated her as he would want his own daughter treated, with "concern and comfort." (*Id.*). He did not know who the man was that was shot and, in any case, did not speak to A.S. at all about her father. (*Id.*, ¶¶9, 11, 12). He never told her that her father wanted to die. (*Id.*, ¶12).

There is simply nothing to show any intent, accidental or otherwise, that any officer had anything but concern and compassion for A.S. Nor that any said what is alleged.

Further, it is clear that A.S. currently does not know how her father died–by suicide or police. (Caldwell Dec, Ex. 6, A.S. Depo., pp.23:6-12; 36:1-4; 39:7-14). She repeated this theme multiple times, twice in the past tense, that she did not know at the time, and then once in present tense. (*Id.*, 23:10-12 ("I wasn't sure if he shot himself"); (*Id.*, 36:3-4 (her grandma "might have heard that my dad got shot or something, or he shot himself. I am not that sure."); (*Id.*, 39:11-14) ("Do you know where those gunshots came from? Either the–the police or his gun that he probably shot himself.").

When asked if "any cops or anyone else at the police station, ever talk with you about what happen with you dad" she responded, "I'm pretty sure not. *** I don't think so." (*Id*, p.37:11-19). When asked "how did you hear that he shot himself," she answered "From like family members

and may police probably. I just remember hearing like – probably from my mom, so that he shot himself – from the police, that they probably knew what happened." (*Id.*, 41:2-6).

When asked, "do you remember any adults ever talking to you about this situation with your dad being suicide?" and she responded "no," she had never heard any adult use that word about her dad. (*Id.*, pp.42:9-43:13). She was then asked if she ever heard her dad wanted to die. She responded:

> I remember this one time, probably like a couple of months maybe before, he asked me, "Do I want to die?"· Because he had a gun or something. He kind of like threatening a bit, kind of sounded like. And then he -- hold on -- so he was kind of like threatening a bit a little to me. And he also basically kind of wanted to die a bit. I think. I'm not sure.
>
> ***
>
> It's because he -- he like -- he was holding a gun and then he wanted me to hold it or something. And he told me -- he kind of like -- it kind of sounds like he almost wanted me and him to die -- die basically, sounded like.

(*Id.*, pp.43:17-24, 44:12-16). This unsettling testimony indicates that before the events in question, A.S. already had in her mind that her father may want to die.

The testimony both from A.S. and the officers does not support the allegation in Plaintiffs' Complaint. It is expected that Plaintiffs will attempt to offer hearsay testimony from A.S.'s uncle and grandparent, that A.S. communicated this information to them. This testimony would be hearsay without any exception. Fed. R. Evid. 802. No alleged statement from A.S. was contemporaneous or for purposes of medical treatment or similar. *See* FRE 803. Her school counselor, the only provider that came close to providing treatment, testified that A.S. never told her what Plaintiffs' allege. (Caldwell Dec., Ex. 13, Deposition of Molly Hyman, p.39:23-25). While the Rules do allow a state of mind exception, they do not allow "a statement of memory or belief to prove the fact remembered or believed." *United States v. Lentz*, 282 F. Supp. 2d 399, 410–11 (ED Va. 2002), *aff'd*, 58 Fed Appx 961 (4th Cir. 2003) (citing FRE 803). A statement may not describe a declarant's past memory or belief about another's conduct. *See United States v. Carmichael*, 232 F.3d 510, 521 (6th Cir.2000) (citation omitted). Any statement must be

Page  28 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

limited to showing the declarant's state of mind and not the factual occurrence engendering that state of mind. *See United States v. Joe,* 8 F.3d 1488, 1492 (10th Cir.1993) (holding that a victim's statement that she feared the defendant is admissible under the state of mind exception but reasons for was an inadmissible factual occurrence). Quite simply, no testimony from A.S.'s relatives fit any exception to the hearsay rule.

### ii.    *The Allegation Is Not Sufficiently Outrageous to Support an IIED Claim.*

Even if such a statement was made–it was not–it is not sufficiently outrageous so as to be seen as "extraordinarily beyond the bounds of socially tolerable behavior." *House*, 218 Or. App. at 357. At worst, it may be an insensitive way to explain to a little girl what happened. That is not sufficient to support a claim. *See*, *e.g.*, *Shay v. Paulson*, 131 Or. App. 270, 273 (1994) (*declining to hold* that "illegal, or even criminal" conduct is per se outrageous in the extreme). In any case, as shown, A.S. has no recollection of anybody other than maybe her mother saying that to her and once again, she believed her father wanted to die before he actually did.

Because there is no admissible evidence to support the IIED claim, summary judgment is appropriate.

### G.    **Plaintiffs Cannot Support an NIED Claim.**

Plaintiffs' fifth claim alleges A.S. "heard the loud rapport of defendant Dyk's AR-15" and "witnessed the sudden fatal injury to her father," (Complaint ¶¶ 58-59). A.S. testimony and recollection do not support these allegations and for that reason alone the claim should be dismissed. (*See* Caldwell Dec., Ex. 6, A.S. Depo., p.23:5-12 (was hiding behind the car and not sure what happened – "I came out–and then my dad was laying on the back patio"; p.38:1-5 ("And then I honestly didn't even hear a gunshot, which I'm surprised I didn't even hear.").

In addition, the claim is based on Officer Dyk's intentional act. Such an intentional act cannot support a negligence claim. Intentional, deliberate, or willful conduct is not negligence. *Denton v. Arnstein*, 197 Or. 28, 45 (1952); *see also Kasnick v. Cooke*, 116 Or App 580, 583 (1992) (plaintiff may not allege facts that necessarily would constitute an intentional tort but then assert

that he can prevail by proving only negligence. He has no negligence claim, as a matter of law, and he has elected not to plead any other claim."). Officer Dyk's conduct was either intentional, or it was negligent—it cannot be both. "An assault and battery is not negligence. The former is intentional and wilful [sic]; the latter unintentional. When defendant's conduct is wilful [sic] and intentional, it is no longer negligence[.]" *Denton*, 197 Or at 45. Indeed, "assault and battery, which are intentional, [cannot] form the basis for a negligence claim." *Saberi v. City of Portland*, 2006 WL 2707995, * 4 (D. Or. Sept. 18, 2006). Officer Dyk's shooting was intentional and in response to Stanton's own conduct. Because that was reasonable and justified, no NIED claim may attach.

## **CONCLUSION**

Based on the foregoing, Defendants respectfully request the Court grant their Motion for Summary Judgment and dismiss all of Plaintiff's claims with prejudice.

DATED: August 15, 2025.

Respectfully submitted,


/s/ Carey Caldwell
Carey Caldwell, OSB #093032
Deputy City Attorney
carey.caldwell@portlandoregon.gov
Caroline Turco, OSB #083813
Senior Deputy City Attorney
caroline.turco@portlandoregon.gov
Of Attorneys for Defendants