Carey Caldwell, OSB #093032
Deputy City Attorney
carey.caldwell@portlandoregon.gov
Caroline Turco, OSB #083813
Senior Deputy City Attorney
caroline.turco@portlandoregon.gov
Portland City Attorney's Office
1221 SW 4th Ave., Rm. 430
Portland, OR 97204
Telephone: (503) 823-4047
Facsimile: (503) 823-3089
*Of Attorneys for Defendants*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **ESTATE OF AARON D. STANTON, BY DOUGLAS STANTON, PERSONAL REPRESENTATIVE, AND A. S., A MINOR, BY AND THROUGH HER GUARDIAN AD LITEM, DOUGLAS STANTON,**<br><br>    **PLAINTIFFS,**<br><br>v.<br><br>**JOSHUA DYK and CITY OF PORTLAND,**<br><br>    **DEFENDANTS.** | 3:23-cv-01767-AN<br><br>**DECLARATION OF GABRI HERTZLER** |

I, Gabri Hertzler, do hereby declare:

1.  I am currently employed as an Officer with the Portland Police Bureau ("PPB") and am assigned to the Special Emergency Reaction Team. I have been employed by PPB since March of 2004.

2.  On July 27, 2022, I was assigned to the Special Resources Division on the Focused Intervention Team.

3.  On that day I was in a partner car with Officer Dominic Lovato.

Page  1 – DECLARATION OF GABRI HERTZLER

4. We were outside of our vehicle in the area of Southeast 102nd and Sacramento when we heard a call from East Precinct related to an individual on the porch of a house south of Burnside on Southeast 126th Avenue firing a weapon.

5. We entered our vehicle and headed to a staging area set up by East Precinct officers at 122nd and Burnside. I believed this to be a rapidly evolving and dangerous situation. This was unlike other shootings in the City where a person may fire off a couple shots then disappear. Instead, this person was in a densely populated area continually firing off shots.

6. Based on the evolving, unique, and unusually dangerous nature of the call, Officer Lovato and I began to formulate a contact plan on our drive to the staging area. As we arrived at the staging area officers left and were driving toward Southeast 126th. Officer Lovato and I followed and parked on Burnside, west of 126th.

7. Upon arrival I grabbed my rifle and Officer Lovato grabbed a ballistic shield and we met with other officers to coordinate on a plan. I heard Sergeant Pool call for a SERT consult. There was a team that had approached the individual's location and positioned themselves behind cover at some distance from the home. I discussed with Sergeant Townley and Officer Dyk about getting eyes on from a closer, concealed position to the individual's location to assist the team, get them additional information, and coordinate any potential approach by the team to the individual or the individual to the team.

8. Officer Dyk and I moved first to a group of officers behind a car, north of the individual's position. There was a discussion about a plan of approach to the situation then Officer Dyk and I moved east behind houses and began to make our way through the back yards of homes until we reached a house across the street from where the individual was. We then took a concealed position behind a fence and carport on the north side of that home.

9. I heard a radio broadcast from Officer Lovato reiterating a portion of his group's plan to contact the individual including tolerating the individual's behavior provided he only shot

Page 2 – DECLARATION OF GABRI HERTZLER

into the air. At about that time I saw the individual come out of his house with a little girl. I provided that information over the radio.

10. I then heard one of the officers from the group to the north of the home announce themselves and give the individual instruction. The individual directed his attention toward those officers and shouted "suck my dick" and "fuck you" in response to the officer's attempt at communication. While I did not initially see him holding a gun, within moments he had a gun in his hand and fired off multiple shots. Again, the little girl was moving around him the entire time.

11. I could not see over the fence as well as Officer Dyk so I went to find a more optimal vantage point and moved toward the south side of the home. As I approached a fence on the south side of the home I heard one or more shots. When I looked toward the individual's home I saw he was down on the porch.

12. I saw at that point the little girl was off the porch and moving back toward it. I was incredibly concerned for her safety throughout the entire situation but was even more so with the sounds of shots and the potential that the individual may still be armed and apparently his behavior had changed.

13. I ran toward the individual's home and attempted to get the little girl to come to me. When she continued to the porch I went to the porch and picked her up and turned taking her away from the scene to the north part of that property. I took off my helmet and attempted to sooth her for a moment before another officer took her in his care.

14. At no time did I mention the individual, tell the little girl her father was dead, that he killed himself, that he wanted to die, or anything even remotely close to those themes. In the very brief time I was with her, I only cooed and attempted to comfort her with comments along the lines of 'You're ok. You're safe.'

/ / /

/ / /

/ / /

Page  3 – DECLARATION OF GABRI HERTZLER

I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury

DATED: 081225 .

Respectfully submitted,

_____
Gabri Hertzler

Page 4 – DECLARATION OF GABRI HERTZLER