Carey Caldwell, OSB #093032
Deputy City Attorney
carey.caldwell@portlandoregon.gov
Caroline Turco, OSB #083813
Senior Deputy City Attorney
caroline.turco@portlandoregon.gov
Portland City Attorney's Office
1221 SW 4th Ave., Rm. 430
Portland, OR 97204
Telephone: (503) 823-4047
Facsimile: (503) 823-3089
*Of Attorneys for Defendants*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| ESTATE OF AARON D. STANTON, BY DOUGLAS STANTON, PERSONAL REPRESENTATIVE, AND A. S., A MINOR, BY AND THROUGH HER GUARDIAN AD LITEM, DOUGLAS STANTON, | 3:23-cv-01767-AN |
| PLAINTIFFS, | DECLARATION OF JOSHUA DYK |
| v. | |
| JOSHUA DYK and CITY OF PORTLAND, | |
| DEFENDANTS. | |

I, Joshua Dyk, do hereby declare:

1.      I am currently employed as an Officer with the Portland Police Bureau ("PPB") and am assigned to the Focus Intervention Team. I have been employed by PPB since March of 2018.

2.      On July 27, 2022, I was assigned to the Special Resources Division on the Focused Intervention Team.

3.      On that date, I was in a partner car with Officer John Bartlett.

Page 1 – DECLARATION OF JOSHUA DYK

4.      I heard a radio callout from dispatch noting multiple reports of gun shots coming from a residence on Southeast 126th Avenue.

5.      I heard that Officer Pavon was the lead officer and setting up a staging area on Southeast 122nd and Burnside.

6.      I radioed to my team that Officer Bartlett and I were going to respond to assist with the call. The team responded that they were going to do the same.

7.      When we arrived at the staging area we convened with Officer Pavon, Sergeant Pool, and other officers to formulate a plan on how to approach the call.

8.      While we were making a plan, I heard a volley of multiple shots from the general direction of the previously identified location. I, along with the other officers, decided to move closer to the location in the event we needed to more quickly respond to render emergency aid or take life saving actions.

9.      As a rifle operator, I also wanted to be able to provide cover in the event we were fired upon so I armed my rifle in preparation for the approach.

10.      I reconvened with other officers on Southeast 126th, south of Burnside. I initially went forward under cover with Officer Bartlett in an attempt to identify the location of the individual firing a weapon. I then returned to near our parked vehicles.

11.      At that location I met with Officer Hertlzer and Sergeant Townley. We discussed that it may be advantageous for purposes of coordination with our team approach to the situation to get eyes on the individual from a safe and discrete vantage point on the east side of 126th in order to convey and process additional information. Sergeant Townley agreed Officer Hertzler and I should do so, so we proceeded South.

12.      Officer Hertzler and I first met with a contact team that included Officer Lovato, Officer Piombo, Officer Pavon, and other officers behind some vehicles and trees south and east of the house. At that location we discussed our coordination of contingencies for the approach to the individual, including but not limited to communication, tolerance of behavior, and potential

Page  2 – DECLARATION OF JOSHUA DYK

uses of force. I specifically commented that absent any other factors or escalations, and provided he only shot in the air, I would not use lethal force. I understood that all officers, including myself, were in agreement with our plan.

13.    Officer Hertlzer and I then proceeded east, discretely behind houses and moved through back yards until we reached a home across from what we believed was the individual's location and I found a concealed position behind a fence.

14.    I heard over the radio that the individual was in the house and had a little girl with him. I initially did not see him or the little girl. However, eventually he came to the door inside the house and I could identify a white male wearing shorts with no shirt. He exited the home with a little girl and I conveyed the same to our team over the radio.

15.    I heard over the radio that the contact portion of the team provided force warnings and other commands. I then heard the individual yell in response something along the lines of "Fuck you" and other defiant language. He then put on a shirt, pulled a handgun out of his pants, and fired it, canted in my direction. The little girl was near him at the time. The gun was not aimed directly at me but was traveling over my head. I was concerned that he may shoot at me but I maintained my concealed position and did not fire as I believed he did not see me.

16.    I radioed that the individual had fired multiple shots. I then heard at that time that the individual was not being cooperative with the contact team's further instructions.

17.    Around the same time, I saw the little girl had gone off the porch the individual was standing on and into the yard or driveway area north of the home. At the same time, I could see the individual was focused on the area where I knew the contact team was positioned.

18.    It was also around this time that Officer Hertlzer informed me he was changing position to find a more optimal viewing angle – I am tall and understood that he perhaps could not see over the fence I had found cover behind.

///

Page 3 – DECLARATION OF JOSHUA DYK

19.    As the individual continued to focus in the area of the contact team, I saw him begin to bring his arm down, extend it, and point the gun toward the contact team – I believed he was aiming at them.

20.    At that point I had seen the individual firing his gun into the neighborhood multiple times over a period of time. I knew he was using real bullets and those bullets were coming down somewhere.

21.    I had heard him aggressively refuse to comply with other team member's multiple instructions, as well as direct comments of destain at those officers through shouts of "fuck you" and "suck my dick," despite the officer's force warnings.

22.    The manner in which he lowered the gun to aim at the officers was different and appeared intentional and directed compared to the other shots I had seen him fire.

23.    As he lowered his weapon toward the officers, I believed he was purposely aiming at the officers to kill them – I believed they, and potentially members of the community in the homes behind the officers, were in immediate and grave threat of death or serious injury.

24.    Because I believed the individual represented an immediate threat of death and serious physical injury to the officers and the community, I fired my rifle one time at his chest, hitting him, stopping his firing at the officers, and causing him to fall to the floor of the porch.

**I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury**

DATED: 8/8/25 .

Respectfully submitted,

_____
Joshua Dyk

Page  4 – DECLARATION OF JOSHUA DYK