**J. Ashlee Albies**, OSB #051846
**Maya Rinta,** OSB #195058
Albies & Stark LLC
1500 SW First Ave., Suite 1000
Portland, Oregon 97201
Telephone: (503) 308-4770
Email: ashlee@albiesstark.com

    Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| ESTATE OF AARON D. STANTON, by DOUGLAS STANTON, Personal Representative, and A. S., a minor, by and through her Guardian ad Litem, DOUGLAS STANTON, | Case No. 3:23-cv-01767-AN |
| Plaintiffs, | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| JOSHUA DYK and CITY OF PORTLAND, a municipal corporation, | |
| Defendants. | |

**TABLE OF CONTENTS**

I.   INTRODUCTION ............................................................................................................ 1

II.  FACTUAL BACKGROUND........................................................................................ 2

   A.   Focused Intervention Team.................................................................................... 2

   B.   PPB Training and Policy of De-escalation ........................................................... 3

   C.   Critical Incident Management Framework ............................................................ 5

   D.   July 22, 2022 Incident........................................................................................... 6

      1.   Neighbors report Mr. Stanton is intoxicated and shooting weapons into the air ............ 6

      2.   PPB Officers arrive at a staging location and attempt to make a plan........................... 6

      3.   PPB Officers approach Mr. Stanton's location and attempt contact ............................. 8

      4.   Mr. Stanton continues firing into the air; Dyk shoots him when A.S. goes into the driveway. ........................................................................................................ 12

      5.   A.S. watches her father die, and Police tell her that he did this to himself .................. 13

      6.   Relevant critical evidence, the neighbor's video of the shooting, was not collected by PPB during its investigation ........................................................................ 14

      7.   Officers give testimony that conflicts with each other, is contrary to physical evidence, and raises credibility issues requiring jury resolution. ..................................... 15

      8.   PPB investigated the conduct of its own and found it within policy … yet again ....... 20

III. LEGAL ARGUMENT.................................................................................................. 23

   A.   Summary Judgment Standard ............................................................................... 23

   B.   Fourth Amendment Claim- Excessive Force ....................................................... 24

      1.   The Severity of Intrusion .......................................................................... 25

      2.   Government Interests ................................................................................. 25

      3.   Material Questions of Fact Exist as to Whether Mr. Stanton Posed an Immediate Threat........................................................................................ 26

      4.   Balancing .................................................................................................. 28

   C.   Qualified Immunity............................................................................................... 29

   D.   Monell Claim ........................................................................................................ 31

   E.   Tort Claims ........................................................................................................... 33

      1.   Wrongful Death ........................................................................................ 33

      2.   IIED........................................................................................................... 35

      3.   NIED ......................................................................................................... 37

IV.     CONCLUSION .................................................................................................... 38

# TABLE OF AUTHORITIES

Cases

*Anderson v. Warner*, 451 F.3d 1063 (9th Cir. 2006) ...................................................... 24

*Avina v. U.S.*, 681 F.3d 1127 (9th Cir. 2012) .................................................................. 25

*Barnes v. Felix*, 145 S Ct 1353 (2025) ............................................................................. 28

*Beck v. City of Pittsburgh*, 89 F.3d 966 (3d Cir. 1996) .............................................. 32, 33

*Box v. Department of State Police*, 311 Or. App. 348 (2021) ......................................... 35

*Bryan v. MacPherson*, 630 F3d 805 (9th Cir 2010) ............................................. 25, 26, 27

*Calonge v. City of San Jose*, 104 F.4th 39 (9th Cir. 2024) .................................... 25, 27, 30

*Castro v. Cty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) ..................................... 31, 32

*Clouthier v. Cty. of Contra Costa*, 591 F.3d 1232 (9th Cir. 2010) ................................. 31

*Conn v. Gabbert*, 526 U.S. 286 (1999) ............................................................................ 24

*Cruz v. City of Anaheim*, 765 F.3d 1076 (9th Cir. 2014) ................................................. 24

*Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001) ..................................................... 26

*Furnace v. Sullivan*, 705 F.3d 1021 (9th Cir. 2013) ....................................................... 23

*George v Morris*, 736 F.3d 829 (9th Cir 2013) ............................................................... 29

*Gibson v. Cnty. of Washoe*, 290 F.3d 1175 (9th Cir. 2002) ............................................ 32

*Glenn v. Washington County*, 673 F.3d 864 (9th Cir. 2011) ........................................... 26

*Gordon v. County of Orange*, 6 F.4th 961 (9th Cir. 2021) .............................................. 23

*Graham v. Connor*, 490 U.S. 386 (1989) ................................................................... 24, 25

*Harris v. Roderick*, 126 F.3d 1189 (9th Cir. 1997) ......................................................... 30

*Hector v. Wiens*, 533 F.2d 429 (9th Cir. 1982) ............................................................... 23

*Henry v. County of Shasta*, 132 F.3d 512 (9th Cir. 1997) ............................................... 33

*Hope v. Pelzer*, 536 U.S. 730 (2002) ............................................................................... 29

*Jackson v. Barnes*, 749 F.3d 755 (9th Cir. 2014) ............................................................ 31

*L.F. by & through Brown v. City of Stockton,* No. 2:17-CV-01648-KJM-DB, 2020 WL 4043017 (E.D. Cal. July 17, 2020) ................................................................................................ 32

*Liston v. County of Riverside*, 120 F.3d 965 (9th Cir. 1997) .......................................... 25

*Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011) ........................................................... 30

*McGanty v. Staudenraus*, 321 Or. 532 (1995) ................................................................ 36

*Moreno v. Baca*, 431 F.3d 633 (9th Cir. 2005) ............................................................... 29

*Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012) .................................................... 25

*Peck v. Montoya*, 51 F.4th 877 (9th Cir. 2022) ................................................... 28, 30, 31

*Philibert v. Kluser,* 360 Or. 689 (2016) ........................................................................... 37

*Prison Legal News v. Lehman*, 397 F.3d 692 (9th Cir. 2005) ......................................... 30

*Richardson v. McKnight*, 521 U.S. 399 (1997) ............................................................... 29

*Rodriguez v. Cty. of L.A.*, 891 F.3d 776 (9th Cir. 2018) ................................................. 32

*Rosenbaum v. City of San Jose*, 107 F.4th 919 (9th Cir 2024) ........................................ 29

*S.R. Nehad v. Browder*, 929 F.3d 1125 (9th Cir. 2019) .................................................. 25

*Sankovich v. Life Ins. Co. of North America*, 638 F.2d 136 (9th Cir. 1981) .................... 23

*Saucier v. Katz,* 533 Us. 194 (2001) ............................................................................... 29

*Smith v. City of Hemet*, 394 F.3d 689 (9th Cir. 2005)................................................................26
*Son v. Ashland Cmty Healthcare Servs*. 239 Or. App. 495 (2010) .............................................34
*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors* Ass'n, 809 F.2d 626 (9th Cir. 1987)...............23
*Thomas v. Ponder*, 611 F.3d 1144 (9th Cir. 2010) ....................................................................23
*Tsao v. Desert Palace, Inc.,* 698 F.3d 1128 (9th Cir. 2012) ......................................................32
*U.S. v. Curry*, 905 F.2d 1541 (9th Cir. 1990) ...........................................................................36
*Velazquez v. City of Long Beach*, 793 F.3d 1010 (9th Cir. 2015).........................................32, 33
*Young v. Cnty. of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011)............................................24, 28

## Statutes

42 USC § 1983 ............................................................................................................... 29

## Rules

FRE 801 ....................................................................................................................... 40
FRE 807 ....................................................................................................................... 41

**CERTIFICATE OF COMPLIANCE**

This brief complies with the applicable word-count limitation under LR 7-2(b) because it contains 10,986 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

## I.    INTRODUCTION

On July 22, 2022, City of Portland Police Bureau (PPB) Officer Joshua Dyk shot Aaron Stanton with an assault rifle a fraction of a second after Aaron Stanton discharged a semi-automatic pistol into the air from the front porch of his home. Officer Dyk, who was concealed from Mr. Stanton's view, had been observing Mr. Stanton shooting his gun into the air for some time before shooting him. Video taken by a neighbor, Jason Morris, shows Mr. Stanton pointing and shooting the gun in the air and the moment later when Officer Dyk shot him. Contrary to officer testimony, Mr. Stanton did not level the gun, nor point it at any officers. Mr. Morris also witnessed the shooting and testified Mr. Stanton was not leveling the gun when Officer Dyk shot him. A reasonable jury could find the shooting unreasonable under Fourth Amendment standards on this evidence alone.

PPB did not collect Mr. Morris' video and log it into evidence during its investigation, even though Mr. Morris showed the video to police right after the shooting, and even though PPB seized Mr. Morris's cell phone for the ostensible purpose of collecting and preserving this evidence. PPB viewed critical video evidence, had it in their possession, and failed to secure it. Defendants offer no explanation for these glaring omissions.

