Carey Caldwell, OSB #093032
Senior Deputy City Attorney
carey.caldwell@portlandoregon.gov
Caroline Turco, OSB #083813
Senior Deputy City Attorney
caroline.turco@portlandoregon.gov
Portland City Attorney's Office
1221 SW 4th Ave., Rm. 430
Portland, OR  97204
Telephone: (503) 823-4047
Facsimile: (503) 823-3089
*Of Attorneys for Defendants*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **ESTATE OF AARON D. STANTON, BY DOUGLAS STANTON, PERSONAL REPRESENTATIVE, AND A. S., A MINOR, BY AND THROUGH HER GUARDIAN AD LITEM, DOUGLAS STANTON,** | **3:23-cv-01767-AN** |
| **PLAINTIFFS,** | **DEFENDANTS' REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| **JOSHUA DYK and CITY OF PORTLAND,** | |
| **DEFENDANTS.** | |

Page  i – DEFENDANTS' REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

REPLY……………………………………………………………………………………………1
I.    Plaintiffs Do Not Materially Dispute Defendants' Facts. ........................................................ 1
II.   Excessive Force. ...................................................................................................................... 9
III.  Qualified Immunity. .............................................................................................................. 11
IV.   Monell Claims......................................................................................................................... 15
V.    Tort Claims. ............................................................................................................................ 20
    A.   Wrongful Death .............................................................................................................. 20
        i.    *Officer Dyk*.................................................................................................................. 20
        ii.   *The City*...................................................................................................................... 21
    B.   IIED.................................................................................................................................. 23
    C.   NIED................................................................................................................................. 26
CONCLUSION……………………………………………………………………………........ 27

**TABLE OF AUTHORITIES**

Federal Cases

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)...............................................................................................21
*Bias v. Moynihan*,
  508 F.3d 1212 (9th Cir. 2007) ..............................................................................10
*Butz v. Economu*,
  438 U.S. 478 (1978)...............................................................................................16
*City of Canton, Ohio v. Harris*,
  489 U.S. 378 (1989)..................................................................................23, 24, 25
*Cnty. of Los Angeles, Calif. v. Mendez*,
  581 U.S. 420 (2017)...............................................................................................11
*Crawford-El v. Britton*,
  523 U.S. 574 (1998)...............................................................................................23
*Elifritz v. Fender*,
  460 F. Supp.3d 1088 (D. Or. 2020) .......................................................................25
*Est. of Moppin-Buckskin v. City of Oakland*,
  No. C 08-04328 CW, 2010 WL 147976 (N.D. Cal. Jan. 12, 2010)...........................7
*Est. of Strickland v. Nevada Cnty.*,
  69 F.4th 614 (9th Cir. 2023) ..................................................................................12
*Estate of Lopez by and through Lopez v. Gelhaus,*
  871 F.3d 998 (9th Cir. 2017) .................................................................................12
*Ford v. United States*,
  917 F.2d 566 (9th Cir. 1990) .................................................................................21
*Gonzalez v. City of Anaheim*,
  747 F.3d 789 (9th Cir. 2014) ...................................................................................9
*Graham v. Connor*,
  490 U.S. 386 (1989)..........................................................................................11, 26
*Kisela v. Hughes*,
  584 U.S. 100 (2018)....................................................................................13, 14, 15
*Lavelle-Hayden v. Legacy Health*,
  744 F. Supp. 3d 1135 (D. Or. 2024) ......................................................................22
*Mullenix v. Luna*,
  577 U.S. 7 (2015)...................................................................................................16
*Pearson v. Callahan*,
  555 U.S. 223 (2009)...............................................................................................15
*Peck v. Montoya*,
  51 F.4th 877 (9th Cir. 2022) .......................................................................10, 13, 14
*Rudebasch v. Hughes*,
  313 F.3d 506 (9th Cir. 2002) .................................................................................16
*S.B. v. Cty. of San Diego*,
  864 F.3d 1010 (9th Cir. 2017) ...............................................................................16
*Scott v. Harris*,
  550 U.S. 372 (2007)............................................................................................9, 10

*Tsao v. Desert Palace, Inc.*,
    698 F.3d 1128 (9th Cir. 2012) .................................................................. 23
*U.S. v. Curry*,
    905 F.2d 1541 (9th Cir. 1990) .................................................................. 30
*United States v. Contra Costa Cnty. Water Dist.*,
    678 F.2d 90 (9th Cir. 1982) ...................................................................... 21
*United States v. Gibson,*
    690 F.2d 697 (9th Cir. 1982).................................................................... 24
*United States v. Sayakhom*,
    186 F.3d 928 (9th Cir.) ............................................................................ 22
*West v. Smith*,
    101 U.S. 263 (1879)................................................................................. 21

State Cases

*Philibert v. Kluser*,
    360 Or  (2016)......................................................................................... 32
*Delaney v. Clifton*,
    180 Or. App. 119 (2002)......................................................................... 32
*Rich v. Cooper*,
    234 Or. 300(1963)................................................................................... 26
*Schiele v. Montes*,
    231 Or.App. 43 (2009)............................................................................ 29
*Schoen v. Freightliner LLC*,
    224 Or.App. 613 (2008).......................................................................... 32

Federal Rules

Fed. R. Evid. 408 .......................................................................................... 21
Fed. R. Evid. 702 .......................................................................................... 22
Fed. R. Evid. 801(c)...................................................................................... 21

**REPLY**

Defendants City of Portland and Joshua Dyk ("Defendants" or "the City") make this Reply in support of Defendants' Motion for Summary Judgment. Defendants rely on and incorporate as though fully set forth below their underlying Motion for Summary Judgment, and the exhibits, declarations, and attachments thereto.

## I.    Plaintiffs Do Not Materially Dispute Defendants' Facts.

Plaintiffs' recitation of facts is substantially similar to that set forth by Defendants. ((ECF 74, Pltfs. Opp.); compare (ECF 59, Defs. MSJ)). To the extent Plaintiffs' recitation differs, those differences are either immaterial, unsupported by the actual evidence, contrary to the evidence and testimony in the case, or contrary to their own arguments.

Plaintiffs agree, and provide evidence, that on July 27, 2022, Aaron Stanton went outside into a densely populated area of a Southeast Portland neighborhood and started firing high-powered guns into the neighborhood. (*See* ECF 74, Pltfs. Opp., p.11). Plaintiffs also agree that Portland's Bureau of Emergency Communications ("BOEC") received multiple calls about Stanton shooting into the neighborhood. (*Id.*). Plaintiffs agreed that officers formed a plan, considered alternatives and contingencies, and considered multiple tools to address Stanton's shooting. (*Id.*, pp.6, 11-12). Plaintiffs do not dispute that Mr. Stanton was defiant and aggressive nor that he refused to put down his gun and surrender when Portland Police Bureau ("PPB") officers instructed him to do so. Plaintiffs also do not dispute that the little girl, A.S., was next to and around Stanton while he was firing shots. (*See, e.g.*, ECF 75-4, 75-6; Albies Dec., Ex. 4, Air 1 Audio Transcript, p.8:20-24; Ex. 6, BOEC Audio Transcript, p.18:16-21 ("More shots in the air, shooting up into the area . . . He's got the little girl right with him, right next to him. The little girl right next to him.").

Plaintiffs' primary factual dispute appears solely related to video taken by Jason Morris and his testimony about review of that video some two years after the events in question and only after being contacted by Plaintiffs' counsel. (*See, e.g.*, ECF 74, Pltfs. Opp., pp.1-2; pp.14-

Page  1 – DEFENDANTS' REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

15, pp.15-20; pp.26-28, pp.29, 36; p.43; *see also* ECF 60-5, Caldwell Dec., Ex. 5, Witness Video). In fact, the video and related testimony of Mr. Morris, who took the video, appears to be the only evidence Plaintiffs rely on for a factual dispute as to what officers saw.