Page 1 – **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Based on its failure to collect and consider relevant evidence, its practice of conducting inadequate investigations, and its pattern of failing to hold officers who use deadly force accountable, a jury could conclude that PPB has a longstanding custom or policy of not conducting thorough internal investigations when officers use deadly force. The evidence thus shows that PPB's internal review process is wholly inadequate to detect, deter, and prevent uses of unconstitutional deadly force.

Defendants' motion ignores critical facts and omits material evidence. For example, Defendants barely reference the only objective evidence—the video—of Officer Dyk shooting Aaron Stanton. Reading their motion, one would not realize that a video of the shooting exists. In addition to contradicting officers' accounts that Mr. Stanton was leveling the gun at distant officers when Officer Dyk shot him, this video, and other evidence, shows that Mr. Stanton's daughter was not in the line of fire—directly contradicting two other rifle-armed officers' claimed reasons for not firing at Mr. Stanton at the same moment Officer Dyk shot Mr. Stanton.

Defendants' motion rests almost entirely on the premise that Mr. Stanton leveled and pointed his gun at police; a premise directly contradicted by video and eyewitness evidence. Genuine disputes of material fact exist about the most important and central facts in this case. For this and the reasons that follow, Defendants' motion should be denied in its entirety.

## II.    FACTUAL BACKGROUND

### A.  Focused Intervention Team

The Focused Intervention Team (FIT) is a specialized unit of the PPB focusing on gun violence. Bartlett dep. 8:25-9:10. FIT responds to calls of shots fired on a near daily basis: for example, in 2022, the year this incident occurred, FIT responded to 1,400 shots calls. Lovato

Page 2 – **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

dep. 30:18-31:2; Townley dep. 22:15-24. FIT commonly responds to gun calls involving people appearing to be in mental health crisis. Hertzler dep. 17:2-5, 20:121:3; Townley dep. 25:19-26:5.

FIT members are partnered up, and while enroute to a call, they gather available information about the incident from the radio and the Mobile Digital Terminal (MDT) and discuss contingencies. Dyk dep. 65:7-24; Hertzler dep. 39:11-41:9.

### B. PPB Training and Policy of De-escalation

PPB's stated policy is to safely resolve all interactions with the least amount of force necessary, and it provides officers with training to effectuate that stated goal. Ex. 41, pp. 2, 3; Bryson dep. 50:13-20. De-escalation training and Crisis Intervention Training (CIT) are allegedly important to the PPB. Ex. 41, p. 4; Bryson dep. 9:3-10:1, 15:6-16:3. A sample training log for a PPB officer shows roughly a quarter of the mandatory training relates to or incorporates de-escalation training (132 of 428 total). *Id.* at 7:5-24, 8:2-20, 9:3-10:1; Ex. 1.[1] PPB offers an advanced academy all the way through to Enhanced Crisis Intervention Training (ECIT). Bryson dep. 13:16-14:3. PPB mandates every officer have CIT; some officers volunteer for ECIT, which builds on CIT, such as active listening, parroting, and building rapport, with an additional 40 hours of classroom and scenario-based training. Hertzler dep. 22:7-15; 23:1-10; Bartlett dep. 25:1-14; Ex. 1.

De-escalation tactics are deliberate attempts to prevent or reduce the amount of force used to resolve a confrontation. Ex. 41, pp. 2, 4. Tactics require thoughtful communication, which includes allowing for venting, engaging in active listening and rapport building, and creating distance. *Id.*; Bryson dep. 34:1-6, 35:3-9, 36:11-37:10. Rapport building and de-

---

[1] All Exhibits are attached to the Declaration of J. Ashlee Albies and will be referred hereafter by exhibit number or by deponent name for deposition testimony.

Page 3 – **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

escalation are crucial aspects of CIT and ECIT. Bartlett dep. 25:9-25, 28:7-8. Rapport building involves engaging with a person in crisis and attempting to gather information by asking questions, with the goal of resolving a confrontation. *Id.* at 25:19-26:18, 27:5-8.

PPB trains officers to recognize signs and symptoms of mental illness, including considering information they receive on a call. Bryson dep. 22:2-5. If an officer receives information that leads them to believe a mental health crisis or illness may be a factor in a situation, PPB trains them to consider that in their decision-making throughout the entirety of the call. *Id.* at 22:5-10; Ex. 41, p. 4. PPB also trains officers to gather information about a subject's common behaviors from people who know the subject to determine whether what they are doing is abnormal for that person. *Id.* at 25:17-26:19.

For PPB calls involving a person in crisis, the call can be coded for ECIT. Bartlett dep. 29:5-11. Officers with ECIT are expected to use their enhanced de-escalation skills with the goal of reducing the amount of force used and are better trained to handle calls involving someone in mental health crisis. *Id.* at 42:16-24; Pavon dep. 16:11-21.

PPB also trains officers to identify someone who is intoxicated, as they often interact with intoxicated people. Hertzler dep. 24:10-12; Piombo dep. 24:22-24. Signs of intoxication include impaired, slow, or uncoordinated movement; thick or slurred speech; belligerence; failure to follow instructions; and combativeness. Hertzler dep. 24:13-19, 25:1-26:9; Pavon dep. 21:11-15; Piombo dep. 24:5-19. PPB trains officers to use de-escalation techniques with intoxicated people and those in mental health crisis. Bryson dep. 38:25-39:25; Bartlett dep. 32:14-33:6.

Page 4 – **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

### C.  Critical Incident Management Framework

PPB trains officers to follow certain protocols related to critical incidents – large, resource-intensive incidents that pose a higher-than-normal risk of danger. Those protocols rely on communication to facilitate a negotiated surrender, and include a contain and call out strategy, a custody plan, a communication team/plan, and a contingencies component. Lovato 30(b)(6) dep. 7:2-8, 27:5-21. The protocols include establishing an incident commander to manage the incident and prioritize the four Cs: contact, custody, communication, and contingencies. *Id*. The contact team makes verbal contact with the subject; the custody team takes the person into custody; the communication team attempts to gain information about and tries to contact subject. Pool dep. 25:18-21, 26:4-5, 26:6-12. The protocols also involve establishing a perimeter, which keeps people and vehicles out, limits danger to the public, and lets officers set up teams to successfully resolve the situation. *Id.* at 28:8-12. The goal is to slow down events during a critical incident; using time to marshal resources increases chances for successful outcome. *Id.* at 29:17-23.

Similarly, for active shooter calls, the goal is to slow down the situation, engage and establish rapport with the subject to gain compliance and get them to voluntarily cooperate, and ECIT officers are important. *Id.* at 31:2-14, 32:8-16.

Radio traffic during critical incidents is at a premium; useful information put out over the radio is a priority. Lovato 30(6)(b) dep. 58:12-23. Officers have an obligation to listen to radio traffic, as it provides critical information about the incident collected from a number of sources. Officers are expected to gather and understand as much information as possible, particularly for incidents involving guns. Dyk dep. 68:13-25; Pool dep. 49:23-50:13; Lovato 30(b)(6) dep. 57:12-20.

Page 5 – **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

### D. July 22, 2022 Incident

*1. Neighbors report Mr. Stanton is intoxicated and shooting weapons into the air*

On the evening of July 22, 2022, Aaron Stanton was at home on SE 125th Ave with his 6-year-old daughter, A.S., and had consumed alcohol to the point of severe intoxication.

At approximately 8:17 p.m., Defendant City's Bureau of Emergency Communications ("BOEC") transmitted information from several 911 calls reporting a person discharging firearms on his property, but not aiming the gun at or threatening anyone. Ex. 2, p. 1 ("THE NBR IS FIRING OFF ROUND IN HIS DRIVEWAY, WM, CLEAN SHAVEN, SHORT HR, POSS WHT CLOTHING…NOT AIMING GUN AT ANY1…"); Pool dep. 44:11-24. Officers responding to the call understood that Mr. Stanton was not threatening or aiming at any person. Hertzler dep. 38:6-22; Lovato dep. 47:10-48:1; Pavon dep. 40:14-20. Callers also reported that Mr. Stanton appeared intoxicated and possibly had mental health issues. Ex. 2, pp. 7, 8; Ex. 3 (AIR1video) at 20:51:02; Ex. 4 at 7:19-22 (Air1 video tr.); Pool dep. 43:13-18. Indeed, Mr. Stanton was visibly intoxicated, wobbling and leaning forward. Morris dep. 20:24-21:12.

*2. PPB Officers arrive at a staging location and attempt to make a plan*

At approximately 8:20 p.m., PPB officers including FIT members were dispatched to respond. Bartlett dep. 54:2-9. *See* Defs' Motion for Summary Judgment (Defs' MSJ) at 3-4.