To Mr. Morris's testimony, he testified that as recently as four or so months before his deposition, he told investigators that he could not see where Stanton pointed the gun; neither at the time of the shooting nor in the video he took. (Caldwell Supp. Dec., Ex. 14, Morris Depo., pp.27:10–28:10; 30:6-12) (testifying in February, 2025, that he told investigator as recently as November, 2024, that he could not tell where Stanton pointed the gun; it was probably three months before the depo that he looked at the video again and thought he knew where the gun was pointed). Mr. Morris further testified that at the time of the shooting, when he was taking video, and upon his first viewings of the video, he did not know where Stanton pointed the gun.

| | |
|---|---|
| Morris: | [I] wasn't looking at the screen. I was watching what was going on, making sure we didn't have to go hide somewhere. |
| Question: | Right. And so when you were looking at it at the time in live action, you couldn't tell where he was pointing his weapon? |
| Morris: | Not as far as I remember. I had to look at the video. |

(*Id.*, p.29:16–30:8).

In other words, for more than two years, Mr. Morris, having witnessed the shooting live and viewed his video multiple times in the intervening period, did not know where Stanton pointed the gun. Then shortly before his deposition, he decided, based on his most recent review of video, and not his memory, that he knew where Stanton pointed the gun. (*Id.*, p.28:13-15 (Q. "And so it was only recently that you were able to determine that you thought the gun was pointing upwards?" A. "Yes."). The video did not refresh his recollection, but instead gave an entirely new basis, more than two years later, to decide something different happened than what he saw at the time and remembered in that prior two-plus year period. (*Id.*, p.28:18-19 ("I don't remember seeing the gun or hearing the shot"); p.29:1-4 (Q. "So that was your most recent review that you made that distinction versus the earlier times you had reviewed it?" A. "Yeah."). That does not

Page  2 – DEFENDANTS' REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

represent evidence of a disputed issue of material fact. Instead, it represents a percipient fact witness who changed their mind about what happened, *not what they saw*, after talking to Plaintiffs' counsel and watching a video multiple times. (*See above* and *id.*, p.27:3-4). It would be no different than Plaintiffs showing the video to somebody on the street, telling that person who they advocate for, then asking that person to opine on the video. That is not evidence of anything.

Plaintiffs' other factual disputes are based on misrepresentations of information received by officers or testimony of those officers. For instance, of the approximately 30 911 calls, only one reported intoxication. (*See* ECF 74, Pltfs. Opp., p.11, relying on Albies Dec., Ex. 2, BOEC Incident History (ECF 75-2) (recording approximately 30 calls; p.8 showing the single report of potential intoxication)). None reported Stanton "possibly had mental health issues." (quoting ECF 74, Pltfs. Opp., p.11 (*see* Albies Dec., Ex. 2, BOEC Incident History (ECF 75-2) generally, *supra*, with no caller reporting possible mental health issues). That is consistent with Stanton's parents' testimony that he had no mental health issues. (ECF 60-7, 60-8; Caldwell Dec., Ex. 7, D. Stanton Depo., p. 46:19-21 (father testifying no recent history of mental health issues); Ex. 8, K. Stanton Depo., pp.68:23-69:2, 114:3-1(mother testifying she had no concerns about Mr. Stanton's mental health for more than a decade)).

Plaintiffs also muddle the record in offering exhibits that contain other events occurring simultaneously to the event at issue in this case. (*See*, *e.g.*, Albies Dec., Ex. 5, BOEC East Dispatch channel transcript (discussing other intoxicated subjects, potential other shootings, and other calls not related to the case) (ECF 75-5); *see also* Caldwell Supp. Dec., Ex. 15, Morley 30(b)(6) Depo., p.15:1-6 (East Dispatch is recording of entire patrol area).

Similarly, Plaintiffs cite to the depositions of officers Bartlett and Pavon for the premise that officers knew Stanton was intoxicated when they first staged and formulated plans. (ECF 74, Pltfs. Opp., p.7)). That is factually inaccurate. As to Stanton's intoxication, Ofc. Bartlett testified that at the time PPB staged: "I don't recall if we had that information at that time yet." (ECF 75-24, Albies Dec., Ex. 24, Bartlett Depo., p.57:1-2). More directly, Ofc. Pavon testified that at the time

in question he did not recall receiving information that Stanton was intoxicated. (ECF 75-30, Albies Dec., Ex. 30, Pavon Depo., p.43:23-24).

Likewise, Plaintiffs offer testimony of Sergeant Michael Pool to support some knowledge by PPB that Stanton previously "got drunk, came out of his house, and fired shots in the air." (ECF 74, Pltfs. Opp., p.7). Plaintiffs knew full well that Sgt. Pool's qualified memory, more than two years after the events in questions, was inconsistent with the actual existing facts. (*See*, *e.g.*, ECF 75-32, Albies Dec., Ex. 32, Pool Depo., p.43:3-9). Plaintiffs had all BOEC, PPB, and other City records associated with Stanton and his address, and no such incidents had ever been reported, responded to, or otherwise recorded. In fact, Plaintiffs' counsel acknowledged there was no such history stating: "*Nothing similar like you were looking at that day had been reported to have occurred at this address before; is that fair?*" (ECF 75-26, Albies Dec., Ex. 26, Dyk Depo, p.135:11-13). Based on Plaintiffs' counsel's acknowledgement, it is unsurprising that Ofc. Pavon and Ofc. Jimenez both deny any prior knowledge or contact with Stanton or his address, much less knowledge of prior intoxication or shooting. (*See* Lino Pavon Supplemental Declaration and Jose Jimenez Declaration filed herewith). In keeping, one of Stanton's neighbors told BOEC that Stanton had never done this before. (ECF 75-2, Albies Dec., Ex. 2, BOEC Incident History, p.1 ("UNK WHAT'S WRONG W/HIM TODAY, NEVER DONE THIS BEFORE")). That is also consistent with Stanton's girlfriend's testimony, the mother of A.S, who testified Stanton had never fired guns in front of the house other than potentially a bb gun, (Caldwell Supp. Dec., Ex. 16, Phou Depo., p.52:21-22).

Plaintiffs also misrepresent the testimony of Ofcs. Pavon and Piombo as to why they did not shoot Stanton when he pointed his gun at them. (ECF 74, Pltfs. Opp., p.13). In the same sentence that mischaracterizes the officers' testimony, Plaintiffs cite to the Morris video in support of the argument that A.S. was not near Stanton. (*Id.*). They cite to the 10 second time period showing when Stanton was shot. (*Id.*, citing ECF 75-11, Albies Dec., Ex. 11 at 45-55 seconds (Morris Video); *see also* Caldwell Dec., Ex. 5 (same video)). They ignore the fact that

Page  4 – DEFENDANTS' REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

the video starts with A.S. next to Stanton. (*Id*. at 1 second). Over the ensuing 34 seconds or so of the video, A.S. runs away from Stanton and out of frame, then back to her father and in frame, then away again. (*Id.* at 1-35 seconds). That is consistent with the actual testimony of the officers. Pavon testified that he did not shoot Stanton because:

| Pavon: | I didn't think it was a safe shot for me. |
|---|---|
| Question: | Why not? |
| Pavon: | Because I wasn't sure of the distance, for one, and then the little girl was pacing back and forth. It was too close to him. |
| Question: | Any other reason that you did not fire at him? |
| Pavon: | That was the main reason. |

(ECF 75-30, Albies Dec., Ex. 30, Pavon Depo., pp.88:21–89:3). Similarly, Ofc. Piombo says he did not shoot at Stanton because:

> Wambold and/or Lovato were telling not to shoot because the girl was between us and him. I heard somebody say, "Don't take the shot. Don't take the shot." I looked up over the sight to kind of try to get a better view of where she was and where he was and how it all correlated. And then I tried to take – get back on the sight and was preparing to take a shot on him if necessary.
> ***
> So just before [Stanton] shot, there was – they were saying that she was there, and then when the shot fired, from what I recall, I think he said–somebody said that, "Don't shoot. She's between us," or, "She's in the way."