PPB had a myriad of weapons and training to address the situation. PPB's fixed wing aircraft (AIR1) provided visual information from above. Pool dep. 47:6-7. Officers had ballistic shields, helmets and vests rated to stop most pistol bullets; binoculars; handguns; impact munitions; rifles; handcuffs; tasers. Dyk dep. 70:12-24, 71:24-72:5; Hertzler dep. 61:16-19, 63:9-20, 64:21-65:15, 66:1-20; Lovato dep. 60:1-3.

Various members of the FIT team, enroute to the scene, discussed contingencies and a

Page 6 – **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

plan. Lovato dep. 47:15-49:25. This included tolerating Mr. Stanton pointing and shooting his weapon in the air and potentially tolerating him levelling or pointing at them if they had sufficient cover. Lovato dep. 48:15-49:25.

Sgt. Pool, the Incident Commander, was responsible for coordinating the big-picture response, including delegating certain actions to other officers. Pool dep. 25:6-17, 27:2-28:12. Sgt. Pool consulted with PPB's Special Emergency Response Team (SERT), a tactical team, about whether the incident rose to the threat level to initiate a SERT response. Townley dep. 31:22-33:24. SERT advised Sgt. Pool that the threat was not yet sufficient to activate SERT, advised him to work on getting containment of the incident, attempt contact with the subject, and then recontact SERT. Townley dep. 68:2-18, 72:1-5.

At approximately 8:25 p.m., a dispatcher transmitted that a neighbor, also armed, approached Mr. Stanton trying to engage with him. Mr. Stanton did not threaten or harm this person. Ex. 2, p. 2; Ex. 5 at 0:02:29-03:53; Ex. 6 at 4:1-7, 20-23; Pavon dep. 50:7-18.

PPB officers staged at the Park and Ride on the SE corner of 122nd Ave and Burnside St. Bartlett dep. 54:16-21. Seargent Pool, Officers Dyk, Ken Le, Bartlett, Pavon, Piombo, Lovato were all present. Dyk dep. 77:18-22, 82:1-6. By the time officers arrived, an officer on scene had already broadcast the name Aaron Stanton, his address, and that he appeared intoxicated. Ex. 5 at 0:03:45; Ex. 6, 5:2-3, 12:3-4; Bartlett dep. 56:22-57:18; Pavon dep. 43:4-22. By then, Sgt. Pool was aware that two officers had a prior similar interaction with Mr. Stanton where he got drunk, came out of his house, and fired shots in the air. Pool dep. 45:6-11.

At approximately 8:36 p.m., PPB Officers were informed by AIR1 that Stanton was observed firing about 30 shots into the air and then went inside his house. Ex. 2, p. 5; Ex. 5 at 8:56-9:10; Ex. 6, 9:8-10:1.

Page 7 – **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

The officers had a quick discussion that they would tolerate Mr. Stanton holding a gun and Mr. Stanton shooting in the air; this was communicated to the officers who were set to approach the location. Dyk dep. 101:8-20, 103:12-21; Lovato dep. 60:16-25; Pavon dep. 59:10-60:18; Piombo dep. 48:3-9. All officers understood this to be consistent with PPB policy. Dyk dep. 103:24-104:5. Thus, officers on scene determined, based on their training and experience, Mr. Stanton shooting into the air was not a threat that justified the use of deadly force. Hertzler dep. 48:1-24; Dyk dep. 104:13-24, 106:18-107:5; Piombo dep. 68:20-23; Wambold dep. 87:3-21; Pool dep. 79:2-11.

Officers did not discuss any other details of the plan because soon after arriving at the staging location, they heard a volley of shots from the direction of Mr. Stanton's home. Bartlett dep. 58:10-18; Dyk dep. 85:25-86:4, 90:5-11; Pavon dep. 46:13-47:5, 51:6-14, 52:10-25; Piombo dep. 32:6-33:2034:9-14; Pool dep. 46:19-47:11.

3. *PPB Officers approach Mr. Stanton's location and attempt contact*

After hearing the shots, PPB officers quickly drove to 126th, which took less than one minute, and once there, immediately got out and started moving south on 126th Ave towards Mr. Stanton's location. Dyk dep. 92:16-25; Lovato dep. 67:17-24; Pavon dep. 53:2-6.

Officer Bartlett was armed with a 40 mm impact less lethal launcher,[2] Wambold with binoculars, Pavon and Piombo with rifles, and Lovato self-assigned giving commands, moved south on SE 126th Ave to get closer behind hard cover,[3] to get eyes on Mr. Stanton and with the end goal of getting him into custody. Bartlett dep. 42:16-23; Hertzler dep. 82:20-83:5; Piombo dep. 38:5-19; Wambold dep. 70:18-71:2. These officers stopped behind a white van or SUV in a

---

[2] The 40 mm less lethal launcher has a range of up to 141 feet and allows less lethal force from a distance.
[3] "Hard cover" is cover that a bullet cannot penetrate. It may be a tree, engine block, ballistic shield, concrete wall, or any of the many other types of objects that will stop a bullet.

Page 8 – **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

driveway across the street to the east and about 85 yards/256 feet north of Mr. Stanton's house where they could see his house at what they felt was a safe distance. Bartlett dep. 64;1-18; Pavon dep. 56:21-57:19; Lovato dep. 60:4-7, 62:16-25. Photos of the officers' location taken from the perspective of Stanton's porch, looking north, and the officers' location, looking south, as well as stills excerpted from the AIR1 video, also show several large trees providing additional zones of hard cover for the officers. Pavon dep. 58:16-23; Albies decl. ¶11, Ex, 7, 8, 9, 10.

Distinct from those officers moving south on 126th Ave, Officers Hertzler and Dyk separately moved south through backyards across the street and east to try to get a place of concealment across the street from Mr. Stanton's home, from which they could observe and communicate additional information about Mr. Stanton to the contact team. Hertzler dep. 54:16-20, 69:24-70:6, 82:20-25; Bartlett dep. 62:21-63:4; Dyk dep. 98:16-99:18. They approached, maintaining cover and a safe distance. Hertzler dep. 52:16-53:14.

By approximately 8:40 p.m., Officers Wambold, Piombo, Pavon, Bartlett, and Lovato were in their position of hard cover and concealment behind the SUV parked in a driveway at the north end of SE 126th Avenue, and Mr. Stanton and A.S. were still in the house. Wambold dep. 78:1-15.

Between 8:37 p.m. and 8:51 p.m., Aaron Stanton and A.S. were inside their home. Ex. 2, p. 4-5, 8. During this time, at 8:40 p.m., a BOEC dispatch operator again broadcast Aaron Stanton's name, and that another neighbor called and reported Mr. Stanton had manic episodes in the past. Ex. 2, pp. 6-7. Officer Le located phone numbers for Aaron Stanton and a woman believed to be his wife; Le dep. p. 9:16-22, 34:5-21; Ex. 6:10-13. At approximately 8:44 p.m., this was announced via radio, and Le requested permission to contact Mr. Stanton. Ex. 2, p. 6; Ex. 6, p. 13:11-13, 14:2-9. Sgt. Townley, a ranking officer on scene, responded over radio "don't

Page 9 – **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

call yet." Le dep. 35:7-10; Ex. 4, 4:9-10; Ex. 6, p. 14:14-15. It is undisputed that no PPB officer attempted communication with Mr. Stanton by phone at any time.

Also by this time, other officers were on the south and north ends of 126th Ave, blocking pedestrian and vehicle traffic, and another separate cluster of officers were stationed a block to the east of Mr. Stanton's residence. Ex. 3 at 20:48:06; Ex 4, 5:17-6:7; Bartlett dep. 59:15-24; Dyk dep. 84:1-17. That is, PPB had or was very near, containment.

At 8:49 p.m., while Mr. Stanton and A.S. were still in the house, Officer Lovato broadcast on the radio "If this guy comes out, we're going to challenge him. If he's got the gun, then (inaudible) what we think is reasonable," which BOEC transmitted as "IF HE COMES OUT, WE'RE GOING TO CHALLENGE HIM, IF HE LEVELS THE GUN, GOING TO DO WHAT WE NEED THAT IS REASONABLE." Ex. 3 at 20:50:52; Ex. 4, 7:6-9; Ex. 6, p. 17:7-10; Pavon dep. 59:10-60:18. Moments later, BOEC radioed that a neighbor reported there was a small girl in the house, and that Mr. Stanton was "extremely intoxicated." Ex. 3 at 20:51:02-:27; Ex. 4, 8:15-24.