(ECF 75-31, Albies Dec., Ex. 31, Piombo Depo., pp.62:10-17; 66:5-9).

Pavon's testimony was consistent with those elements that are discernible in the video. Pavon describes Stanton facing the street with the gun in his direction before Stanton fires a shot toward the officers. (ECF 75-30, Albies Dec., Ex. 30, Pavon Depo., p.85:4-12). Pavon goes on to say why he did not shoot–not because, as Plaintiffs aver, "A.S. was in the way or right next to [Stanton]," but instead because of the distance and the uncertainty of A.S.'s movements. Likewise, Piombo did not shoot because "A.S. was in the way or right next to [Stanton]," but instead because "Wambold and/or Lovato" told him not to. That is also consistent with Ofc. Nicholas Wambold's testimony. Wambold testified:

/ / /

| Question: | Do you remember when the last time you saw her was? |
| Wambold: | Moments before, I–seconds, I couldn't tell you if it was 10 or 20. She was walking around independently of him, back and forth. And, again, we had that–like, that low hedge, so I could only see part–I could only see, like, the top of her head, for the most part of it. So there would be times where I knew she was still up there, but I just couldn't see her. |
| Question: | Do you recall, when you were behind the car with the other officers, when you were observing Mr. Stanton, do you remember anybody saying, "No shot"? |
| Wambold: | I said it. |
| Question: | Why did you say that? |
| Wambold: | I said, because, from where we were at, that the little girl–if someone accidentally flinched or tripped a trigger or they shot low, that there's a potential that we could accidentally shoot this little girl. |

(Caldwell Supp. Dec., Ex. 17, Wambold Depo., p.100:2-19). Ofc. Wambold's testimony is consistent with those elements that are discernable in the video – namely A.S. coming in and out of view until about 10–20 seconds before Stanton is shot.

So too are other officer descriptions of Stanton before he fired his final shot. Despite more than two-years elapsing between the events of July 27, 2022, and officer depositions (and nearly the same since they had provided detective and IA interviews and grand jury testimony), they each had substantially similar recollection of what occurred. (*See, e.g.*, ECF 75-24, Albies Dec., Ex. 24, Bartlett Depo., p.85:11-14 (Stanton's wrist relaxed) compared to *id.*, ECF 75-26, Albies Dec., Ex. 26, Dyk Depo., p.132:2-5 (Stanton was "limp-wristing" the handgun); *id.*, pp.138:7-11; 139:6-13 (Stanton sideways and looking up the street at the officers and lowers gun in that direction) compare to ECF 75-30, Albies Dec., Ex. 30, Pavon Depo., pp.84:21–89:3 (Stanton faces street and leveled gun in officers' direction).

During depositions more than two years after the fact there were some minor inconsistencies as to Stanton's exact orientation and handedness, but all officers were consistent in that they saw Stanton stand on his porch, fire into the neighborhood, then extend an arm and point his gun at them. (*See* ECF 70, Wambold Dec., ¶15; ECF 69, Piombo Dec., ¶11; ECF 68, Pavon Dec., ¶16; ECF 63, Lovato Dec., ¶24; ECF 66, Bartlett Dec., ¶19; ECF 67, Dyk Dec.,

Page  6 – DEFENDANTS' REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

¶19); *see also* ECF 74, Pltfs. Opp., pp.22-26). Notably, none of the officers' testimony conflicted with any other officers' in any substantive fashion. *See*, *e.g.*, *Est. of Moppin-Buckskin v. City of Oakland*, No. C 08-04328 CW, 2010 WL 147976, at *5 (N.D. Cal. Jan. 12, 2010) (discrepancies in officer testimony "is immaterial" when no "substantive difference"). Instead, the only differences in testimony related to body orientation and when exactly a shot may have been fired. But all were explicit in the fact that at the end, Stanton's firing changed and he lowered his gun at the officers.

Further, based on Plaintiffs' arguments that the officers were nearly a football field away and that there were many elements of cover that would prevent Stanton from seeing the officers, it is also unsurprising that there would be some inconsistencies in exactly what officers saw from that distance and through that cover. (*See*, *e.g.*, ECF 74, Pltfs. Opp., p.14 (85 yards away; several large trees providing additional zones of hard cover); *id.*, p.16 ("(unlikely [Stanton] could see the officers" due to distance and cover); Caldwell Supp. Dec., Ex. 17, Wambold Depo., p.100:1-10); ECF 75-31, Albies Dec., Ex. 31, Piombo Depo., p.55:5-10 ("No. It wasn't a clear shot, no. It was partial. * * * There was arborvitae, stuff like that."). Any differences in officer recollection of Stanton's exact position are immaterial and not indicative of anything other than time (since the event) and distance (from their obscured vantage point).

In like manner, Plaintiffs' conspiratorial musings have no bases. (*See* ECF 74, Pltfs. Opp., pp.7, 25, for the first time alleging a conspiracy amongst officers). First, every involved/witness officer was subject to a communication restriction order that evening and none talked to each other about the Stanton events before that order was lifted, with many never speaking about the events with another officer. (*See* Caldwell Supp. Dec., Ex. 17, Wambold Depo., p.112:1-8; Ex. 19, Lovato Depo., p.123:11-14; Ex. 20, Dyk Depo., p.158:22-23; Ex. 18, Bartlett Depo., p. 50: 11-24; Ex. 21, Pavon Depo., p.99:6-12; Ex. 22, Piombo Depo., p.72:15-21); *see also* ECF 65, Bell Decl., referencing Ex. 10, PPB Directive 1010.10 (*see* 1010.10 Definition of Communication Restriction Order; *see also*, *id.*, (2.1.3.1.1), (2.1.3.1.2) (initiation of

Page  7 – DEFENDANTS' REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

communication restriction at the scene), (8) (communication restriction orders). Plaintiffs did not, and cannot, present any evidence to support their spurious claims that communication restrictions were not followed. Plaintiffs know full well, based on their attorneys' depositions of the involved officers, that no officer spoke with any other officer before giving detective interviews, follow up detective interviews, Internal Affairs interviews, or Grand Jury Testimony. (*See*, *e.g.*, Caldwell Supp. Dec., Ex. 19, Lovato Depo., p.123:11-14; Ex. 18, Bartlett Depo., p.50:11-16). Plaintiffs' conjecture is unsupported, slanderous, and an affront to integrity of the officers who were trying to serve the community and get a dangerous individual to stop firing bullets into the neighborhood.