At approximately 8:51 p.m., Mr. Stanton and A.S. came out of the house to the front porch; Officer Lovato, who was not ECIT trained (nor interested in ECIT training), yelled at Mr. Stanton, identifying as police and giving a force warning to the effect of "if you don't do exactly as we say, we may shoot you." Ex. 3 at 20:51:35; Ex. 4, 7:25-8:9; Wambold dep. 78:10-15, 80:1-5, 80:23-81:4; Bartlett dep. 75:14-21; Lovato dep. 23:17-21, 69:22-70:4, 71:9-12. Officer Lovato did not try to build rapport or attempt to engage in de-escalating dialogue. Lovato dep. 75:5-78:19. He did not address Mr. Stanton by name, did not ask his name, did not reference his child, did not ask what was going on, did not ask why he was upset, did not allow him to vent, did not

Page 10 – **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

attempt to engage in a conversation; he did not engage in any conduct consistent with ECIT or de-escalation tactics. Lovato dep. 109:18-25, 111:2-24.

Mr. Stanton yelled profanities back, slurring his words. Bartlett dep. 77:5-78:4; Wambold dep. 80:1-10. Based on his and officers' positions, it was unlikely he could see the officers. Officer Piombo also observed that Mr. Stanton was staggering around, used thick speech, and appeared intoxicated. Piombo dep. 53:9-24. At 8:51 p.m., Officer Hertzler conveyed over the radio that he had eyes on Mr. Stanton, that Mr. Stanton was out front, putting his shirt on, hands free, and yelling profanities at the police. Ex. 3 at 20:52:26; Ex. 4, 8:10-13; Hertzler dep. 107:12-15. Officer Lovato could see Mr. Stanton on his front porch and could not hear him, but heard Hertzler's radio transmission. Lovato dep. 70:17-33, 71:2-20.

A.S. did not appear scared of her father. Hertzler dep. 76:21-24; Lovato dep. 104:21-105:12. At no time did Mr. Stanton verbally threaten any officers or indicate that he would shoot them. Lovato dep. 116:3-6; Pavon dep. 80:9-11. At no time did Mr. Stanton threaten his daughter or neighbors. Bartlett dep. 73:12-16; Pavon dep. 50:7-51:4, 80:6-14.

After Officer Lovato yelled at Mr. Stanton that the police would shoot him if he did not do exactly as they said, at approximately 8:52 p.m., Mr. Stanton fired his gun into the air multiple times. Lovato dep. 73:9-21; Hertzler dep. 86:9-88:1; Bartlett dep. 73:17-74:16. Officer Bartlett radioed to let everyone know that Mr. Stanton was firing the gun but was <u>not</u> pointing the firearm at anyone. Bartlett dep. 75:1-8. Officer Bartlett felt Mr. Stanton was not showing an intent to hurt somebody, but his behavior was "dangerous" and "crazy," and Bartlett didn't want other officers to think they needed to come rescue the officers or "jack things up and precipitate some other kind of use of force." Bartlett dep. 80:16-81:16. After Officer Bartlett radioed this information, Mr. Stanton shot at least two more rounds in the air. Bartlett dep. 81:17-82:12.

Page 11 – **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Other officers on scene, based on their training and experience and consistent with their plan, did not use deadly force when Mr. Stanton was shooting his weapon in the air. Hertzler dep. 48:1-21.

4. *Mr. Stanton continues firing into the air; Dyk shoots him when A.S. goes into the driveway.*

At approximately 8:53 p.m., just prior to Mr. Stanton being shot, A.S. left the front porch and went into the driveway behind a parked car. Ex. 3 at 20:53:24; Ex. 4, 9:10-11 (AIR1 broadcast a person "left the front porch and went behind a parked car").

Officer Dyk, located across the street slightly to the NE from Mr. Stanton and completely concealed, had Mr. Stanton in his sights and saw that A.S. had left the front porch. Dyk dep. 111:25-112:7, 119:2-16, 147:1-12. Officer Dyk felt confident that Mr. Stanton could not see him and did not know he was there. Dyk dep. 119:2-16. Officer Dyk had been watching Mr. Stanton for about five minutes from that concealed location, observing Mr. Stanton go in and out of his house once or twice and shoot multiple rounds in the air. Dyk dep. 128:12-24. Dyk wondered if Mr. Stanton was intoxicated or just angry, by the way he was yelling at the officers. Dyk dep. 129:23-130:5. Officer Dyk did not know exactly where the other officers were, and could not hear Officer Lovato giving commands. Dyk dep. p. 140:21-141:11, 148:20-149:22. He only heard via the radio that officers were giving force warnings and commands. *Id.*

Moments after A.S. left the porch, Mr. Stanton lifted his shirt up, reached into his waistband with his left hand, pulled out a gun, held it up in the air, and shot it towards the sky. Morris dep. 14:17-20; Ex. 11, 0:0:49; Ex, 3, 20:53:02. At 8:53 p.m., less than a second after Mr. Stanton fired off this last round into the air, Officer Dyk shot and killed him, while still concealed and behind cover. Morris dep. 14:21-23; Ex. 11, 0:0:49; Ex. 3, 20:53:02.

Page 12 – **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

At the time Officer Dyk shot Mr. Stanton, Officer Dyk could not see and did not know exactly where the other officers were. Dyk dep. 140:21-141:11. Officer Dyk said he would not have shot Mr. Stanton if A.S. was near Stanton. Dyk dep. 147:1-12. Based on this, it could be inferred that Officer Dyk shot Mr. Stanton not because he observed Mr. Stanton level his pistol or otherwise behave in a manner constituting a deadly threat, but because he had the opportunity to shoot Mr. Stanton when A.S. was no longer in the line of fire.

Officers Piombo and Pavon were both armed with assault rifles and had clear views of Mr. Stanton. Pavon dep. 82:23-83:2; Piombo dep. 55:2-10, 69:5-24. They both had their safeties off when they claimed they saw Mr. Stanton point the gun in their direction, with Pavon describing Mr. Stanton as taking a shooting stance. Pavon dep. 83:3-85:19; Piombo dep. 61:16-21, 62:1-8. Both testified that they did not shoot Mr. Stanton because A.S. was in the way or right next to him. Pavon dep. 88:21-89:8, 95:8-14; Piombo dep. 62:1-17, 66:5-67:6. This is demonstrably inaccurate. Ex. 11, 0:0:45-55.

Officer Bartlett testified that Mr. Stanton had let his left wrist relax and come down, pointing in the direction of the officers behind hard cover north of the residence, and he felt it was like a blind shot, not pointing the gun or using the sights in any way. Bartlett dep. 85:11-20.

All the officers behind hard cover claim to have ducked as they heard Dyk's shot ring out. Bartlett dep. 86:9-12; 87:5-13; 89:13-90:3. There is no evidence that any homes or objects were struck by Mr. Stanton's shots. Sims dep. 55:23-56:6.

5.   *A.S. watches her father die, and Police tell her that he did this to himself*

After her father was shot, A.S. ran to the front porch and knelt beside him, watching him take his last breaths, until removed by police. Ex, 3, 20:55:40-56:00; Ex. 11, 02:24-2:48.

Page 13 – **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

She was picked up by Officer Hertzler and handed to Officer Adi Ramic, who drove her to the East Precinct in his car. *Id*.; Ramic dep. 32:12-15. Officer Ramic does not remember exactly what he said to her. Ramic dep. 30:18-25. A.S. gave police her mother's phone number, she was called and came within 10 minutes. Ex. 2, pp. 11, 12; Ramic dep. 33:25-34:12. There, A.S.'s mother and Mr. Stanton's parents waited for hours and were questioned by police about Mr. Stanton until PPB finally told them that he was dead. K. Stanton dep. 96:21-97:9, 98:2-16, 99:1-100:1; Phou dep. 48:8-50:25; 54:4-25.

In the aftermath of her father's death, A.S. suffered nightmares and emotionally overwhelming breakdowns when she described seeing her father die. *Id.* at 58:18-59:25, 72/7-73/7; K. Stanton dep. 103:4-22. A.S. told her mother that she saw his purple lips and that an officer picked her up and told her that he killed himself. Phou dep. 59:12-60:8. Within a week of his death, A.S. told her grandmother that she heard the gurgle of her father's dying breaths, that an officer came to pick her up when she was next to him, and that an officer told her that her father "died of suicide." K. Stanton dep. 99:17-100:5, 102:2-6; 103:4-22. A week later, A.S. told her uncle that when she asked a PPB officer why they shot her father, the officer responded, "We did not do this. He did this to himself. He was sad." T. Stanton dep. 41:8-42/24.

None of the officers on scene remember what A.S. said or what specifically was said to her. Le dep. 18:11-19:4; Ramic dep 32:6-8, 30:12-17.

6. *Relevant critical evidence, the neighbor's video of the shooting, was not collected by PPB during its investigation*

Mr. Stanton's neighbor, Jason Morris, was one of the neighbors who called 911, witnessed the shooting and filmed it on his phone. Morris dep. 11:4-23, 13:6-7, 14:3-25; Ex. 11. Mr. Morris showed the video to Officer Ken Le, who was canvassing for evidence shortly after

Page 14 – **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

the shooting. Morris dep. 18:11-20:1, 23:15-17; Le dep. 20:10-22, 21:1-24. After watching the video on Mr. Morris' phone, Officer Le remarked, "you got the money shot." Morris dep. 19:18-21, 25:1-2. Officer Le seized Mr. Morris' phone, as well as the passcode to unlock it. Le dep. 23:3-19; Ex. 12. But neither Le nor anyone from PPB took a statement from Mr. Morris, and his video was not in PPB's case file nor turned over by the City in discovery in this case. Ex. 12; Sims dep. 39:10-42:14, 54:12-55:17; Albies decl. ¶13.