Another important distinction about Plaintiffs' unfounded conspiracy theory is that Ofc. Dyk did not testify that he shot Stanton because Stanton fired at the officers. Instead, he testified that he fired at Stanton because Stanton's behavior had changed and, based on Stanton lowering his weapon toward the other officers, Dyk believed Stanton _was going to_ shoot them:

> Yeah. So, like I said, Mr. Stanton is firing this weapon outside. He's yelling at officers something along, "Suck my dick," "Fuck you"; he's showing disdain toward those officers.
> And then he looks -- I'm going to say this is the direction the officers are -- directly in the direction -- he's not -- this is different from what he's previously kind of been doing.
> So he's looking directly at them. And instead of moving the gun around wildly, he starts to lower the weapon in the direction of officers to what I absolutely believe was taking an aimed shot directly at them.
> I know my action -- my reaction time, I'll never be able to beat his action; and that if I wait for him to shoot * * * if I wait for him to shoot, somebody is already possibly getting killed.
> Like, previous times, when he was shooting over my head, I didn't think he was shooting -- I didn't know for sure and I was concerned about where those bullets were landing, but I didn't think he was shooting at me. This time, he was purposely aiming the gun at police officers.

(ECF 75-26, Albies Dec., Ex. 26, Dyk Depo., p.139:2-25). Even if Stanton missed, Dyk's decision was not based on any miss, but instead on Stanton's changed movements from wildly firing the gun into the neighborhood to leveling and directing it toward officers.

Page 8 – DEFENDANTS' REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

The above facts, with the elucidation of Plaintiffs' mischaracterizations, show that there are no material question of facts and support the granting of Defendants' Motion for Summary Judgment. Defendants' legal argument in the underlying Motion, and below, buttress that grant.

## II.    Excessive Force.

"The threshold question at the summary judgment stage of whether or not an officer's actions were objectively reasonable under the Fourth Amendment is 'a pure question of law,' not a question of fact reserved for a jury." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 800 (9th Cir. 2014) (quoting *Scott v. Harris*, 550 U.S. 372, n.8 (2007))

Plaintiffs' Opposition once more relies in large part on Mr. Morris. For instance, in the second line of their substantive argument on Excessive Force, they note Mr. Morris did not feel threatened by Mr. Stanton. (ECF 74, Pltfs. Opp., p.31). It is important to note, as evidenced in his video, Mr. Morris was hiding behind the corner of a home. In addition, Mr. Morris testified that he was not concerned about his own safety "because [Stanton] wasn't looking in my direction at all. He never did, in fact." (ECF 75-39, Albies Dec., Ex. 39, Morris Depo., p.39:8-10). In contrast, like all the officers, Morris was concerned about A.S.'s safety.

> Question:    Okay. And what made you start filming?
> Morris:       When his daughter came up on the porch. That concerned me of
>                   her safety. I was concerned for her safety.

(*Id.*, p.13:8-11). There is no contradiction from Morris, as Plaintiffs aver, but instead unanimity in that all persons on site were concerned for A.S.'s safety based on Stanton's continued firing of the gun near her.

In addition, Mr. Morris's actual testimony supports the general overall concern expressed by the officers related to the safety of the community. Morris testified he saw Stanton shooting what he thought was "between a nine-millimeter and a .45 handgun." (*Id.*, p.11:10). Stanton then went into the house and came out with what Morris "would guess [] to be an AR-15 . . . and he fired several rounds . . . . But then the branches started falling from the trees, so that's how I

knew it was live rounds." (*Id.*, p.11:12-16). When Morris realized the bullets were causing tree branches to fall on his street, he called 911. (*Id.*, p.11:24-25). In short, Plaintiffs' attempt to paint Morris as unconcerned about Stanton is belied by the fact that he called 911 on Stanton and began to film because he was concerned about Stanton firing his gun near a little girl.

Plaintiffs then once more argue that there was some conspiracy amongst the officers that is now revealed by Morris's video. That argument does not hold water. First, the video is not dispositive, so it is insufficient to defeat summary judgment. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("the mere existence of *some* alleged factual dispute will not defeat an otherwise properly support motion for summary judgment") (emphasis in original); *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (party opposing summary judgment is "required to present significant probative evidence tending to support her allegations."). Second, even if the video clearly showed exactly how Stanton moved his left arm – it does not – Ofc. Dyk's perception is viewed based upon the objective reasonableness of what he perceived at the time. *Cnty. of Los Angeles, Calif. v. Mendez*, 581 U.S. 420, 428 (2017) (so stating). What he perceived cannot be looked at in hindsight. *Graham v. Connor*, 490 U.S. 386, 396 (1989). Whether a use of force was reasonable depends on the unique facts of each case and "must embody allowance for the fact that police officers are often forced to make split second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

Here, Ofc. Dyk found himself in a dynamic, tense situation where at times bullets flew directly over his head. (*See* Caldwell Suppl. Decl., Ex. 20, Dyk Depo., p.132:8-15); *cf. Peck v. Montoya*, 51 F.4th 877, 893–94 (9th Cir. 2022) ("five-minute incident forced the officer to confront "an evolving set of circumstances that took place over a short time period necessitating 'fast action.'") (citation omitted). Nonetheless, Dyk maintained his composure and continued to give Stanton the opportunity to comply with communications to put down his weapon and surrender to police. It was only when Stanton lowered his weapon toward other officers that

Page  10 – DEFENDANTS' REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Dyk, knowing he only had a split-second to potentially save those officers lives, as well as other citizen lives, used deadly force. (*See* ECF 75-3, 75-4; Albies Dec., Ex. 3, Air 1 Video, 20:50:41; Ex. 4, Air 1 Audio Transcript, p.7:11-13 ("citizens out in the street just east of that guy's address.")). At that point, Stanton posed the immediate threat of death or serious bodily harm and deadly force was reasonable and did not violate Stanton's constitutional rights. As the Ninth Circuit found:

> As we've said, when a suspect points a gun in the direction of officers, they would be justified to use deadly force.

*Est. of Strickland v. Nevada Cnty.*, 69 F.4th 614, 621–22 (9th Cir. 2023), *cert. denied*, 144 S.Ct. 559 (2024). Dyk was justified in his use of force and it was entirely reasonable. Therefore no excessive force claim should survive and it should be dismissed with prejudice.

## III.    Qualified Immunity.

To evaluate qualified immunity, a court considers "(1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct." *Estate of Lopez by and through Lopez v. Gelhaus,* 871 F.3d 998, 1005 (9th Cir. 2017). What Plaintiffs ignore is that the Supreme Court has emphasized that "[e]xcessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless *existing precedent* 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (emphasis added). "Specificity is especially important." *Id.* Plaintiffs failed to provide any precedent to defeat qualified immunity.

The *Kisela* case cited above is instructive and informs qualified immunity in this case. *Kisela,* involved "a woman who had just been seen hacking a tree with a large kitchen knife and whose behavior was erratic enough to cause a concerned bystander to call 911 and then flag down [officers]." 584 U.S. at 106. The woman with the knife, Hughes, was within a few feet of her roommate, and "failed to acknowledge at least two commands to drop the knife." *Id*. The

Page  11 – DEFENDANTS' REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

court found Hughes "had committed no illegal act, was suspected of no crime, and did not raise the knife in the direction of [her roommate] or anyone else." *Id.* at 108. Two other responding officers held their fire. *Id.* Officer Kisela fired on Hughes within a minute of arriving on scene. *Id.* at 101. The Supreme Court found that it did not need to "decide whether Kisela violated the Fourth Amendment when he used deadly force against Hughes. For even assuming a Fourth Amendment violation occurred—a proposition that is not at all evident—on these facts Kisela was at least entitled to qualified immunity." *Id.* at 103-4. The Supreme Court concluded "[t]his is far from an obvious case in which any competent officer would have known that shooting Hughes to protect [her roommate] would violate the Fourth Amendment." *Id.* at 105-6.