The evidence thus shows PPB talked to Mr. Morris, watched his video of the shooting, failed to secure this critical evidence, and failed to identify or disclose that this video existed. From this, one could infer that PPB undertook affirmative steps to ensure the "official" narrative was that which officers claimed—that Aaron Stanton leveled the gun at officers—and that the officers' stories would not be contradicted by the only known video footage of the shooting.

> 7. *Officers give testimony that conflicts with each other, is contrary to physical evidence, and raises credibility issues requiring jury resolution.*

As noted above, Mr. Morris's testimony and the contemporaneous video of the moment of the shooting evidence Mr. Stanton pointing the gun in the air with his left hand, facing the street. Ex. 11.at 0:0:49. This contradicts Defendants' testimony that he "leveled the gun."

**Officer Wambold**, who had been observing Mr. Stanton through binoculars, testified that: Mr. Stanton never once looked directly at the officers; Mr. Stanton grabbed the handgun, bladed with his left side towards the officers, arched the gun up and over his head and pointed/leveled at the officers; Wambold ducked down; and then heard a gunshot different than the other shots. Ex. 13 (Wambold clip); Wambold dep. 80:1-10,96:13-20, 88:20-89:3, 90:6-20, 91:9-93:10, 94:2-8. Officer Wambold initially thought Mr. Stanton might have shot himself. *Id*. at 97:3-7.

Page 15 – **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**



**Officer Dyk** claimed Mr. Stanton was purposely aiming the gun at police officers, despite Officer Dyk not knowing exactly where the officers were. Dyk dep. 139:2-25, 140:21-141:11. He claims Mr. Stanton took a "dueling stance," bladed towards and stared at other officers and targeted them, trying to fire at them, and described Mr. Stanton not only brought his arm down, but <u>extended</u> his arm and the gun out into a firing position.; *Id.* at 140:1-7. 140:21-141:11, 141:21-24, 142:3-9; Ex. 14 (Dyk clip):



Nov 22 2024 04:37:17 PM

In addition to the issue of Officer Dyk's credibility raised by the Morris video, his testimony that he did not know where the other officers were (officers who were allegedly threatened by Mr. Stanton), supports the inference that Mr. Stanton, also, did not know precisely where the other officers were, especially considering the distance, trees, and cars officers were taking cover behind and his obvious intoxication.

**Officer Lovato** claimed Mr. Stanton turned in the direction of the officers south on 126th Ave and leveled the gun at them. Lovato dep. 82:6-83:2. Officer Lovato ducked down behind the white car, heard shots and when he stood back up, he then claimed he saw Mr. Stanton level his gun again <u>across the street</u> to where he understood <u>Officers Dyk and Hertzler</u> were (which no other officers testified to witnessing), then saw Mr. Stanton drop and heard radio traffic that the suspect had been shot. Ex. 15 (Lovato clip); Lovato dep. 82:19-84:11, 94:8-95:16, 97:25-98:13, 101:22-102:8, 103:9-13. Officer Lovato also claimed, contrary to the video evidence, that A.S. was close to Mr. Stanton when Dyk shot him. *Id*. at 104:5-17:

Page 17 – **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**



**Officer Piombo** testified when Mr. Stanton pointed the gun in the direction of the officers, he didn't shoot because A.S. was in the way. Ex. 16; Piombo dep. 62:1-17, 66:5-67:6. He also initially thought, after seeing Mr. Stanton go down, that Mr. Stanton might have shot himself, because "he had that gun up and it was close to his face and it was out here and it was visible, and things are moving on, and then, bang, and down he went." *Id.* at 61:16-21, 70:3-12.



Page 18 – **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**Officer Pavon** described Mr. Stanton as taking a shooting stance and pointing the gun in the direction of the officers. Pavon dep. 84:8-85:19. He also claimed he did not shoot because A.S. was in the way. *Id*. at 88:21-89:8, 95:8-14, Ex. 17 (Pavon clip):



**Officer Bartlett** testified Mr. Stanton let his left wrist relax and come down, pointing in the direction of the officers behind hard cover; he felt like it was a blind shot, not pointing the gun or appearing to be using the sights in any way. Ex. 18 (Bartlett clip), Bartlett dep. 85:11-20.



Page 19 – **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

A reasonable jury could compare Mr. Morris' testimony and the video evidence with the officers' various demonstrations of how Mr. Stanton was positioned when he was killed, find that the video and Mr. Morris' testimony contradict these officers' accounts, and thus disbelieve PPB's narrative that Mr. Stanton leveled the gun. Or they could also conclude the officers' testimony is consistent with one another—but not the video—because Officer Dyk and the witness officers had no knowledge that the video existed and constructed a false narrative, confident that PPB's longstanding custom of not conducting bona fide investigations would not hold them accountable.

Moreover, Officer Lovato claimed he did not know that Mr. Stanton was reported to be intoxicated and did not appear intoxicated, Lovato dep. 48:5-14, despite radio broadcast of his intoxication, witness testimony of his intoxication, and other officer observations of intoxication.

Likewise, Officer Le (who did not witness the shooting) testified that he watched only part of Mr. Morris' video showing Mr. Stanton "firing up in the air" but did not recall watching the entire video. Le dep. 21:10-23:19. Given that the video shows Mr. Stanton firing the gun just once before almost immediately being shot, and that Mr. Morris testified Officer Le said Morris got the "money shot," a jury could disbelieve Officer Le and conclude that PPB undertook pains to ensure the "official" narrative was that Aaron Stanton leveled the gun.

8. *PPB investigated the conduct of its own and found it within policy ... yet again*

Every time, save one, PPB has ever investigated a PPB officer-involved deadly force incident resulting in death, it found the use of force within policy. Albies decl. ¶21. Several cases demonstrate that PPB's deadly force investigations fail to account for or collect critical

Page 20 – **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

evidence, or rely solely on officer testimony—even when that testimony conflicts with physical evidence.

Quanice Hayes, a 17-year-old Black teen, was shot and killed by PPB on February 9, 2017. Ex. 19. PPB's investigation determined the shooting was justified because the shooting officer claimed that Mr. Hayes, surrounded by officers, on his knees and complying with officer's commands, reached for a gun in his waistband. *Id.* A replica gun was found near his body, but no officer on scene saw the gun. The City's theory was that Mr. Hayes was able to reach into his waistband, pull out his gun, and toss it nearby after he was shot in the head and torso with an AR15. *Id.* at 35, 40; Ex. 20. PPB could not explain why a 17-year old would reach for a fake gun as he faced multiple police officers pointing guns at him.  Additionally, an expert in the lawsuit filed by Mr. Hayes' family showed it was impossible for him to have been shot then toss the gun as the City claimed. Ex. 20, pp. 10-11. The City settled that case for $2,095,081, the second largest settlement at the time for PPB killing someone. *See* Dkt. 129, Or. Dist. Court Case No. 3:18-cv-00988-AC (3/15/21). While the release agreement disclaims City liability, a jury could infer from the fact and amount of the settlement that PPB failed to conduct a bona fide internal investigation, which would have disclosed witness officers constructed a false narrative to cover up their use of excessive deadly force.

PPB shot and killed Lane Martin, a man in a mental health crisis on July 30, 2019. PPB failed to secure relevant video evidence of the actual shooting, even though PPB secured evidence from many other video sources depicting moments before, but not of, the shooting. See Ex. 21 (Martin investigative report confidential); Ex. 22 (Decl. of Lori Hayes). Mr. Martin was reportedly armed with a hatchet, which he dropped before PPB confronted him, and was screaming and pointing at officers aggressively. Ex. 21, p.3. A PPB officer shot Mr. Martin 11

Page 21 – **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

times after claiming he reached for a knife in his waistband—all 11 shots were deemed consistent with PPB policy. Ex. 21, pp.24, 43-44. A witness who watched the unsecured video depicting the actual shooting described it as showing Mr. Martin with his hands up and without a weapon the moment he was shot. Ex. 22. That case settled for $975,000, at the time, the fourth largest settlement by the City for PPB killing someone. Dkt. 22, Or. Dist. Court Case No. 3:19-cv-01647-SI (9/25/20). Like the Hayes case, a jury could infer PPB failed to conduct a bona fide internal investigation, and officers constructed a false narrative to cover up excessive force.