The facts in the present case are even more compelling for qualified immunity than in *Kisela*. Here, there were approximately 30 911 calls concerned about the behavior of a person shooting into the neighborhood. Mr. Morris noted that he called 911 because bullets caused tree limbs to break and fall into the street; something more than hacking a tree with a kitchen knife. Officers gave multiple warnings and instructions to Stanton to which he responded with insults, disdain, and continued shooting. When Stanton leveled his gun at officers up the street those officers ducked out of fear of an imminent threat of death or serious bodily harm to themselves. Likewise, when Ofc. Dyk saw Stanton change from firing indiscriminately into the neighborhood to lowering the gun toward fellow officers up the street, Dyk believed Stanton represented an immediate threat of death or serious bodily harm to those officers. That was before Stanton fired his weapon. Dyk attempted to stop Stanton from firing at the officers by using force. Stanton, however, was still able to get a shot off.

Even if Dyk was mistaken about where Stanton was pointing the gun–he was not–that is not sufficient to defeat qualified immunity. "The protection of qualified immunity applies regardless of whether the [officer's] error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009), *citing Butz v. Economu*, 438 U.S. 478, 507 (1978) (immunity covers "mistakes in judgment, whether the mistake is one of

Page  12 – DEFENDANTS' REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

law or fact")). The doctrine of qualified immunity thus allows for reasonable error. *Rudebasch v. Hughes*, 313 F.3d 506, 514 (9th Cir. 2002). Dyk, along with all officers, perceived an immediate threat of death or serious bodily harm which led to his use of force. There was no error, but if there was, based on the unanimity of perception and reaction, it was reasonable.

Even if Dyk violated a constitutional right—he did not—any such right was not clearly established by precedent "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) ("*existing precedent* must have placed the statutory or constitutional question beyond debate.") (citations omitted) (emphasis added). Plaintiffs completely fail in their burden to "identify precedent as of [July 27, 2022]—the night of the shooting—that put [Dyk] on clear notice that using deadly force in these particular circumstances would be excessive." *S.B. v. Cty. of San Diego*, 864 F.3d 1010, 1015 (9th Cir. 2017). Instead, Plaintiffs rely on the decision in a case filed approximately four months after the "night of the shooting." *Peck v. Montoya*, 51 F.4th 877, 883 (9th Cir. 2022) (filed October 18, 2022). There is no way any officer, Dyk included, could be aware of the decisional holding in *Peck* four months before it came out. Regardless, it is inapposite and does not squarely govern the specific facts at issue here.

*Peck* involved a blind man, Mono, who was upset about a construction dispute. *Peck*, 51 F.4th at 883. He pointed a gun at his realtor and threatened to shoot his contractor, who was not present. *Id.* His realtor told him to put the gun away, and he did. *Id.* The contractor, who was on the phone with the realtor at the time, called 911 and told them Mono was threatening to kill him. *Id.* When police arrived Mono became agitated and aggressive. *Id.* At one point, an officer noticed a gun in a holster on a couch. *Id.* at 884. When he alerted other officers, Mono became more agitated and said he would show them his gun. Testimony differs at that point. *Id.*

Two officers said they saw him go for the gun so they shot him. *Peck*, 51 F.4th at 884. Officers shot Mono within seconds of giving him force warnings. Mono's wife, who was present and saw the entire interaction, disputed the police description and claimed her husband never

Page  13 – DEFENDANTS' REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

reached for a gun. *Id.* A neighbor also witnessed the interaction and testified Mono was moving away from the gun. *Id.* The gun was ultimately found in its holster, under a coffee table, away from where Mono went down due to the gunshots. *Id.*

Once more, *Peck*, by definition, is <u>not</u> precedent as it was decided after the events at issue in this case. But for purposes of completing the analysis, Plaintiffs misstate the basis for the holding in that case. At the beginning of the case, the Ninth Circuit noted that, based on the unique procedural nature of that particular appeal, jurisdictionally it could not evaluate the evidence presented to the district court *de novo* and had to "accept the district court's determinations that there are genuine disputes of fact and that a jury could find that Mono did not pick up the gun—and was not moving toward the gun—before he was shot." *Peck*, 51 F.4th at 887. Starting from that premise, the court was constrained to making its decision by assuming Mono was not armed and did not attempt to arm himself. *Id.* Because the court assumed Mono was not armed and did not attempt to arm himself, officers were not justified in shooting him and therefore the officers were not entitled to qualified immunity. *Id.* at 888. Notably, the court went on to distinguish Mono's situation, finding:

> To be sure, the Fourth Amendment does not necessarily require officers to delay their fire until a suspect turns his weapon on them, and if the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat.

*Id.* (citation and quotes omitted). That latter distinction is what applies here.

Stanton was certainly armed, firing multiple weapons into the neighborhood. When police attempted to communicate and instruct him to put down his weapon, he refused and continued to fire. After their last instruction, he once again directed ire at them and lowered his weapon toward them. At that moment Dyk believed Stanton represented an immediate threat of death or serious bodily harm. It was more than a furtive movement and was accompanied by the disdain Dyk had seen previously. There is also no discrepancy that Stanton was in fact firing a gun and lowered it at officers. The only contrary testimony (Morris), as illustrated previously,

was formed more than two years after the events, and based on multiple viewings of a video, not any then existing perception.

Officer Dyk did not violate any constitutional right, and in any event, no such right was clearly established at the time Dyk used force against Stanton. Plaintiffs failed to meet their burden to defeat Dyk's entitlement to qualified immunity and all claims against him should be dismissed with prejudice.

## IV.    Monell Claims.

Plaintiffs' evidentiary *Monell* support rests in large part on the fact that there were settlements in other cases. (*See* ECF 74, Pltfs. Opp., pp.26-28). Evidence of settlement is strictly forbidden to prove the validity or liability of a claim. Fed. R. Evid. 408. Courts have enforced this exclusion for nearly 150 years. *West v. Smith*, 101 U.S. 263, 273 (1879) (excluded because "they were made to avoid controversy and to save the expenses of vexatious litigation."); *United States v. Contra Costa Cnty. Water Dist.*, 678 F.2d 90, 92 (9th Cir. 1982) ("this Court concurred with the general rule of inadmissibility"); *Ford v. United States*, 917 F.2d 566 (9th Cir. 1990) (impermissible for the jury to "infer culpable conduct" from such evidence). Therefore, contrary to Plaintiffs' assertion, a jury may not infer anything from the fact the City settled previous lawsuits, much less that there is some ongoing conspiracy to not conduct investigations.

In addition, notably, no tribunal, judge, jury, or otherwise, ever found a constitutional violation related to the cases relied upon by Plaintiffs. Instead, Plaintiffs rely on inadmissible hearsay to support constitutional violations, including that of a person who was never qualified as an expert. At their base, Plaintiffs' arguments are essentially reiterations of the allegations in their Complaint which is not sufficient to support a claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (a plaintiff "may not rest upon mere allegation or denials of his pleading but must set forth specific facts showing that there is a genuine issue for trial.").

Fed. R. Evid. 801(c) defines hearsay as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth

Page  15 – DEFENDANTS' REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

of the matter asserted in the statement." The more than five-year old purported expert report of Jesse Wobrock, retained by a different attorney, in a different case, is textbook hearsay and not subject to any exceptions.[1] (ECF 75-21, Albies Dec., Ex. 21, IA investigation); *see also* Fed. R. Evid. 702 (expert testimony requires qualification; there was no such qualification here so to the extent there is a purported scientific bases for the hearsay statement, it is not admissible). Further, it contains hearsay within hearsay in its reliance on other purported materials. Such hearsay is not admissible. *Lavelle-Hayden v. Legacy Health*, 744 F. Supp. 3d 1135, 1142 (D. Or. 2024) ("because summary judgment qualifies as a substitute for a trial, and hearsay (absent an exception or exclusion) is inadmissible at trial, a motion for summary judgment may not be supported by hearsay.") (citation and internal quotations omitted).