In the case of Emmaneul Clark, on November 19, 2022, PPB responded to a call of an attempted robbery in a fast-food restaurant parking lot by what the caller described as 3-4 white males in a sedan. Ex. 23, p. 3. Miles away and sometime later, PPB conducted a "high risk stop" of a different car with a female and three males, two of whom were Black. *Id.* Police pulled into the parking lot and shone their lights on the car. Within seconds of exiting his police vehicle, a PPB officer shot Mr. Clark, a Black man, in the back while Mr. Clark was running away. *Id.* The officer involved described Mr. Clark running around the back of his car, towards officers and reaching for his waistband. *Id.* at 21-27. Yet, video evidence showed Mr. Clark running around the front of his car, away from police, without pause or reach for his waistband. *Id*. at 35-37. While an internal affairs investigation found the officer violated PPB's deadly force, the Police Chief and Mayor reversed this and found the officer's conduct within policy. *Id*. at 38; Albies decl. ¶27; *See also* [Portland City Council Regular Session 08/07/25](#). This too supports a flawed system of accountability.

The killings of Quanice Hayes, Lane Martin, Aaron Stanton, and Emmanuel Clark, all found by PPB to be within policy based on flawed investigations ignoring critical evidence, and/or based on flawed analysis in heavy favor of the shooting officer. A jury could find PPB

Page 22 – **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

has a pattern or practice of conducting flawed investigations meant to absolve officers, takes all officers at their word even where that narrative contradicts physical evidence, fails to collect and consider relevant and critical evidence when it contradicts the police narrative, and will refuse to discipline officers whose conduct violates policy and the law.

## III.    LEGAL ARGUMENT

### A.  Summary Judgment Standard

"Summary judgment is appropriate only if, taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Furnace v. Sullivan*, 705 F.3d 1021, 1026 (9th Cir. 2013) (internal quotation marks omitted). "An issue of material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party." *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010) (internal quotation marks omitted). The Court must view the evidence in the light most favorable to Plaintiffs as the non-moving parties and draw all reasonable inferences in their favor. *Gordon v. County of Orange*, 6 F.4th 961, 967 (9th Cir. 2021). All reasonable doubt as to the existence of a genuine issue of facts should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1982). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of North America*, 638 F.2d 136, 140 (9th Cir. 1981).

Substantive law on an issue determines the materiality of a fact. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors* Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). At summary judgment, the court does not weigh conflicting evidence with respect to a disputed material fact, nor make credibility determinations. *Id*. Such credibility determinations are in the province of the jury. *Id*.

Page 23 – **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

### B. Fourth Amendment Claim- Excessive Force

42 USC § 1983 "provides a federal cause of action against any person who, acting under color of state law, deprives another of his federal rights." *Conn v. Gabbert*, 526 U.S. 286, 290 (1999). To maintain a claim under § 1983, a plaintiff must allege (1) the deprivation of a right secured by the federal Constitution or statutory law, and (2) that the deprivation was committed by a person acting under color of law. *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006). Here, Plaintiff brings claims under 1983 for violation of the Fourth Amendment, and Defendants do not contest that Officer Dyk was not acting under color of law. The only legal question is thus whether Defendant Dyk deprived Plaintiff of a secured right, and the answer to that is disputed.

The Fourth Amendment requires police to use only an amount of force that is objectively reasonable under the circumstances facing them at the time. *Graham v. Connor*, 490 U.S. 386, 387 (1989). Unreasonable uses of force are unconstitutional. *Id*. The Court must assess the gravity of the particular intrusion on Fourth Amendment interests, then "assess the importance of the government interests at stake," and finally, "balance the gravity of the intrusion on the individual against the government's need for that intrusion to determine whether it was constitutionally reasonable." *Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1161 (9th Cir. 2011) (internal quotation marks and citation omitted).

In deadly force cases, the Court "cannot 'simply accept what may be a self-serving account by the police officer" especially because "the person most likely to rebut the officers' version of events—the one killed—can't testify[.]" *Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014) (citations omitted). Under such circumstances, the Court "must carefully examine all the evidence in the record ... to determine whether the officer's story is internally consistent and consistent with other known facts." *Id.*

Page 24 – **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

The reasonableness of force used by an officer "is ordinarily a question of fact for the jury." *Liston v. County of Riverside*, 120 F.3d 965, 976 n10 (9th Cir. 1997). "Because the excessive force inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Avina v. U.S.*, 681 F.3d 1127, 1130 (9th Cir. 2012) (citation omitted).

### 1.  The Severity of Intrusion

"The intrusiveness of a seizure by means of deadly force is unmatched" because of a person's "fundamental interest in his own life." *Calonge v. City of San Jose*, 104 F.4th 39, 45 (9th Cir. 2024) (citation omitted). Deadly force is reasonable only "if a suspect poses a *significant* threat of death or serious physical injury to the officer or others." *S.R. Nehad v. Browder*, 929 F.3d 1125, 1133 (9th Cir. 2019) (emphasis in original) (citation omitted).

### 2.  Government Interests

To evaluate the government's interest in using force, courts look to three primary factors: (1) "whether the suspect poses an immediate threat to the safety of officers or others," (2) "the severity of the crime at issue," and (3) "whether he is actively resisting or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. The "most important" factor under *Graham* is whether the suspect posed an "immediate threat to the safety of the officers or others." *Bryan v. MacPherson*, 630 F3d 805, 826 (9th Cir 2010) (citation omitted). Importantly, on this *Graham* factor, the immediacy of the "threat analysis must be based on objective factors and not merely 'a simple statement by an officer that he fears for his safety or the safety of others.'" *Nelson v. City of Davis*, 685 F.3d 867, 880 (9th Cir. 2012) (quoting *Delore*, 272 F.3d at 1281).

Page 25 – **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

These factors are not exclusive. *Glenn v. Washington County*, 673 F.3d 864, 872 (9th Cir. 2011). Other relevant factors include the availability of less intrusive alternatives to the force employed, whether proper warnings were given, and whether it should have been apparent to officers that the person they used force against was emotionally distraught. *Bryan* at 805, *Deorle v. Rutherford*, 272 F.3d 1272, 1282–83 (9th Cir. 2001). Other factors, such as "the availability of alternative methods of capturing or subduing a suspect," may also be considered. *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005).

### 3. Material Questions of Fact Exist as to Whether Mr. Stanton Posed an Immediate Threat

Starting with the most important factor, a reasonable jury could conclude that Mr. Stanton did not pose an immediate threat of death or serious physical injury to Officer Dyk or others. The neighbor who witnessed the lethal shooting, Mr. Morris, testified that he did <u>not</u> feel threatened by Mr. Stanton. Morris dep. 39:8-15. Officer Dyk's cited justification for deadly force was that Mr. Stanton levelled the gun at a group of distant officers, and he testified that Mr. Stanton's arm extended out as he did so. Yet, Mr. Morris's testimony and video evidence dispute this account. This contradictory narrative of a disinterested witness is sufficient to establish that this question should be in the province of a jury. Likewise, the only PPB member to have watched the video, Officer Le, also described Mr. Stanton as "shooting up in the air."

Yet, more evidence also shows disputed facts. Based on the timing of Officer Dyk's shooting, a reasonable juror could infer that Officer Dyk shot Mr. Stanton, not because he observed Mr. Stanton level his pistol or behave in a manner constituting a deadly threat, but because he had the opportunity to shoot Mr. Stanton when A.S. was no longer in the immediate vicinity. In addition, other officers' descriptions of Mr. Stanton allegedly leveling the gun are

Page 26 – **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

inconsistent with one another, as depicted above in Section 2. D. 7, and inconsistent with the Morris video. None of the involved officers had seen the Morris video; a jury could conclude that the officers are circling the wagons to justify the shooting and protect Officer Dyk.

Two other PPB rifle operators, Officers Piombo and Pavon, were aiming at Mr. Stanton and had clear shots, but did not shoot when Officer Dyk shot. A jury could determine that they did not shoot because they did not perceive Mr. Stanton to be an immediate threat, especially given that the officers' explanations for why they did not shoot—because the child A.S. was blocking their shot—is contradicted by the video evidence.

Further, undisputed evidence shows that at no point prior had Mr. Stanton threatened anyone. Officers knew this when they arrived on scene, and had specific information that Mr. Stanton had fired the gun into the air but had <u>not</u> pointed the gun at anyone or threatened anyone. All officers had previously agreed that deadly force was not justified when Mr. Stanton was shooting in the air, and that he was not an immediate threat to officers or anyone else. The officers also had information that an armed neighbor attempted to confront Mr. Stanton, and he still did not threaten that confrontational armed neighbor. Once on scene, no PPB officer observed or received information from any source that Mr. Stanton had pointed a gun or otherwise physically or verbally threatened harm to anyone.