Likewise, Plaintiffs' counsel's individual opinions or understandings is not admissible – an attorney cannot be both a witness and an advocate in the same litigation. *United States v. Sayakhom*, 186 F.3d 928, 943 (9th Cir.), *amended in other part*, 197 F.3d 959 (9th Cir. 1999) ("the advocate-witness rule prohibits an attorney from appearing as both a witness and an advocate in the same litigation") (citations omitted). Plaintiffs' counsel's statement in paragraph 21 of the Declaration of Ashlee Albies is testimony that attempts to support the allegations in the Complaint. (ECF 75). It is not supported by any evidence and reflects only that attorney's personal "understanding." (*Id.*). That is not permissible or admissible.

In addition, the website counsel relies on in the same paragraph is essentially an advocacy site for plaintiffs with cases against police. It aggregates news articles and parrots the language from such plaintiffs' complaints as absolute truth. It is by definition inadmissible hearsay. *Lavelle-Hayden*, 744 F. Supp. 3d at 1147 (D. Or. 2024) ("it is axiomatic to state that newspaper articles are by their very nature hearsay evidence and are thus inadmissible if offered to prove the truth of the matter asserted") (citations omitted).

/ / /

---

[1] So too, for the same reasons is the Declaration of Lori Hayes hearsay (ECF 75-22, Albies Dec., Ex. 22).

Page  16 – DEFENDANTS' REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

In any event, Plaintiffs argue that the City's *Monell* liability rests in a policy of inaction or omission. (ECF 74, Pltfs. Opp., pp.31-38). "To establish that there is a policy based on a failure to preserve constitutional rights, a plaintiff must show, in addition to a constitutional violation, that this policy amounts to *deliberate indifference* to the plaintiff's constitutional right, and that the policy caused the violation." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012) (quotes and citations omitted) (emphasis added). As the U.S. Supreme Court held,

> [this] requires a high degree of fault on the part of city officials before an omission that is not in itself unconstitutional can support liability as a municipal policy under *Monell*. * * * [a plaintiff must] establish that the facts available to city policymakers put them on actual *or constructive notice* that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens.

*City of Canton, Ohio v. Harris*, 489 U.S. 378, 396 (1989) (emphasis in original). It is not enough "that an otherwise sound program has occasionally been negligently administered." *Id.* at 391.

In the present case, Plaintiffs indict PPB for a missing video. Contrary to Plaintiffs' continued conspiratorial musings, there is nothing to show there was any intentional act by PPB to omit a video from the investigation file or that policy makers knew that there was a blatant history of missing videos such that they would be on notice that such would lead to the violation of a constitutional right. *See Crawford-El v. Britton*, 523 U.S. 574, 600 (1998) ("the plaintiff may not respond simply with general attacks upon the defendant's credibility, but rather must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of proving pertinent motive.").

Ofc. Le collected video from two sources: from a link provided by a neighbor, Mr. Behn, and by taking the actual phone of another neighbor, Mr. Morris. (ECF 75–27, Albies Dec., Ex. 27, Le Depo., p.29:14-22; 32:21-23). Ofc. Le gave Morris's phone to Officer Kathleen Martinez from the Forensic Evidence Division (an FBI certified forensic examiner. (*Id.*, p.32:21–23; Caldwell Supp. Dec., Ex. 23, Martinez Depo., pp.8:8–10; p.19:7–18). Officer Martinez had no recollection of Ofc. Le, his gender, or anything shared on scene. (*Id.*, pp.11:12–12:2). It was

Page 17 – DEFENDANTS' REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

unusual for her to be called to a crime scene to collect evidence. (Id., p.10:17-25). She could not access the files on Morris's phone on scene so she brought the phone to her office to use proprietary FBI software to download. *(Id.*, p.13:10–18). She would not review any files but would only download the data file that represented any video. She chose the data files based on the time frame she was provided as to when they would have been recorded. (*Id.*, p.20:6–17). Ultimately, she downloaded two videos from the phone with no knowledge of what those videos depicted; she never saw any of the videos. (*Id.*, pp.25:21–26:3; 12:25–13:9). She then copied those data files to a thumb drive and gave that copy to Detective Brian Sims. (*Id.*, pp.16:4–13; 17:9-15). Ofc. Martinez did not know what happened to the thumb drive after she copied it; she also did not recall any communication with Sims. (*Id.*, p.16:4–13;).

Detective Sims was the lead homicide investigator on the Stanton shooting. (ECF 62, Sims Dec., ¶2). In that role he reviewed and processed evidence. (*Id.*, ¶3). It appears that in processing some of that evidence, Det. Sims was confused as to the source of video. (*See* Caldwell Dec., Ex. 24, Sims Depo., pp.62:10–11; 63:1–7; 64:19–23; 66:6–9, 21–24 (testifying that he thought all videos were from Morris's phone but after extensive review during the deposition "maybe [he was] incorrect"; also noting "There's 500 pages of documents in this case").

In short, PPB went out of its way in its attempt to gather the Morris video. It took the unusual step of calling in an FBI certified forensic examiner who rarely came to such scenes. Ofc. Martinez gathered the evidence and passed it on to the investigator, Detective Sims. It is clear Sims dealt with a tremendous volume of evidence and believed he had processed everything. To the extent he was mistaken, there is no evidence it was intentional, much less malicious, conspiratorial, or in any way a custom of the PPB. At best his investigation had a very small element of "negligent administration." *Canton*, 489 U.S. at 396 (not sufficient to support a *Monell* claim). Plaintiffs did not and cannot show otherwise. Further, Det. Sims's role is only one small part in the entirety of the investigative process. (*See* ECF 65, Bell Dec. (outlining the multiple steps involved in investigations). A lapse on the part of Sims does not negate the

Page  18 – DEFENDANTS' REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

efficacy of PPB investigation policy, and implementation of the same, as a whole.

Further, the video does not dispositively show exactly what Stanton did with his gun in his final moments. More importantly, it does not show what Dyk would have seen from a completely different angle at a different elevation. As Morris testified, it took him multiple views (and a conversation with Plaintiffs' attorney) to decide that it looked like Stanton fired in the air. In addition, any testimony from Morris about what Ofc. Le may or may not have said is hearsay without any exception – Plaintiffs offer that testimony to prove 1) that Ofc. Le made such a statement, and 2) that the statement accurately characterized what was on the video.

As noted above, Defendants illustrated PPB's robust investigatory process. (*See*, *e.g.*, ECF 65, Bell Dec.; ECF 59, Defs. MSJ, pp.15-16). Importantly, this Court, when considering much of the same time period for the same claim of failure to investigate officers' uses of deadly force, found that the PPB "thoroughly investigat[es] each use of deadly force by its officers." *Elifritz v. Fender*, 460 F. Supp.3d 1088, 1119 (D. Or. 2020). Consistent with that, the only evidence Plaintiffs offer, a single portion of the PPB's multi-step investigation process, supports that such thorough investigations did occur in the cases Plaintiffs' cite (*See* ECF 75-19, 75-21; Albies Dec., Exs. 19, 21 (IA investigations)). Plaintiffs offer nothing, other than their personal feelings and conjecture about the ultimate findings and outcome of prior investigations, to "establish that the facts available to city policymakers put them on actual *or constructive notice* that [any] omission [was] substantially certain to result in the violation of the constitutional rights of their citizens. *Canton*, 489 U.S. at 396 (emphasis in original). Plaintiffs' personal feelings and conjecture are not sufficient to create a material issue of fact and their *Monell* claim should fail.