Yet another factor is that Mr. Stanton had not committed a serious crime. The conduct Mr. Stanton engaged in was, at most, disorderly conduct, unlawful use of a weapon, reckless endangerment, or discharging a firearm in city limits—all misdemeanors. Dyk dep. 108:15-109:19; Hertzler dep. 16:1-11; Bartlett dep. 46:3-7; Lovato dep. 116:12-117:1-4. The Ninth Circuit recognizes that a misdemeanor "is not a serious crime that could justify a high degree of force." *Calonge v. City of San Jose*, 104 F.4th 39, 47 (9th Cir. 2024); *Bryan*, at 829.

Page 27 – **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Further, a reasonable jury could find that all officers knew (or should have known) that Mr. Stanton was highly intoxicated, and/or was experiencing a mental health crisis, and that such people take longer to comply with police orders. *See Barnes v. Felix*, 145 S Ct 1353, 1358 (2025) (officer's actions in trying to control the encounter are part of the "totality of the circumstances").

Defendant City makes much of Mr. Stanton yelling expletives at officers, supposedly demonstrating noncompliance. But PPB officers encounter community members who are disrespectful or yell curse words at officers all the time. Pavon dep. 24:17-25:7; Piombo dep. 25:5-16. "Suck my dick" and "fuck you" are not serious verbal threats, nor threats of harm. Mr. Stanton's use of expletives does not justify deadly force. *Peck v. Montoya*, 51 F.4th 877, 887–88 (9th Cir. 2022) ("officers may not kill suspects simply because they are behaving erratically, nor may they kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed").

Finally, police had information that Mr. Stanton might be experiencing a mental health crisis. This is a critical factor for Officer Dyk to have considered when using force.

### 4. Balancing

The gravity of using deadly force, the most substantial of government intrusions, on an intoxicated person shooting a gun in the air (a misdemeanor) weighs in favor of allowing a jury to find this shooting unreasonable, unjustified, and unconstitutional under the Fourth Amendment. *Young*, 655 F.3d at 1161.

## C. Qualified Immunity

Officer Dyk bears the burden of proving he is entitled to qualified immunity. *Moreno v. Baca*, 431 F.3d 633, 638 (9th Cir. 2005). The U.S. Supreme Court has consistently held that a government agent seeking immunity bears the burden "of showing that such an exemption is justified." *Richardson v. McKnight*, 521 U.S. 399, 412 (1997).

The Supreme Court outlined a two-step process for determining the applicability of the qualified immunity doctrine: the first is to determine "whether a constitutional right would have been violated on the facts alleged" and the second is to determine "whether the right was clearly established." *Saucier v. Katz,* 533 Us. 194, 200 (2001).

First, as described above, and taking the facts and inferences in the light most favorable to Plaintiff as the Court must, a reasonable jury could find that Dyk violated Mr. Stanton's Fourth Amendment right to be free from excessive force. This is especially true because Mr. Stanton was not posing an immediate threat of death or serious physical injury. He did not point the gun at any officers, he did not threaten any officers or anyone else including an armed neighbor who confronted him before the police got there, and his conduct was, at worst, a misdemeanor. *See Rosenbaum v. City of San Jose*, 107 F.4th 919, 926 (9th Cir 2024) (denying QI where "[f]ar from contradicting his allegations, the video and record evidence generally supports [plaintiff's] excessive force claims."); *George v Morris*, 736 F.3d 829 (9th Cir 2013) (denying QI where decedent was holding a gun, but it was pointed down – not an immediate threat).

Second, that right was clearly established. To determine whether an officer violated clearly established law, it is not necessary that the very action in question has previously been held unlawful. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). Existing precedents clearly establish the law, even for novel facts, especially in excessive-force cases. *Mattos v. Agarano*, 661 F.3d

Page 29 – **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

433, 442 (9th Cir. 2011); *Hope*, 536 US at 741. Because the constitutional standard for excessive force is "very fact-specific," if qualified immunity provided a shield in all novel factual circumstances, officers would "rarely, if ever, be held accountable for their unreasonable violations of the Fourth Amendment." *Mattos*, 661 F.3d at 442. In addition to Ninth Circuit precedent, unpublished decisions and the law of other circuits can also clearly establish the law. *Prison Legal News v. Lehman*, 397 F.3d 692, 701–02 (9th Cir. 2005). But the Court need not look further than the Ninth Circuit to determine the law was clearly established.

The Ninth Circuit has "clearly established" that "[l]aw enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed." *Harris v. Roderick*, 126 F.3d 1189, 1204 (9th Cir. 1997) (citing cases); *id.* at 1201 (citing cases). The Ninth Circuit has likewise "held over and over that a suspect's possession of a gun does not itself justify deadly force." *Calonge v. City of San Jose*, 104 F.4th 39, 48 (9th Cir. 2024) (collecting cases).

"[O]fficers may not kill suspects simply because they are behaving erratically, nor may they kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed." *Peck*, 51 F.4th at 887–88 (9th Cir. 2022). The *Peck* case is instructive. In *Peck,* five sheriff's deputies responded to a 911 call that a suspect was acting erratically and threatening someone with a firearm. *Id.* at 882. (As described above, Plaintiffs note that at <u>no</u> point did the officers in this case receive any reports that Mr. Stanton was threatening anyone with a firearm.) The *Peck* suspect came to the front door with a gun, waved it over his head, and at one point pointed the gun at someone and then threatened to shoot another person. *Id.* at 883. In a call to 911, one of the people threatened told the dispatcher that the suspect was "threatening with a firearm to shoot somebody … in his house." *Id.*

Page 30 – **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Sheriff's deputies arrived on scene, established a perimeter around the house, and observed the *Peck* suspect screaming, swearing at officers, making obscene gestures towards them, and at one point lowering his pants and pressing his buttocks against the window. *Id.* But unlike the case here, the *Peck* suspect additionally verbally threatened the officers, yelling statements like "[i]f you come into my house, I'm going to shoot you," "I'll show you my gun! You wanna see my gun?" and "shoot me" and "kill me." *Id.* at 883, 884.

According to the *Peck* officers, the suspect then reached for the gun, grabbed it, "raised the gun towards the other deputies," and two officers shot the suspect in response. *Id.* at 884. The *Peck* plaintiff disputed these facts regarding the gestures with the gun. *Id.* Those disputes were dispositive: the court determined that because "a jury could find that no such [furtive] movement occurred, our cases clearly establish that the use of deadly force would be impermissible." *Id.* at 888. Such is the case here too. Mr. Stanton did not verbally threaten the officers (or anyone else) and the officers' claims that Mr. Stanton pointed the gun are directly disputed by video evidence. Qualified immunity should be denied.

### D. Monell Claim

Plaintiffs may support their *Monell* claim by showing official policies or established customs inflicted the alleged constitutional injury, or that omissions or failures to act reflected a local government policy of deliberate indifference to the constitutional rights at issue. *Clouthier v. Cty. of Contra Costa*, 591 F.3d 1232, 1249−50 (9th Cir. 2010), *overruled on other grounds by Castro v. Cty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016).

Liability may be grounded in policies of inaction or omission, as well as policies of action or commission. *Jackson v. Barnes*, 749 F.3d 755, 763 (9th Cir. 2014). A policy of inaction or omission may be based on a municipality's "failure to implement procedural safeguards to

Page 31 – **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

prevent constitutional violations." *Tsao v. Desert Palace, Inc.,* 698 F.3d 1128, 1143 (9th Cir. 2012) (citation omitted). The municipality will be liable because of its omissions "for a constitutional violation committed by one of its employees, even though its formal written policies were facially constitutional, the municipality did not direct the employee to take the unconstitutional action, and the municipality did not have the state of mind to prove the underlying violation." *Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1185-86 (9th Cir. 2002), *overruled on other grounds, Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016). A policy is a cause or "moving force" behind the underlying violation of plaintiff's rights if an appropriate policy "could have prevented the violation." *Id.* at 1194.

"[I]t is sufficient under [Ninth Circuit] case law to prove a 'custom' of encouraging excessive force to provide evidence that personnel have been permitted to use force with impunity." *Rodriguez v. Cty. of L.A.*, 891 F.3d 776, 803 (9th Cir. 2018) (citing cases). Specifically, a policy or custom of failing to investigate and discipline officers who allegedly committed prior instances of excessive force can form the basis of *Monell* liability. *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1027 (9th Cir. 2015). *See also L.F. by & through Brown v. City of Stockton,* No. 2:17-CV-01648-KJM-DB, 2020 WL 4043017, at *21 (E.D. Cal. July 17, 2020). That is, the mere fact that the City has a procedure to ostensibly receive and investigate complaints does not shield it from liability: "It is not enough that an investigate process be in place * * * [t]he investigative process must be real. It must have some teeth. * * * The mere fact of investigation for the sake of investigation does not fulfill a city's obligation to its citizens." *Beck v. City of Pittsburgh*, 89 F.3d 966, 974 (3d Cir. 1996).