/ / /

/ / /

/ / /

/ / /

Page  19 – DEFENDANTS' REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

V.      **Tort Claims.**

   A.      <u>**Wrongful Death**</u>

      i.      *Officer Dyk*

Plaintiffs argue that "the officers are circling the wagons to justify the shooting and protect Officer Dyk" ( ECF 74, Pltfs. Opp., p. 27), yet also that their testimony contains inconsistencies that create a question of fact. Plaintiffs' arguments do not account for the fact that witnesses can perceive and remember events differently and yet observe the same facts. Plaintiffs' arguments also assume that the testifying officers had the benefit of 20/20 hindsight, which is not an appropriate measure for negligence. *See* UCJI 20.02 ("Do not judge the person's conduct in light of later events; instead, consider what the person knew or should have known at the time."); *Graham v. Connor*, 490 U.S. 386, 396 (1989) ("[T]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.")

In Oregon, "a police officer is presumed to act in good faith in determining the amount of force to be used when making an arrest." *Rich v. Cooper*, 234 Or. 300, 309, 311(1963). As illustrated above, in evaluation of the excessive force claim, pages 9-11 *supra*, Officer Dyk had a reasonable belief that Stanton was endangering others with a deadly weapon. (*See also* ECF 59, Defs. MSJ, pp.20-29 (discussing reasonableness and justification of Dyk's use of force). Other officers, in other positions, with different angles of vision also saw the weapon lower at them. These other points of view reinforce Officer Dyk's point of view. The evidence does show that some officers inferred or perceived that Stanton may have been intoxicated. Plaintiffs' assertions regarding Defendant Officers' understanding of Stanton's mental state does not change the fact that when he lowered his gun toward officers, he posed an imminent threat to the lives of those officers. Plaintiffs' spurious allegations of conspiracy and disingenuous allegation of prior knowledge are completely unsupported by any evidence and do not refute that Stanton posed an imminent threat of death or serious bodily injury when Dyk used lethal force. (ECF 74, Pltfs.

Page  20 – DEFENDANTS' REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Opp., p.39).

### ii.    The City

Regardless, any discrepancies in description are not material to the wrongful death negligence claims against the City as Plaintiffs' three particulars of negligence all center on communication techniques and de-escalation. (ECF 1, Cmplt., ¶¶49-51). Namely, (1) failure to summon and await arrival of Portland's Behavioral Health Unit, (2) failure to place present and available officers with Enhanced Crisis Intervention Skills in charge, and (3) failure to employ crisis intervention and de-escalation communication tactics and training. (*Id.*). These are the actual allegations at issue for summary judgment, and they must be analyzed as they specifically read.

First, as noted in the Motion for Summary Judgment, Plaintiffs have fundamental misunderstanding of the role of the behavioral health unit. (See ECF 60-9, Caldwell Dec., Ex. 9, Pavon Depo., pp.7:3-11, 23:8-11).

Second, officers did use crisis intervention and de-escalation techniques and tactics. PPB Directive 1010.00 instructs that officers "shall use disengagement and de-escalation techniques *when time and circumstances reasonably permit.*" (*See* Caldwell Supp. Decl., Ex. 25, PPB Directive 1010.00, p.4, 1.1) (emphasis added). That is consistent with training where context will inform which de-escalation tactics may be appropriate. (ECF 60-4, Caldwell Dec., Ex. 4, Bryson 30(b)(6) Depo., pp.34:16-19; 35:3-9 ("de-escalation could be anything from thoughtful communication, as discussed in this class, to using sound tactics, for lack of a better word, which could be creating distance, using barriers, using tools, having more officers, there's many thing that could be considered de-escalation"). As noted by multiple officers, this was an incredibly dynamic scene and only a few minutes elapsed from the time officers first saw Mr. Stanton and he lowered his weapon at them. (*See*, *e.g.*, ECF 60-11, Caldwell Dec., Ex. 11, Townley Depo., pp.96:25-97:9 (rapidly evolving event)). Therefore, there was not the time nor opportunity to use every possible technique (even if appropriate) and assemble every possible resource. (*See* ECF 60-9, Caldwell Dec., Ex. 9, Pavon Depo., pp.22:7-8,11-16; ECF 60-11, Caldwell Dec., Ex. 11,

Page  21 – DEFENDANTS' REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Townley Depo., p.31:12-14; ECF 66, Bartlett Dec., ¶¶10, 12; ECF 70, Wambold Dec., ¶14.

In any case, Directive 1010.00 provides numerous de-escalation techniques that officers did employ. For instance, de-escalation techniques include: "allowing the person appropriate time to respond to direction" and "communicating with the person from a safe position using verbal persuasion, advisements, or warnings." (*See* Caldwell Supp. Decl., Ex. 25, PPB Directive 1010.00, p.4, 1.1.1(2)). There is no dispute that Ofc. Lovato gave multiple instructions to put down the gun and surrender to police. (*See* ECF 63, Lovato Dec., ¶19). There is also no dispute that Stanton had the time and ability to put down his weapon and surrender to the police and instead hurled insults punctuated with additional firing of his weapon. In addition, as Plaintiffs' note, officers used "distance, cover, and concealment" to communicate with Stanton, another de-escalatory technique. Caldwell Supp. Decl., Ex. 25, PPB Directive 1010.00, p.4, 1.1.1(4)). Another de-escalatory technique is containment. (*Id*.). Plaintiffs agree that PPB was attempting to establish containment. (ECF 74, Pltfs. Opp., pp.12, 15). PPB's Directive also explains that de-escalation includes "ensuring there are an appropriate number of members on scene." (*See* Caldwell Supp. Decl., Ex. 25, PPB Directive 1010.00, p.4, 1.1.1(6)). It is undisputed that Lovato's team had multiple resources and attempted contact with Stanton, but also that PPB continued to assemble resources during that interaction. (*See*, *e.g.*, ECF 74, Pltfs. Opp., pp.11-14 (discussing PPB planning, conferring with additional resources, etc.).

As can be seen, Defendants used most of the de-escalatory techniques identified in Directive 1010.00 (Caldwell Supp. Dec., Ex. 25, PPB Directive 1010.00, p.4, 1.1.1). Plaintiffs can only offer conjecture that additional or different communications or techniques would have changed the outcome; that position is premised on speculation and unsupported by any evidence. Further, it may not have been safe to implement additional components of de-escalation. (ECF 60-3, Caldwell Dec., Ex. 3, Lovato Depo., p. 22:3-10). As explained extensively in the underlying Motion, the "boots on the ground" assessment and implementation of tactics and techniques outweigh any hypotheticals, speculations, or Plaintiffs' conclusory opinions. (ECF 59, Defs. MSJ,

Page  22 – DEFENDANTS' REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

pp.29-31).

Plaintiffs cannot show that officers' actions were unreasonable in the brief time they attempted to make contact and get Stanton to surrender his weapon. Nor can they show that officers caused Stanton to level his gun at police (he had already fired off more than 60 rounds). Plaintiffs have not, and cannot, create a question of fact as to their negligence claims and those should be dismissed with prejudice.

**B.    IIED**

As a starting point, Plaintiffs fail to offer any evidence whatsoever that any alleged words said by the police actually caused A.S. harm. They allege that her father's death itself caused emotional distress, but they fail to offer any evidence at all that she was harmed by any words – not from her testimony, her family's testimony, or any other source. As a threshold matter, a plaintiff must present evidence of emotional harm to support an IIED claim. *See Schiele v. Montes*, 231 Or.App. 43, 48 (2009). On that basis alone the claim should fail.