Here, evidence shows that PPB has repeatedly failed to collect and analyze critical evidence of deadly shootings, like in the Quanice Hayes case, the Lane Martin case, the present

Page 32 – **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

case, and the Emmanuel Clark case.[4] PPB failed to collect relevant evidence, was overly

deferential to PPB officers' justifications even when the physical evidence or other witness

testimony directly contradicted those explanations. Like the plaintiff in *Beck*—a Third Circuit

case cited favorably by the Ninth Circuit in *Velazquez*[5]—a jury could find that the PPB's internal

accountability process "[is] nothing more than a facade to cover the violent behavioral patterns

of police officers under investigation, to protect them from disciplinary action, and thereby

perpetuate the City's custom of acquiescing in the excessive use of force by its police officers."

*Beck,* 89 F.3d at 974.

### E. Tort Claims

#### 1. *Wrongful Death*

Defendants assert that Plaintiff's wrongful death claim should be dismissed because

Officer Dyk's use of lethal force was both reasonable and justified. Defs' MSJ, pp. 20-21.

Defendants' argument fails given the disputed material facts as to this very question. First,

Defendants argue that Mr. Stanton's felonious conduct is a complete defense to a wrongful death

action, but the argument is based on their assertion that Mr. Stanton was pointing a gun at

officers when Officer Dyk shot and killed him—which is disputed. Likewise, Defendants assert

that Officer Dyk's use of force was justified because he reasonably believed lethal force was

necessary for self-defense or defense of a third person. Defs' MSJ., p. 22. But, for all the reasons

---

[4] "[P]ost-event evidence is not only admissible for purposes of proving the existence of a municipal defendant's policy or custom, but may be highly probative with respect to that inquiry." *Henry v. County of Shasta*, 132 F.3d 512, 518-519 (9th Cir. 1997), as amended, 137 F.3d 1372 (9th Cir. 1998), cert. denied, 525 U.S. 819 (1998).

[5] *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1028 (9th Cir. 2015).

Page 33 – **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

discussed in Section 3.B, whether Officer Dyk's conduct was reasonable or self-defense is, itself, a material disputed fact.

As to the negligence claim, significant evidence in the record shows PPB officers created a foreseeable risk of harm of shooting Mr. Stanton without justification, and that their conduct was unreasonable in light of this risk. *Son v. Ashland Cmty Healthcare Servs*. 239 Or. App. 495, 506 (2010). PPB officers are well trained to use de-escalation techniques including: number of officers, time, distance, concealment, silent approach, delayed custody, and ongoing attempts to establish rapport and dialogue. Ex. 41, p. 4; Wambold dep. 24:23-25:5, 26:16-30:18. As incident commander, Sgt. Pool knew Mr. Stanton engaged in similar conduct before and expected that Sgt. Townley and the contact and custody teams would take into account Mr. Stanton's extreme intoxication, and to have an ECIT-training officer communicate with him. Pool dep. p. 64:7-16, 65:3-8.

Yet, with Mr. Stanton, despite there being several officers on scene who were ECIT, Officer Lovato, who is not, communicated with Mr. Stanton by yelling ultimatums. PPB officers did not engage in nearly any of the de-escalation tactics that they receive extensive training on: they did not use his name although they knew it; they did not allow him additional time to comply with commands even though they knew or should have known he was intoxicated or experiencing a mental health crisis, as at least two neighbors reported this behavior was very unusual and that he had had manic episodes in the past; they did not use the several ECIT officers on scene who were better trained to establish rapport; they did not call him or reach out to his wife to get information about what was going on or try to understand in order to engage. Further, PPB did not code the call as a mental health call, Ex. 2, p. 1, nor send a less lethal launcher closer, for a viable option of less lethal force.

Page 34 – **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This evidence permits a reasonable juror to draw inference that Defendants either ignored their training concerning signs and symptoms of mental illness and/or are lying about Mr. Stanton not displaying observable signs and symptoms. It also permits the inference that Defendants ignored or disregarded their extensive CIT, ECIT, and de-escalation training. For instance, Officer Lovato yelling, "drop the gun or we will shoot you," is not de-escalation; it suggests a predetermined outcome to all officers present about what would happen if Mr. Stanton did not drop the gun. Their failure to engage with Mr. Stanton consistent with their training could lead a jury to find shooting Mr. Stanton when it was not reasonable was a foreseeable outcome of their approach to the incident. A reasonable juror could conclude that defendants were negligent by engaging in any one or more of the foregoing acts and omissions, and that each such act or omission was a cause in fact of Mr. Stanton's death. *Box v. Department of State Police*, 311 Or. App. 348, 369-371 (2021).

   2. *IIED*

Defendants seek summary judgment on the IIED claim based on the assertion that there is no admissible evidence to support it. Def's MSJ., p. 25. Evidence in the record shows that A.S. made statements to her family that officers told her that her dad wanted to die. Defendants attempt to ignore or dismiss this evidence, arguing that it would be inadmissible hearsay not subject to exception. Defs' MSJ, p. 28. Defendants are incorrect.

A.S.'s statements to her family are not hearsay because they are not being offered to prove the truth of the matter asserted. FRE 801. That is, Plaintiffs do not offer the statement that an officer told A.S. that her father "died of suicide" to prove that Mr. Stanton died of suicide. The significance of the offered statement lies solely in the fact that it was made. "If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of

Page 35 – **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

anything asserted, and the statement is not hearsay." *U.S. v. Curry*, 905 F.2d 1541, 2 (9th Cir. 1990) (citation omitted).

Even if the court were to find A.S.'s statements to her family to be hearsay, they are still admissible under FRE 807, as (1) her statements are supported by sufficient guarantees of trustworthiness--after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts. A.S. made no less than three separate consistent comments to trusted family members in the aftermath of her father's death, contrasted with the statements made years later. Moreover, A.S.'s deposition does not contradict what she told her family. *See* Dkt. 60-6, 38:6-14, 37:4-16. 39:7-41:6. That is, these statements are not hearsay, or else they are admissible hearsay evidence supporting the IIED claim, and at the very least, allow a jury to determine the question of fact as to whether PPB members made these statements to A.S.

To establish an IIED claim, plaintiff must prove that (1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the defendant's acts were the cause of the plaintiff's severe emotional distress, and (3) the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct. *McGanty v. Staudenraus*, 321 Or. 532, 544, 543 (1995) (citation omitted). Defendants argue that Plaintiffs cannot meet the first element of intent, because "there is absolutely no evidence that any officer intended any harm of any sort to A.S.— quite the opposite." Defs' MSJ, p. 27. Plaintiffs are not required to prove actual intent to harm to meet this element; rather, intent is satisfied upon a showing that the defendant knew such distress was certain <u>or</u> substantially certain to result from the conduct. *McGanty.* 321 Or. at 549-551. Whether this element is met is, at a minimum, a question of fact for the jury. Here, a jury could

Page 36 – **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

find that an officer telling a 6-year-old girl who had just witnessed her father's death that "we did not do this," "he did this to himself," and he "died of suicide"—that is, messages to the child that her father *wanted* to die—was certain or substantially certain to cause emotional distress to that child.

Defendants also assert that such statements were at worst, "an insensitive way to explain to a little girl what happened" but not beyond the bounds of socially tolerable behavior. Defs' MSJ, p. 29. Lying to a six-year-old child who just watched her father take his last breath that "he did it to himself," knowing full well the police shot him, is egregious. Summary judgment should be denied.

### 3. NIED

Evidence in the record shows that PPB officers including Dyk were aware that A.S. was very near to her father when they killed him, and it is undisputed that she watched him die; it was entirely foreseeable that she would witness her father die. While Dyk's act of shooting Mr. Stanton was intentional, Defendants assert that because the NIED claim is "based on Officer Dyk's intentional act," the negligence claim must fail. This mischaracterizes the claim. While Officer Dyk's intentional act was against Mr. Stanton, he did not intend for A.S.to witness her father's death. She did, however, and suffered serious emotional distress because of it. This meets the elements of an NIED claim. *See Philibert v. Kluser,* 360 Or. 689 (2016) (Allowing claim for NIED under bystander rule of recovery for two brothers who watched their third brother die as a result of being hit by defendant's pickup truck).

As described above, the NIED is not based on an intentional tort like assault or battery and on additional facts. Defendants' motion should be denied.

Page 37 – **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## IV.    CONCLUSION

Video evidence demonstrates Mr. Stanton did not point his gun at police. For this reason alone, summary judgment should be denied, but there is evidence on this record for a jury to find PPB's shooting of Mr. Stanton and subsequent treatment of A.S. violates the law. This case should proceed to a trial where a jury can decide whether to hold Defendants accountable. Defendants' motion should be denied in its entirety.

Dated:  September 16, 2025                     Respectfully submitted,

                                                    */s Ashlee Albies*

**J. Ashlee Albies**, OSB No. 051846
Maya Rinta, OSB No. 195058
Albies & Stark LLC

***Attorneys for Plaintiffs***