In any event, Plaintiffs incorrectly argue that there are no hearsay problems with the IIED claim. The entire claim rests on statements allegedly made to family—which are different and do not match the statement alleged in paragraph 53 of the Complaint. (ECF 1, Cmplt., ¶53). The uncle of A.S., Taylor Stanton, testified that A.S. said that the officer said, "'We did not do this. He did this to himself. He was sad.'" (*See* Caldwell Supp. Decl., Ex. 26, T. Stanton Depo., p.42:22-24). The mother of A.S., Vansopheak Phou, testified that A.S. said that the officer said, "He killed himself." (Caldwell Supp. Decl., Ex. 16, Phou Depo., p. 60:1-6). Stanton's mother, A.S.'s grandmother, said "he died of suicide." (ECF 75-37, Albies Dec., Ex. 37, K. Stanton Depo., p.100). By contrast, the Complaint alleges that the officer said, "your father wanted to die." (ECF 1, Cmplt., ¶53).

Furthermore, those statements were contradicted in the deposition of A.S. See ECF 59, Defs. MSJ, p. 27-28. A.S. testified she did not talk to any adult about her father's death being suicide. (ECF 60-6, Caldwell Dec., Ex. 6, A.S. Depo., p.42:9-43:13). And she testified she did

Page 23 – DEFENDANTS' REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

not think she talked to the cops about what happened to her dad. (*Id.*, p.37:11-19). She also testified she thought her grandmother might have heard something about her dad being shot or shooting himself, or she probably learned about it from her mom. (*Id.*, pp.39:11-14; 41:2-6). She was deliberate and thoughtful in her testimony and there is no reason to discount it in any way. That is the controlling testimony as to what A.S. knew, when she knew it, and how she knew it. Notably, Plaintiffs do not question A.S.'s testimony but instead try to rely on contradictory, hearsay statements from her mother, grandmother, and uncle.

The statements of family members are indeed being offered for the truth of the matter asserted—that the statement itself was true and that the statement evidences an intent by the officer to inflict harm. That is the allegation in the Complaint: an "officer or officers told A.S. that 'your father wanted to die.'" (ECF 1, Cmplt., ¶53). Plaintiffs are trying to establish the truth of that allegation – the truth of the matter asserted is that an officer said "your father wanted to die" to A.S. Whether Mr. Stanton died by suicide is not an issue in this case and not part of Plaintiffs' Complaint. Therefore, their reliance on the unreported case *U.S. v. Curry*, 905 F.2d 1541 (9th Cir. 1990) is misplaced. (ECF 74, Pltfs. Opp., pp.35-36).

The *Curry* case involved the statement "'[g]ive this to Mr. Curry," in the context of seeking to overturn a jury conviction on conspiracy, drug distribution, and drug possession charges. The statement was allowed because it was not offered to prove the person who heard it was given something to give to Mr. Curry, but instead, that the statement confirmed part of the conspiracy. *Id.* at *2. The *Curry* court relied on *United States v. Gibson* to make its finding. 690 F.2d 697, 700 (9th Cir. 1982).

In *Gibson*, various investors testified that they were given various economic assurances by various Gibson employees about a Gibson business. *Id.* at 700. The court allowed the testimony in not to prove the truthfulness of the assurances, but instead to show that there was a scheme by Gibson: "The purpose of the testimony was solely to establish the fact that the salesmen and employees had made the statements." *Id.*

Page  24 – DEFENDANTS' REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Pursuant to *Gibson*, <u>*A.S.'s testimony*</u> would be allowed to show what an officer may have said to her, for example, that her father wanted to die. But that testimony would not be allowed to show that her father actually wanted to die. But that is not what is at issue here. What is at issue here is what A.S. then allegedly said to her family (which again completely contradicts her own testimony). It would be analogous to an investor in *Gibson* going home after a conversation with Gibson's employees and telling their family what the employees told them. Like here, testimony by family about what the investor told them would be hearsay. Regardless, that scenario was not what the *Gibson* court, or *Curry* court, considered.

Statements offered from A.S.'s family members about what she allegedly told them to support the allegation that an officer or officers told A.S. that her father wanted to die are pure hearsay without any exceptions. Those are therefore inadmissible and should not be considered.

As to Plaintiffs' second argument, Plaintiffs argue the statements have sufficient guarantees of trustworthiness and the statements are probative. These statements are not trustworthy, given that the statements allegedly made to the family members differ from each other, and they differ from what is alleged in the Complaint. And further, those statements differ from A.S.'s own testimony during the deposition. Plaintiff A.S. heard of suicide from her family and her father, but there is no evidence that the police communicated this to her. (See ECF 59, Defs. MSJ, pp. 27-28).

Finally, Plaintiffs argue that the officers do not remember exactly what was said to A.S. at the scene, but this is a disingenuous twisting of the testimony. The officers were clear, in depositions and declarations, that they never would have made such a statement to A.S. (ECF 60-2, Caldwell Dec., Ex. 2, Hertzler Depo., pp. 94:4-9; ECF 64, Hertzler Dec., ¶ 14; ECF 61, Ramic Dec., ¶ 12). They can testify to the nature of their interaction with A.S. without also knowing exactly everything that was said during the encounter, and they can certainly testify they would have never said such things. Again, the entire claim rests on hearsay, and it is prejudicial to allow the claim to proceed without any other evidence to support the claim.

Ultimately, even if true, Plaintiffs fail to show how such a comment in the heat of the moment constitutes conduct that is "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Schoen v. Freightliner LLC*, 224 Or.App. 613, 626-27 (2008). As noted previously, Oregon "cases suggest that conduct that is negligent, mistaken, or otherwise remiss rather than deliberate, intentional, or engaged in by design will not support a claim for IIED." *Delaney v. Clifton*, 180 Or. App. 119, 136 (2002) ("[W]e have identified no Oregon case in which the conduct that was the basis for an IIED claim was alleged to have been merely negligent and nevertheless was determined to be actionable."). Plaintiffs offer nothing other than righteous indignation to support that such a comment would be a deliberate "lie" intended to harm a little girl that all officers had been concerned about since they learned she was on scene. There is no evidence to support the allegation and it does not comport with any other facts in evidence. For these reasons the claim should be dismissed with prejudice.

## C.    NIED

Plaintiffs argument in support of the NIED claim is that the experience of A.S. meets the elements of *Philibert v. Kluser*, 360 Or 689 (2016). However, this argument assumes negligence in the first place. The actions of Officer Dyk, as already discussed herein and in Defendants' underlying Motion were reasonable and justified; therefore, a negligence claim based on those intentional acts cannot move forward. Further, as discussed, Plaintiffs' claim fails from lack of causation:  A.S. does not know how her father died. Any emotional distress she has suffered cannot be causally linked to Officer Dyk's conduct, as she does not know that Officer Dyk shot her father. (See ECF 59, Defs. MSJ, pp.35-36).

/ / /

/ / /

/ / /

/ / /

Page  26 – DEFENDANTS' REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

## **CONCLUSION**

For the foregoing reasons, and those in Defendants' underlying Motion for Summary Judgment (ECF 59, Defs. MSJ), Defendants respectfully request the Court grant Defendants' Motion for Summary Judgment and dismiss Plaintiffs' Complaint with prejudice.

DATED: October 6, 2025.

Respectfully submitted,

/s/ Carey Caldwell
Carey Caldwell, OSB #093032
Senior Deputy City Attorney
carey.caldwell@portlandoregon.gov
Caroline Turco, OSB #083813
Senior Deputy City Attorney
caroline.turco@portlandoregon.gov
Of Attorneys for Defendants