IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| ESTATE OF AARON D. STANTON, by Douglas Stanton, personal representative; and A.S., a minor by and through her Guardian ad Litem, Douglas Stanton,<br><br>       Plaintiffs,<br>  v.<br><br>JOSHUA DYK and CITY OF PORTLAND,<br><br>       Defendants. | Case No.: 3:23-cv-01767-AN<br><br><br><br><br>OPINION AND ORDER |

Aaron Stanton was shot by City of Portland police officer Joshua Dyk while Mr. Stanton was standing on his porch holding a gun. Plaintiffs Estate of Aaron Stanton, by Douglas Stanton as personal representative, and A.S., Mr. Stanton's minor daughter by and through her guardian ad litem Douglas Stanton,[1] bring this action alleging wrongful death due to battery, wrongful death due to negligence, intentional infliction of emotional distress, and negligent infliction of emotional distress against City of Portland ("the City") and alleging excessive use of deadly force in violation of the Fourth Amendment under 42 U.S.C. § 1983 against both the City and defendant police officer Joshua Dyk. Defendants now move for summary judgment as to all claims. After reviewing the parties' thorough briefing and evidence, the Court finds that oral argument will not help resolve this matter. *See* Local R. 7-1(d). For the reasons stated below, defendants' motion is granted in part and denied in part.

---

[1] Aaron Stanton, the decedent, is referred to as "Mr. Stanton" throughout this opinion. Mr. Stanton's Estate and minor daughter A.S., both represented by Douglas Stanton, are together referred to as "plaintiff."

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Materiality is determined with reference to the substantive law and material facts are those which might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005) ("A mere scintilla of evidence supporting the non-moving party's position is insufficient; there must be evidence on which a jury could reasonably find for the nonmoving party.").

The moving party has the initial burden of establishing the bases for its motion and identifying the portions of the record that demonstrate the absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). However, if the non-moving party bears the burden of proof at trial, the moving party is not required to produce evidence disproving each element of the non-moving party's claims. *Id.* at 325. Instead, the moving party need only show an absence of evidence supporting the non-moving party's case. *Id.*; *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). The court's role is not to "weigh the evidence" or make credibility determinations, which are tasks reserved for a jury. *Anderson*, 477 U.S. at 249. Instead, the court must "view the facts in the light most favorable to the nonmoving party" except to the extent that the nonmoving party's testimony is "'blatantly contradicted'" by record evidence, especially video evidence. *Hughes v. Rodriguez*, 31 F.4th 1211, 1218 (9th Cir. 2022) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

## BACKGROUND

The initial events leading up to Mr. Stanton's shooting are largely undisputed. Around 8:20 p.m. on July 27, 2022, Portland police were dispatched to Mr. Stanton's neighborhood in Southeast Portland based on numerous calls reporting an armed person, who turned out to be Mr. Stanton, behaving erratically. *See* Decl. of J. Ashlee Albies ("Albies Decl."), Ex. 2 ("Incident History"), ECF 75-2, at 1-2. Neighbors

reported that Mr. Stanton was firing shots in the air, going in and out of his house to change between a semi-automatic rifle and a handgun, and that he had had "manic/yelling episodes in the past." *Id.* at 3-4, 7. Numerous police officers responded to the call. *See* Albies Decl., Ex. 30 ("Pavon Depo."), ECF 75-30 at 46:3-6. Those officers, including Dyk, set up a staging down the street from Mr. Stanton's home, discussed the response strategy, and worked to secure the immediate area. *See* Albies Decl., Ex. 35 ("Wambold Depo."), ECF 75-35 at 56:13-57:24; Albies Decl., Ex. 40 ("Hertzler Depo."), ECF 75-40 at 82:20-83:10; Decl. of Joshua Dyk ("Dyk Decl."), ECF 67 at ¶ 7. Shortly after arriving and securing the scene, the officers heard nearby gunfire and decided to relocate their staging area closer to the source of the gunshots (which was ultimately determined to be the Stanton residence). Dyk Decl. ¶¶ 8-10.

By 8:40 p.m., some officers, including Dyk and Gabri Hertzler, were dispatched to move through backyards to secure a concealed position with visibility to the Stanton home. *Id.* at ¶¶ 11-13; Incident History 6. Around 8:50 p.m., Dyk and other officers saw Mr. Stanton exit his home with a young girl, who was ultimately determined to be A.S., and stand on his porch with a handgun. Dyk Decl. ¶¶ 14-15; *see also* Incident History 8; Pavon Depo. 80:6-14. At 8:51, police officer Dominic Lovato identified himself as Portland Police, instructed Mr. Stanton to walk toward the officers with his hands in the air, and warned him that "if he did not comply, [the officers] may use force." Declaration of Dominic Lovato ("Lovato Decl."), ECF 63, at ¶ 19. Mr. Stanton responded by putting his shirt on, with no gun in his hands, shouting vulgarities at the officers, and firing shots in the air. *See id.* at ¶¶ 21-22; Incident History 8. Lovato again identified himself as police and repeated his previous instructions. Lovato Decl. ¶ 23. Mr. Stanton did not comply, nor did he make any verbal threats. *See* Albies Decl., Ex. 39 ("Morris Depo."), ECF 75-39, at 14:20; Pavon Depo. 80:9-11; Lovato Decl. ¶ 24.

This is where the parties' accounts materially diverge. According to a neighbor, Mr. Stanton fired additional shots in the air and, at the moment Dyk shot him, Mr. Stanton was "point[ing his gun] up, not at anybody, but up." Morris Depo. 14:20. According to Dyk, Mr. Stanton fired shots in the air and then "look[ed] directly at" the officers, preparing to "tak[e] an aimed shot directly at them." Albies Decl., Ex. 26 ("Dyk Depo."), ECF 75-26, 139:10-25. According to the other officers, at the time Dyk shot him, Mr.

3

Stanton was holding his "gun up . . . close to his face" possibly about to shoot himself, Albies Decl., Ex. 31 ("Piombo Depo."), ECF 75-31, 70:3-12, or not "point[ing] the gun or . . . trying to use the sights in any way," Albies Decl., Ex. 24, ("Bartlett Depo."), ECF 75-24, 85:18-19.  There is no dispute that without any further warning Dyk then shot and killed Mr. Stanton.  *See* Incident History 8; Dyk Decl. ¶ 24; Albies Decl., Ex. 11 ("Morris Video"), ECF 75-11.

After Mr. Stanton was shot, Hertzler and Officer Adi Ramic took A.S. from the scene and transported her to the East Precinct.  The parties also dispute the nature of the officers' interactions with A.S.  According to defendants, the officers exclusively provided support and comfort to A.S.  *See* Decl. of Gabri Hertzler ("Hertzler Decl."), ECF 64 at ¶¶ 13-14; Decl. of Adi Ramic ("Ramic Decl."), ECF 61 at ¶¶ 8-12.  According to plaintiff, at least one officer told A.S. that Mr. Stanton wanted to die and was responsible for his own death.  *See* Albies Decl., Ex. 36 ("Phou Depo."), ECF 75-36, at 59:23-60:8; Albies Decl., Ex. 37 ("Karen Stanton Depo."), ECF 75-37, at 100:17-101:02; Albies Decl., Ex. 38 ("Taylor Stanton Depo."), ECF 75-38, at 41:13-24.

On November 28, 2023, plaintiff filed the operative complaint on behalf of Mr. Stanton's estate and A.S.  *See* Compl., ECF 1.  The parties proceeded through discovery and, on August 15, 2025, defendants filed a motion for summary judgment on all claims.  *See* Defs. Mot. for Summ. J. ("Defs. Mot."), ECF 59.  Plaintiff responded in opposition, *see* Pl. Resp., ECF 74, and defendants filed a reply in support, *see* Defs. Reply, ECF 87.

## DISCUSSION

The Court first address's the Estate of Stanton's Section 1983 claims against Dyk and the City, considering, in turn, defendants' arguments related to excessive force, qualified immunity, and *Monell* liability.  The Court then discusses defendants' arguments related to the Estate's wrongful death claims— the first based on battery, the second based on negligence—against the City.  For the reasons stated below, the Court concludes that summary judgment is appropriate as to plaintiff's *Monell* claim and wrongful death due to negligence claim, but denies defendants' motion as to other claims brought by the Estate.  Finally,

4

the Court considers defendants' arguments with respect to the claims brought on behalf of A.S. and concludes that summary judgment should be denied as to the IIED claim and granted as to the NIED claim.

**A.    Section 1983**

1.    *Excessive Force*

Defendants argue that plaintiff's Section 1983 claim should be dismissed because Dyk's use of deadly force was reasonable and, therefore, did not violate Mr. Stanton's Fourth Amendment rights. "To determine whether the use of force was objectively reasonable, the court balances the 'nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Vos v. City of Newport Beach*, 892 F.3d 1024, 1030 (9th Cir. 2018) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Use of deadly force represents the "highest level" of intrusion on a person's Fourth Amendment interests because that person "has a 'fundamental interest in his own life' and because such force 'frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment.'" *A.K.H. ex rel. Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016) (quoting *Tennessee v. Garner*, 471 U.S. 1, 9 (1985)). The question, then, is whether the governmental interests at stake justified this extraordinary intrusion on Mr. Stanton's Fourth Amendment rights.

In assessing the significance of the governmental interests, courts must evaluate the totality of the circumstances with particular attention on three primary factors: (1) "'the severity of the crime at issue,'" (2) "'whether the suspect poses an immediate threat to the safety of the officers or others,'" and (3) whether the suspect "'is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *Graham*, 490 U.S. at 396). "The 'most important' of these factors is 'whether the suspect posed an immediate threat to the safety of the officers or others.'" *Id.* (quoting *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc)).

First, the severity of Mr. Stanton's alleged crime was low. Defendants' assertions that Mr. Stanton was committing a felony require disputed facts to be resolved in their favor. *See* ORS § 166.220 (unlawful use of a weapon requires that it be used "against another," carried with the intent of such use, or discharged "at or in the direction of any person, building, structure, or vehicle within the range of the weapon); ORS

5

§ 161.405 (attempted murder, manslaughter, or assault require the defendant to ***intentionally*** take substantial steps toward killing or assaulting an individual).  But, as discussed below, the Court finds that there are genuine disputes of fact as to whether Mr. Stanton ever pointed his gun anywhere other than straight up.  Had Mr. Stanton survived, he could have been charged with disorderly conduct or reckless endangerment, both misdemeanors.  *See* Or. Rev. Stat. ("ORS") § 166.025 (disorderly conduct in the second degree is a Class B misdemeanor); ORS § 163.195 (recklessly endangering another person is a Class A misdemeanor); *see also* Dyk Depo. 108:1-109:19.  A misdemeanor weapons charge is "not a serious crime that could justify a high degree of force."  *Calonge v. City of San Jose*, 104 F.4th 39, 47 (9th Cir. 2024).  Therefore, this factor weighs against the governmental interest in the use of deadly force against Mr. Stanton.

Second, Mr. Stanton was not fleeing or otherwise evading arrest; he was standing on the porch of his home when Dyk shot him.  *See* Incident History 8.  Indeed, the record shows no attempt by Mr. Stanton to flee at any point during the incident.  Nor is there evidence in the record that Mr. Stanton heard any of the officers' orders.  To the extent that Mr. Stanton failed to comply with orders he heard, that amounts no more than "passive resistance," which the Ninth Circuit has held does not justify "a substantial use of force."  *Bryan v. MacPherson*, 630 F.3d 805, 830 (9th Cir. 2010).  Therefore, this factor also weighs against defendants.

The final, but most important, factor is whether Mr. Stanton posed an "immediate threat" to the safety of those around him.  *See Vos*, 892 F.3d at 1031-32.  "In considering 'whether there was an immediate threat, a simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern.'"  *Id.* at 1032 (quoting *Mattos*, 661 F.3d at 441-42).  Although possessing a firearm, alone, is not such a factor, pointing the gun at officers or making "a furtive movement, harrowing gesture, or serious verbal threat" while armed may be objective indicators of an immediate threat.  *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013).  The parties strenuously debate whether such objective indicators were present here.

6

Defendants assert that "from the beginning, Mr. Stanton posed an immediate threat of death or bodily harm to police officers and community members," Defs. Mot. 21, but that argument is undermined by Dyk's testimony that he and other officers on scene agreed that Mr. Stanton being armed or even firing shots into the air would not justify lethal force. Dyk Depo. 101:5-20; *id.* 104:13-24; *see also* Piombo Depo. 68:19-23 (testifying that he did not see justification for deadly force when Mr. Stanton was shooting in the air). Although defendants also argue that Mr. Stanton "hurl[ed] insults and profanities at them with aggression and disdain," Defs. Mot. 12, officer testimony again indicates that Mr. Stanton did not make any verbal threats, Pavon Depo. 80:9-11. More plausibly, defendants contend that Dyk perceived an immediate threat when "Mr. Stanton pointed his gun at other officers." Defs. Mot. 20; *id.* at 21 ("It was only [Mr. Stanton's] action of pointing his gun at officers that terminated officers' ability to wait him out. . . ."). There is little debate that a person pointing a gun threateningly at officers could be an immediate threat justifying deadly force. Thus, the key question is whether Mr. Stanton in fact pointed his gun at the responding officers. *See Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014) ("To decide this case a jury would have to answer just one simple question: Did the police see [the decedent make a threatening gesture]? If they did, they were entitled to shoot; if they didn't, they weren't.").

Plaintiff argues that Mr. Stanton never pointed his gun at anyone. For support, plaintiffs point to the deposition testimony of Jason Morris, Mr. Stanton's neighbor who witnessed the incident. Pl. Resp. 31. Mr. Morris testified that he watched the scene unfold and did not "see [Mr. Stanton] at any point aim his gun at any people or level it towards the ground." Morris Depo. 11:18-21. He further testified that Mr. Stanton, in his final moments, "held [his gun] up in the air . . . and shot it off. It was pointed up, not at anybody, but up." *Id.* at 14:15-20. And, "within milliseconds" of Mr. Stanton firing his gun pointing up, Mr. Morris saw him be shot by Dyk. *Id.* 14:21-23. Mr. Morris recorded parts of the incident, including the moments leading up to Dyk shooting Mr. Stanton. Albies Decl., Ex. 11 ("Morris Video"). The Court has reviewed Mr. Morris's video recording and finds that it supports—or, at the very least, does not contradict—his description of events. In it, Mr. Stanton is seen standing on his porch interacting with his daughter

before she moves out of frame, raising his arm straight up and firing into the air, and then collapsing from an apparent gunshot wound. *Id.*

Defendants dispute the credibility of this testimony, but credibility determinations are (almost) "exclusively within the province of the factfinder at trial, not the district court on summary judgment." *Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 10353636 (9th Cir. 2005); *Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). The only exception to this is if plaintiff's "version of events is so utterly discredited by the record that no reasonable jury could have believed him." *Scott*, 550 U.S. at 380. The video supports, rather than discredits, Mr. Morris's testimony.

Plaintiff's description of events is also supported by the depositions of officers who testified, contrary to defendants' description of events, that Mr. Stanton was holding his "gun up . . . close to his face" possibly about to shoot himself, Piombo Dep. 70:3-12, "firing blindly" and not "point[ing] the gun or . . . trying to use the sights in anyway," Bartlett Depo. 85:18-19. To be clear, the officers on the scene also testify, variously, that Mr. Stanton was generally lowering his gun, gesturing right above them, or pointing the gun at concealed officers. But the inconsistencies in the officers' testimony, although not dispositive, further counsel against granting summary judgment. *See Cruz*, 765 F.3d at 1079 ("Because the person most likely to rebut the officers' version of events—the one killed—can't testify, the judge must carefully examine all the evidence in the record to determine whether the officer's story is internally consistent and consistent with other known facts." (cleaned up)).[2]

---

[2] Defendants' reliance on *Sabbe v. Washington Cnty. Bd. of Commissioners*, 84 F.4th 807 (9th Cir. 2023) is not persuasive. There, the Ninth Circuit relied on the fact that the defendants had observed the decedent taking violent action against the officers (by intentionally ramming his vehicle into the officer's truck) and on defendants' unrebutted testimony that an officer saw decedent pointing a rifle directly at the officer's truck. *Id.* at 828. If the Court accepted defendants' version of events, then *Sabbe* would be persuasive. But the record here, unlike in *Sabbe*, is not "consistent." *Id.* Based on Mr. Morris's video and eyewitness testimony and the inconsistent testimonies of the officers at the scene, a reasonable jury could disbelieve Dyk's account and conclude that there were no objective indicators that Mr. Stanton was an immediate threat and, therefore, Dyk's decision to shoot Mr. Stanton was unreasonable.

A reasonable jury could weigh Mr. Morris's testimony, video evidence, officers' inconsistent statements, and other circumstantial evidence and conclude that Mr. Stanton never pointed his gun toward the officers and no reasonable officer could have perceived an immediate threat. At this stage of the litigation, the Court can only conclude that whether Dyk saw Mr. Stanton point his gun at officers is genuinely disputed. Because that is the only objective indicator of an immediate threat identified by defendants, defendants cannot establish as a matter of law that there was no violation of the Fourth Amendment.

    2.    *Qualified Immunity*

The Supreme Court's doctrine of qualified immunity shields police officers and other public officials who violate individuals' constitutional rights from liability if the injured party cannot show that the violated right "'was clearly established at the time of the officer's alleged misconduct.'" *Vos*, 892 F.3d at 1035 (quoting *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014)).[3] Thus, even though plaintiff has identified a genuine dispute of material fact relevant to the reasonableness of Dyk's conduct, Dyk cannot be required to face a jury unless the conduct alleged was clearly established as a violation of the Fourth Amendment at the time of the shooting. "To overcome qualified immunity, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Hughes*, 31 F.4th at 1223 (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018). Although plaintiffs must identify "a case where an officer acting under similar circumstances as [the defendant] was held to have violated the Fourth Amendment," a factually identical case is not required. *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam).[4] The stated

---

[3] Qualified immunity may also be established if there was no violation of a constitutional right. *Vos*, 892 F.3d at 1035. As that "prong of the qualified immunity analysis 'mirrors the substantive summary judgment decision on the merits'" discussed above, the Court does not repeat it here. *Shepard v. Quillen*, 840 F.3d 686, 688 (9th Cir. 2016) (quoting *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002)).

[4] Generally, "with all affirmative defenses . . . the defendant bears the burden of proof." *Monge v. Maya Mags., Inc.*, 688 F.3d 1164, 1170 (9th Cir. 2012) (citing *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 561 (1985)). However, the doctrine of qualified immunity is often exempted from otherwise generally applicable rules. *See Jamison v. McClendon*, 476 F. Supp. 3d 386, 405 (S.D. Miss. 2020) (discussing the doctrine's "sweeping procedural advantages"). With respect to burden, there appears to be some disagreement among Ninth Circuit panels as to whether defendant or plaintiff is responsible for establishing qualified immunity (or the lack thereof). *Compare Frudden v. Pilling*, 877 F.3d 821, 831 (9th

goal of this case-to-case comparison is to determine "'whether the violative nature of ***particular*** conduct is clearly established.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 742 (2011)).

Dyk asserts that he is entitled to such immunity because even if his decision to kill Mr. Stanton was not reasonable, Mr. Stanton's Fourth Amendment rights were not clearly established in this particular context. Plaintiff cites various Ninth Circuit cases in opposition to Dyk's qualified immunity claim. Pl. Resp. 34-35. Three of these cases—*Peck v. Montoya*, 51 F.4th 877 (9th Cir. 2022) (decided October 18, 2022); *Rosenbaum v. City of San Jose*, 107 F.4th 919 (9th Cir 2024); *Calonge v. City of San Jose*, 104 F.4th 39 (9th Cir. 2024)—were decided after the July 2022 events at issue in this case. The Court is barred from relying on those cases by the Supreme Court's admonishment that cases "decided after the shooting at issue" are "'of no use in the clearly established inquiry.'" *Kisela*, 584 U.S. at 107 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 200 n.4 (2004)). Other cases are readily distinguishable. *See Mattos*, 661 F.3d at 443-51 (analyzing use of tasers against the unarmed plaintiffs); *Harris v. Roderick*, 126 F.3d 1189, 1201-04 (9th Cir. 1997) (analyzing the defendants' express policy and practice of using deadly force without warning in the context of an armed standoff). However, one case cited by plaintiff, *George v. Morris*, 736 F.3d 829 (9th Cir 2013), merits discussion.

In *George v. Morris*, Donald George, who had terminal brain cancer, woke up in the early morning, retrieved his pistol from his truck, and loaded it. 736 F.3d at 832. Donald's wife, Carol, called 911 and could be heard exclaiming on the call recording "No!" and "My husband has a gun!" *Id.* Concerned about a domestic disturbance involving a firearm, three sheriff's deputies were dispatched to the George household. *Id.* Carol met them at the door and "asked them to be quiet and not to scare her husband, while

---

Cir. 2017) (describing qualified immunity as "an affirmative defense that the [defendant] has the burden of pleading and proving" (citing *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992)), *with Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017) ("It is the plaintiff who 'bears the burden of showing that the rights allegedly violated were 'clearly established.'" (quoting *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1157 (9th Cir. 2000)). Nonetheless, the outcome here is the same whether the burden of proof sits with plaintiff or defendant.

also advising that he was on the patio with the gun." *Id.* The three deputies established a perimeter around the home, with some securing protected cover with limited visibility. *Id.* When Donald came out of the home, "he was holding a gun with the barrel pointing down" as well as "a walker or a buggy." *Id.* The district court found a factual dispute as to whether Donald "ever manipulated the gun, or pointed it directly at deputies," and it determined that one deputy's account could not be credited because of contradictions in the record. *Id.* at 833. Nonetheless, the deputies shot and killed Donald "[t]welve seconds after the deputies broadcast that Donald had a firearm." *Id.*

The Ninth Circuit held that the deputies' conduct violated the Fourth Amendment. *Id.* at 838. The deputies stated that they felt threatened by Donald, but "such a statement 'is not enough; there must be objective factors to justify such a concern.'" *Id.* (quoting *Bryan*, 630 F.3d at 826). Objective factors could include, for example, "a furtive movement, harrowing gesture, or serious verbal threat." *Id.* But, in the absence of such objectively threatening conduct, "the fact that the 'suspect was armed with a deadly weapon' does not render the officers' response per se reasonable under the Fourth Amendment." *Id.* (quoting *Glenn v. Washington County*, 673 F.3d 864, 872-73 (9th Cir. 2011)). Thus, the Ninth Circuit's decision in *George* clearly established that it is a violation of the Fourth Amendment for an officer to use lethal force from behind cover and without warning against an armed individual who is standing on his own porch not pointing his gun at anyone and has not made verbal or other threats.

The facts of this case are sufficiently similar to put Dyk on notice. As in *George*, law enforcement was called to the scene because of an armed person behaving erratically. *See* Incident History 1. As in *George*, multiple officers responded to the call. *See* Pavon Depo. 46:3-8. As in *George*, those officers were able to secure the immediate area and establish positions behind protective cover, reducing risk to themselves and third parties. *See* Hertzler Depo. 82:20-83:10. As in *George*, the suspect interacted with a family member without violence. *See* Pavon Depo. 80:6-14; *see also id.* 50:7-51:4 (testifying that Mr. Stanton also interacted with an armed neighbor without violence); Incident History 8 (A.S. "right next to" Mr. Stanton). As in *George*, the suspect stepped out onto his porch, armed, but did not flee or actively resist arrest. *See* Incident History 8. As in *George*, construing the evidence in the light most favorable to

the plaintiff, the suspect kept the gun pointed away from the officers and made no verbal threats. *See* Morris Depo. 14:17-20; Pavon Depo. 80:9-11. Nonetheless, as in *George*, the defendant expressed subjective fear of the suspect firing on someone. Dyk Depo. 143:5-9. So, as in *George*, the defendant fired shots from behind cover without any contemporaneous warning. *See* Hertzler Depo. 86:1-3; Dyk Depo. 111:25-112:7.

Some factual differences between *George v. Morris* and this case indicate that Dyk's conduct was even more unreasonable than that of the officers in *George*. First, in *George*, officers were called to the scene based on concerns of domestic violence, which the Ninth Circuit has noted is a "'particularly dangerous' [situation] because 'more officers are killed or injured on domestic violence calls than on any other type of call.'" *George*, 736 F.3d at 839 (quoting *Mattos*, 661 F.3d at 450). Here, no such special factor was present, and a factfinder could conclude from evidence in the record that responding officers were aware that Mr. Stanton had engaged in similar behavior before without anyone getting hurt. Albies Decl., Ex. 32 ("Pool Depo."), ECF 75-32, 45:6-11; Incident History 7 (referencing past episodes). Further, law enforcement had not just three deputies on site, as was the case in *George*, but "a lot of officers on scene" to control the area. Pavon Depo. 46:3-6; *see also* Incident History 16-17 (listing more than a dozen officers "os" [on site] at the time Mr. Stanton was shot).

Nonetheless, the fact that Mr. Stanton pointed the gun up and fired shots into the air, Morris Depo. 14:17-20, while the decedent in *George* kept the gun pointed down and did not fire any shots, 736 F.3d at 838, is a factual difference that could be said to weigh in Dyk's favor. However, even with this difference, *George* is sufficient to put Dyk on notice of the unlawfulness of his conduct. *See al–Kidd*, 563 U.S. at 741 (emphasizing that courts "do not require a case directly on point" to clearly establish a right). Indeed, in *Williams v. City Of Canton*, the Sixth Circuit found that, even in the absence of a factually similar case, all reasonable police officers would know that it would be unlawful to shoot a man "shooting a weapon into the air from his home." 168 F.4th 933, 943 (6th Cir. 2026). Because the decedent in *Williams* was shooting in apparent celebration around midnight on New Years' Day, the Sixth Circuit reserved addressing some of the specific questions presented here, but the court's essential holding that "any reasonable officer would

12

recognize that the police do not have an automatic right to immediately shoot in the direction of gunfire whenever they hear it," is highly applicable. *Id.*

Ultimately, the material similarities in the particular police conduct found to have violated the Fourth Amendment in *George* gave defendant Dyk "fair warning" that his specific actions, as alleged, would violate Mr. Stanton's rights. *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Given the infinite variability of law enforcement encounters, to require greater factual similarity than this would gut the Supreme Court's holding "that officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* This is particularly true here, where Dyk had both the specific notice provided by *George*, and the general notice discussed in *Williams* that he did not have an automatic right to shoot Mr. Stanton merely for firing a gun from his porch. Together, these are sufficient to put the "constitutional question beyond debate." *White*, 580 U.S. at 79.

Additional case law further supports this conclusion. For more than three decades, circuit courts have repeatedly emphasized that possession of a firearm does not justify use of deadly force absent an objective threat to officers or bystanders. *See Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991) (holding that it was a violation of the Fourth Amendment to shoot an armed suspect who "did not point the gun at the officers and apparently was not facing them when they shot him"); *Est. of Lopez v. Gelhaus*, 871 F.3d 998, 1010-11 (9th Cir. 2017) (holding that it was a violation of the Fourth Amendment to shoot a suspect who appeared to have an AK-47, which was pointed down or, at most, lifted slightly but "never rose at any point to a position that posed any threat to either of the officers"); *accord Baker v. Putnal*, 75 F.3d 190, 198 (5th Cir. 1996) (holding that witness testimony that the armed "decedent took no threatening action toward [the defendant] as the officer approached the truck" and "may have barely had an opportunity to see" the officers before he was shot could establish a Fourth Amendment violation); *King v. Taylor*, 694 F.3d 650, 663 (6th Cir. 2012) ("[The decedent] did not point a gun towards the officers just before he was shot, thereby rendering [the defendant's] use of deadly force unreasonable."); *Knibbs v. Momphard*, 30 F.4th 200, 226 (4th Cir. 2022) ("[U]se of deadly force against a homeowner possessing a firearm in a non-threatening manner in his own home while investigating a nocturnal disturbance was

unconstitutional."). The Ninth Circuit's decision in *George v. Morris*, and this larger body of case law, puts this constitutional question beyond debate. Instances of officers firing on armed and sometimes erratic individuals at the first opportunity and without warning is an unfortunately common fact pattern, and one that federal courts have consistently found to be in violation of the Fourth Amendment. Accordingly, summary judgment on plaintiff's Section 1983 claim based on qualified immunity is denied.

3.    *Monell Claim*

Although there is no recovery against municipalities under a respondeat superior theory, the City may be held liable under Section 1983 if: "(1) [plaintiff] was deprived of a constitutional right; (2) the municipality had a policy; (3) the policy amounted to deliberate indifference to [plaintiff's] constitutional right; and (4) the policy was the moving force behind the constitutional violation." *Lockett v. County of Los Angeles*, 977 F.3d 737, 741 (9th Cir. 2020) (citing *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011)). The municipal policy need not be an official edict, and may instead be "a pervasive practice or custom" or "a failure to train, supervise, or discipline." *Horton ex rel. Horton v. City of Santa Maria*, 915 F.3d 592, 602-03 (9th Cir. 2019).

Here, plaintiff argues that the City is liable under *Monell* because (1) Mr. Stanton was deprived of his constitutional right to be free from unreasonable seizure; (2) the City had a practice or custom of "fail[ing] to collect and analyze critical evidence of deadly shootings" and of being "overly deferential to [police] officers' justifications [for uses of force] even when the physical evidence or other witness testimony directly contradict[s] those explanations," which constitute a policy of encouraging excessive force, Pl. Resp. 37-38; (3) such a policy amounted to deliberate indifference to Mr. Stanton's rights; and (4) the City's practice of encouraging excessive force was a moving force behind Dyk's decision to shoot Mr. Stanton. As discussed above, the Court concludes that there is a genuine dispute of material fact regarding whether Mr. Stanton was deprived of a constitutional right, so the first element cannot be the basis for granting summary judgment. Therefore, the Court focuses its analysis on the last three elements.

To show that the City had a policy of encouraging excessive force through a failure to adequately investigate prior uses of excessive force, plaintiff cites three incidents in which Portland police officers

14

killed unarmed individuals in the five years before Mr. Stanton was shot—the shootings of Quanice Hayes, Lane Martin, and Emmanuel Clark. *See* 26-28, 37-38. It is difficult to overstate the tragedy of each of these killings, but plaintiff fails to identify evidence showing that these deaths, or the resulting investigations, demonstrate that the City had a policy, practice, or custom of "deliberate indifference" or that they were a "moving force" behind Dyk's actions. *See Lockett*, 977 F.3d at 741.

With respect to the killings of Quanice Hayes and Lane Martin, plaintiffs point to no evidence that any investigator or tribunal has concluded that a constitutional violation occurred. Instead, plaintiff's evidence shows, in both cases, that an investigation was conducted, *see* Albies Decl., Ex. 19, ECF 76-3 (Hayes investigative report); *id.* Ex. 21, ECF 76-5 (Martin investigative report), and that the parties reached settlement, *see* Not. of Settlement, ECF 129, *Hayes v. City of Portland*, Case No. 3:18-cv-00988-AC (D. Or. 2021); Not. of Settlement, ECF 22, *Martin v. City of Portland*, Case No. 3:19-cv-01647-SI (D. Or. 2020). Although large monetary settlements can appear to be admissions of guilt to the public, such settlements are not admissible evidence of wrongdoing. *See* Fed. R. Evid. 408 *advisory committee's note on proposed rules* ("[I]t is apparent that a similar attitude [of excluding evidence of offers of compromise] must be taken with respect to completed compromises when offered against a party thereto."); *Green v. Baca*, 226 F.R.D. 624, 640-41 (C.D. Cal. 2005) (collecting cases and holding that the fact and amount of prior settlements are inadmissible to establish *Monell* liability). Absent a finding of a constitutional violation, these incidents are not evidence of a policy or practice of failing to investigate police shootings.

With respect to the killing of Emmanuel Clark on November 19, 2022, the evidence shows that Portland Police Bureau's Internal Affairs department found a constitutional violation. *See* Albies Decl., ¶ 27 & Ex. 23 ("IA Clark Rpt."), ECF 75-23, at 35-38. The officer in that case shot Mr. Clark while Mr. Clark was running away with his back turned towards the officers. *See* IA Clark Rpt. 36. The Internal Affairs investigator found that this shooting was "out of policy," and thus a violation of Mr. Clark's constitutional rights. *Id.* at 38. The evidence also shows that, in spite of this investigation, the City's Mayor

and the Portland Police Bureau's Chief of Police reversed the investigator's finding and declined to discipline the officer. *Id.* ¶ 27[5].

Generally, evidence of the City declining to discipline officers found to have committed constitutional violations would be probative of a policy of deliberate indifference to residents' constitutional rights. However, the Ninth Circuit cases cited by plaintiff in support of his *Monell* claim show why evidence of a single incident is not sufficient to show a policy of refusing to investigate or being too deferential to police officers' use-of-force explanations. In *Rodriguez v. County of Los Angeles*, plaintiffs' evidence included an independent report concluding that defendants had failed "to investigate approximately one hundred use-of-force allegations." 891 F.3d 776, 790 (9th Cir. 2018). And in *Velazquez v. City of Long Beach*, plaintiffs represented that the specific officer involved had ten citizen complaints and over thirty internal affairs investigations in less than eight years. 793 F. 3d 1010, 1027. Although the Court does not conclude that dozens or hundreds of prior incidents are required to show a pattern amounting to deliberate indifference, the three incidents here are insufficient, particularly when only one evidence is substantiated with admissible evidence. Indeed, the Ninth Circuit has recently reaffirmed that three prior incidents in a five-year period constitutes evidence of only "'sporadic' or 'isolated' wrongdoing [and] is generally insufficient to establish 'that the conduct has become a traditional method of carrying out policy.'" *Jones v. City of N. Las Vegas*, 168 F.4th 1131, 1141 (9th Cir. 2026) (quoting *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996)). Because plaintiff's evidence fails to establish a genuine dispute of material fact regarding the existence of a policy, the City is entitled to summary judgment as a matter of law on plaintiff's *Monell* claim.[6]

---

[5] Defendants object to statements of plaintiff's counsel being accepted as evidence. *See* Defs. Reply 16. The Court does not rely on counsel's statement under oath, but the report of the City's own internal affairs investigator and the records of the Portland City Council's Regular Session meeting of August 7, 2025.

[6] Further, Clark was shot months ***after*** Mr. Stanton. *Compare* Albies Decl., Ex. 23, at 1 (Clark shooting was on November 19, 2022 and report was finalized January 18, 2024), *with*, Incident History at 1 (Mr. Stanton was shot on July 27, 2022). Therefore, even if the investigation and disciplinary decision regarding Clark did constitute sufficient evidence of a policy of indifference, there is no evidence that Dyk was aware of such a policy or that it factored into his decision to shoot Mr. Stanton. Therefore, a jury could not

**B.    Wrongful Death Due to Battery**

Plaintiff asserts two theories of wrongful death; the first is based on the intentional tort of battery. *See* Compl. ¶¶ 46-48.  Under Oregon law, a claim "of battery requires (1) a person act with intent to cause harmful or offensive contact with another person, and (2) those actions directly or indirectly cause a harmful or offensive contact with that other person."  *Underwood v. City of Portland*, 319 Or. App. 648, 656, 510 P.3d 918 (2022) (citing *Bakker v. Baza'r, Inc.*, 275 Or. 245, 249, 551 P.2d 1269 (1976)).  The City does not dispute that Dyk intentionally engaged in harmful contact with Mr. Stanton, which resulted in his death. Instead, the City argues that Dyk's use of deadly force was privileged under Oregon law because plaintiff was engaged in a felony at the time of his death and Dyk's use of force was reasonable and justified.  The Court discussed the reasonableness of Dyk's conduct above, *see supra* at 5-9, and only restates the pertinent conclusions here.

First, Oregon law provides a "complete defense in any civil action for personal injury or wrongful death" if the injured party was engaged in a felony and such conduct contributed to their injury.  ORS § 31.180(1).  However, there is a genuine dispute of material fact regarding whether Mr. Stanton was engaged in a felony when Dyk shot him.  It is undisputed that Mr. Stanton fired his gun into the air, which may constitute misdemeanor disorderly conduct or reckless endangerment.  *See* ORS § 166.025; ORS § 163.195.  The only basis to conclude that Mr. Stanton was engaged in a felony—for example, unlawful use of a firearm, attempted murder or assault—hinges on Mr. Stanton aiming his gun at the responding officers with an intent to fire on them.  However, as discussed above, the evidence in the record establishes a genuine dispute regarding whether Mr. Stanton ever leveled his gun toward the officers.  This dispute precludes summary judgment based on Mr. Stanton's allegedly felonious conduct.

Second, Oregon law permits a peace officer may use force against a person "only when it is objectively reasonable, under the totality of circumstances known to the peace officer, to believe . . . [t]hat

---

conclude that the City's decision to not discipline Mr. Sathoff, alone, was a "moving force" behind Dyk's shooting of Mr. Stanton.  *See Lockett*, 977 F.3d at 741.

17

the person poses an imminent threat of physical injury to the peace officer or to a third person." ORS § 161.233(1)(a); *see also* ORS § 161.219(3) ("[A] person is not justified in using deadly physical force upon another person unless the person reasonably believes that the other person is . . . [u]sing or about to use unlawful deadly physical force against a person."). As discussed above, there is a genuine dispute of material fact regarding whether Dyk's use of deadly force was reasonable. Whether Dyk reasonably believed Mr. Stanton posed an imminent threat depends on whether he perceived Mr. Stanton take aim at other officers, which in turn depends on whether a factfinder credits Dyk's testimony or the conflicting testimony of Mr. Morris and other officers. These are questions that must be reserved for a jury.

The cases cited by defendants are readily distinguishable. In *Elifritz v. Fender*, the decedent "charged at officers with [a] knife" shortly after threatening to stab a bystander. 460 F. Supp. 3d 1088, 1106 (D. Or. 2020). In *Scouller v. Maxfield*, the plaintiff "engag[ed] the police in a high-speed chase, refus[ed] to surrender as officers approached, and press[ed] the accelerator as officers approached the front of his van." Case No. Civ. 01-431 HA, 2003 WL 194690, at *4 (D. Or. Jan. 16, 2003). Here, the evidence in the record is not sufficient to establish that Mr. Stanton actively resisted or evaded arrest, made verbal threats, or took threatening actions toward the police. In the absence of such evidence, the City has failed to show that they are entitled to summary judgment as a matter of law on plaintiff's battery claim.

## C.     Wrongful Death Due to Negligence

Plaintiff's second theory of wrongful death is predicated on allegations of negligence. *See* Compl. ¶ 50(a)-(c). To establish a claim for negligence under Oregon law, a plaintiff must prove:

> (1) that defendant's conduct caused a foreseeable risk of harm, (2) that the risk is to an interest of a kind that the law protects against negligent invasion, (3) that defendant's conduct was unreasonable in light of the risk, (4) that the conduct was a cause of plaintiff's harm, and (5) that plaintiff was within the class of persons and plaintiff's injury was within the general type of potential incidents and injuries that made defendant's conduct negligent.

*Solberg v. Johnson*, 306 Or. 484, 490-91, 760 P.2d 867 (1988) (citing *Fazzolari v. Portland School Dist. No. 1J*, 303 Or. 1, 734 P.2d 1326 (1987), *and*, *Stewart v. Jefferson Plywood Co.*, 255 Or. 603, 606, 469 P.2d 783 (1970)), *abrogated in irrelevant part by Deckard v. Bunch*, 358 Or. 754, 370 P.3d 478 (2016).

18

Defendants argue that plaintiff's negligence claim fails because there is no evidence of causation. The Oregon Supreme Court has emphasized that "the causal connection between defendant's acts or omissions and the plaintiff's injuries must not be left to surmise or conjecture . . . and a mere possibility that the alleged negligence of the defendant was the proximate cause of plaintiff's injuries is not sufficient." *Sims v. Dixon*, 224 Or. 45, 48, 355 P.2d 478 (1960); *Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 336 Or. 329, 340, 83 P.3d 322 (2004) (reiterating the plaintiffs "must prove 'factual' or 'but-for' causation—that there is a causal link between the defendant's conduct and the plaintiff's harm"). To defeat summary judgment on the issue of causation, plaintiff must "identify evidence from which a reasonable juror could infer that, absent [defendants'] preshooting negligence, there was a reasonable probability that the shooting would not have occurred." *Box v. Dep't of Oregon State Police*, 311 Or. App. 348, 369, 492 P.3d 685 (2021).

Plaintiff's complaint identifies three negligent acts: (1) failure to code the call as a mental health call and await the arrival of Portland's Behavioral Health Unit ("BHU") or other officers with greater de-escalation skills and training; (2) failure to put officers with Enhanced Crisis Intervention Skills in charge; and (3) failure to adequately employ crisis intervention and de-escalation communication tactics. *See* Compl. ¶ 50(a)-(c). First, in response to defendants' motion for summary judgment, plaintiff appears to abandon the first basis, making no reference to the BHU and offering no response to defendants' assertion that "there is no evidence that waiting for BHU would have resulted in a different outcome." *Compare* Defs. Mot. 30, with Pl. Resp. 39-40. A plaintiff's "failure to respond to a fact asserted in the motion permits a court to 'consider the fact undisputed for purposes of the motion.'" *Heinemann v. Satterberg*, 731 F.3d 914, 917 (9th Cir. 2013) (quoting Fed. R. Civ. P. 56(e)(2)). This basis for negligence is therefore waived.

Second, the latter two allegedly negligent acts both focus on defendants' failure to deescalate the situation and are discussed together. Plaintiff identifies no evidence showing that the shooting was a foreseeable outcome of defendants' alleged failures to employ de-escalation personnel and tactics. *See* Pl. Resp. 40. Plaintiff's theory is that Dyk shot Mr. Stanton while he posed no imminent threat; plaintiff offers no explanation for how using Mr. Stanton's name, giving him additional time to comply with commands,

19

building rapport, or calling Mr. Stanton's wife would have prevented Dyk from shooting Mr. Stanton who, according to plaintiff, already posed no imminent threat. Plaintiff leaves the causal connection between the preferred tactics and Mr. Stanton's death to little more than "surmise or conjecture." *Sims*, 224 Or. at 48. Therefore, because plaintiff fails to cite evidence from which a jury could reasonably infer that, had defendants employed all or some of these tactics, there was a reasonable probability that Dyk would not have shot Mr. Stanton, defendants are entitled to summary judgment on plaintiff's negligent wrongful death claim.

D.      **Intentional Infliction of Emotional Distress**

Plaintiff brings a claim for intentional infliction of emotional distress ("IIED") on behalf of A.S., Mr. Stanton's minor daughter, based on the allegation that, shortly after Dyk shot Mr. Stanton, one of the City's officers told A.S. that her father killed himself. *See* Compl. ¶¶ 52-56. To prevail on an IIED claim under Oregon law, "a claimant must demonstrate: '(1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the defendant's acts were the cause of the plaintiff's severe emotional distress, and (3) the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct.'" *Bibeau v. Pac. Nw. Rsch. Found., Inc.*, 339 F.3d 942, 947 (9th Cir. 2003) (quoting *McGanty v. Staudenraus*, 321 Or. 532, 543, 901 P.2d 841 (1995)). Defendants argue that officers (1) never said the alleged statement; (2) that there was no intent to inflict emotional harm; and (3) that even if an officer did blame A.S.'s father for his own death, such conduct is not sufficiently outrageous to establish an IIED claim.[7] The Court considers each argument in turn and concludes that summary judgment is not appropriate as to plaintiff's claim for IIED.

---

[7] On reply, defendants assert that plaintiff cannot show that A.S. was emotionally harmed by the officers' conduct. However, "'arguments raised for the first time in a reply brief are waived.'" *Turtle Island Restoration Network v. U.S. Dep't of Com.*, 672 F.3d 1160, 1166 n.8 (9th Cir. 2012) (quoting *Graves v. Arpaio*, 623 F.3d 1043, 1048 (9th Cir. 2010) (per curiam)).

1.  *Evidence of the Alleged Statement*

First, there is a genuine dispute of fact regarding whether an officer told A.S. that her father killed himself. Defendants offer declarations and deposition testimony from two officers who interacted with A.S. after her father's shooting, Gabri Hertzler and Adi Ramic. *See* Hertzler Decl.; Ramic Decl. Hertzler attests to picking A.S. off the porch after Mr. Stanton was shot and attempting to sooth her. *See* Hertzler Decl. ¶ 13. Ramic attests to taking A.S. from another officer, taking her to the East Precinct, and sitting with her there in an effort to comfort her. *See* Ramic Decl. ¶¶ 8-10. Both Hertzler and Ramic emphatically disclaim saying or suggesting to A.S. that her father wanted to die or that he killed himself. *See* Hertzler Decl. ¶ 14; Ramic Decl. ¶¶ 11-12.

A.S.'s own deposition testimony is equivocal on the issue. She testified that her family was crying at the police station because "[t]hey might have heard that my dad got shot or something, or he shot himself. I'm not that sure." Caldwell Decl., Ex. 6 ("A.S. Depo."), ECF 60-6, at 36:1-4. When asked where the gunshots came from that killed her father, she stated "[e]ither the – the police or his gun that he probably shot himself." *Id.* 39:11-14. Asked where she heard that Mr. Stanton shot himself, A.S. testified "[f]rom like family members and maybe police probably. I just remember hearing like – probably from my mom, so that he shot himself – from the police, that they probably knew what happened." *Id.* 41:2-6.

On the other hand, evidence in the record shows that A.S. told three adult family members that officers did tell her that her father killed himself. First, A.S.'s mother testified in her deposition that "a few weeks . . . or [a] month" after the shooting, A.S. told her that "one of the officer pick her up and then they tell her that he killed himself." Albies Decl., Ex. 36 ("Phou Depo."), ECF 75-36, at 59:23-60:8. Second, A.S.'s grandmother testified in her deposition that "within a week" of the shooting, A.S. told her that "the police officer told her . . . that [Mr. Stanton] died of suicide." Albies Decl., Ex. 37 ("Karen Stanton Depo."), ECF 75-37, at 100:17-101:2, 102:2-6. Third, A.S.'s uncle testified in his deposition that less than two weeks after the shooting, A.S. told him that she asked the officer "'Why did you do this?,' And the officer told her, 'We did not do this. He did this to himself. He was sad.'" Albies Decl., Ex. 38 ("Taylor Stanton Depo."), ECF 75-38, at 41:13-24.

21

Defendants correctly note that the testimony of A.S.'s family members is hearsay. Indeed, it is hearsay within hearsay: the inside layer is the officer's statement to A.S. asserting that her father was responsible for his own death, the outside layer is A.S.'s statements to family asserting that an officer made such a statement. The Court readily finds that the officer's statement is exempt from the rules against hearsay because it is not offered by plaintiff to prove the truth of the matter asserted—that Mr. Stanton killed himself—instead, it is offered for the fact that it was made. *See* Pl. Resp. 40-41. This is admissible under Federal Rule of Evidence 801(c)(2). *See Caldrone v. Circle K Stores Inc.*, 156 F.4th 952, 960 (9th Cir. 2025). However, the second level of hearsay, A.S.'s statements to her family members, are offered for the truth—that a City police officer told A.S. that her father was responsible for his own death—and the only avenue to admissibility identified by plaintiff is the residual hearsay exception under Federal Rule of Evidence 807.

Although Rule 807 "was designed for 'exceptional circumstances,'" the Ninth Circuit has recognized that it "provide[s] judges a 'fair degree of latitude' and 'flexibility' to admit statements that would otherwise be hearsay." *United States v. Bonds*, 608 F.3d 495, 500-01 (9th Cir. 2010) (first quoting *Fong v. American Airlines*, 626 F.2d 759, 763 (9th Cir.1980); and then quoting *United States v. Valdez-Soto*, 31 F.3d 1467, 1471 (9th Cir. 1994)). Rule 807 permits a hearsay statement to be admitted into evidence if:

> (1) the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and

> (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

Fed. R. Evid. 807(a). The trustworthiness assessment does not consider the credibility of the testifying witnesses, who can be cross-examined, but instead focuses "on circumstantial guarantees surrounding the making of the statement itself, as well as any independent evidence corroborating the statement." Fed. R. Evid. 807 *advisory committee's note on 2019 amendment*; *see also Bonds*, 608 F.3d at 502 (affirming the district court, which "properly focused on the record of untrustworthiness of the out of court declarant").

As the Tenth Circuit has observed, "'[c]ourts have employed the [residual hearsay] exception most extensively in admitting statements made by child witnesses, particularly in sexual abuse cases.'" *United States v. Burgess*, 99 F.4th 1175, 1183 (10th Cir. 2024) (quoting 2 McCormick on Evid. § 324 (8th ed. July 2022)); *see also, e.g.*, *United States v. Wandahsega*, 924 F.3d 868, 881 (6th Cir. 2019); *United States v. Peneaux*, 432 F.3d 882, 893 (8th Cir. 2005) ("[E]xceptional circumstances [satisfying Rule 807] generally exist when a child sexual abuse victim relates the details of the abusive events to an adult."). To be clear, there are no allegations or suggestions that A.S. was abused; however, the Court finds these precedents helpful to the extent that they provide guidance on considering hearsay statements by a child declarant who has experienced a traumatic event and subsequently discussed that event with adults in their life.

There is no rigid set of factors to be considered when evaluating trustworthiness of a child's statements under Rule 807. Courts have relied on the proximity in time between the hearsay statements and the underlying events, whether the statements were made in normal conversation or during leading interviews, consistency or corroboration of the statements, and the ability of the objecting party to question the witness. *See, e.g.*, *Valdez-Soto*, 31 F.3d at 1472; *Wandahsega*, 924 F.3d at 882; *Peneaux*, 432 F.3d at 892. Here, under the totality of the circumstances, A.S.'s statements to her family members are supported by sufficient guarantees of trustworthiness to satisfy Rule 807.

First, each of A.S.'s statements to family members were made within a few weeks or a month of the shooting. *See Valdez-Soto*, 31 F.3d at 1472 (weighing short time between relevant event and statement in favor of reliability); *United States v. Vretta*, 790 F.2d 651, 659 (7th Cir. 1986) (holding that "close proximity in time between" the declarant's statements and the underlying events "lends support to the statements' trustworthiness").

Second, there is no evidence to suggest that A.S. was subject to leading interviews to induce her statements; instead, her family members testified that she brought up the officer's comments spontaneously or in response to open-ended questions. *See Wandahsega*, 924 F.3d at 882 (affirming district court's finding of reliability where minor declarant's statements to testifying adults were made in "the course of a normal conversation" rather than an interview setting).

Third, A.S.'s statements were materially similar across all three conversations. *See Peneaux*, 432 F.3d at 892 (observing that a "child repeat[ing] the same facts consistently to adults" is an indicator of reliability); *Cf. Idaho v. Wright*, 497 U.S. 805, 821 (1990) (citing approvingly the consideration of "spontaneity and consistent repetition" as factors to evaluate the trustworthiness of a child's hearsay statements in the Confrontation Clause context). There were some differences in the testimony of A.S.'s family members regarding the exact words she attributed to the officer. *Compare* Phou Depo. 59:23-60:8 (officer told A.S. "that he killed himself), *with* Karen Stanton Depo. 100:17-102:06 (officer told her "that he died of suicide"), *and* Taylor Stanton Depo. 41:13-24 (officer told her that "[h]e did this to himself"). However, these differences are slight, not material to plaintiff's claim, and at least as attributable to the testifying witness's choice of words as to differences in A.S. story. *See United States v. Thunder Horse*, 370 F.3d 745, 748 (8th Cir. 2004) (holding it was not an abuse of discretion for district court to admit child's hearsay statements under Rule 807 despite minor inconsistencies in the reported statements because, in part, the jury could "accord the statements whatever weight it deemed appropriate").

Fourth, and finally, defendants had an opportunity to question A.S. Although her deposition testimony was less than clear and she repeatedly responded that she didn't know or couldn't remember relevant details, she did not recant the substance of her statements to family members. This is an indicator of trustworthiness. *See Valdez-Soto*, 31 F.3d at 1472 (noting that availability of declarant for examination weighs in favor of the trustworthiness of declarant's out-of-court statements); *Peneaux*, 432 F.3d at 892 (same). Weighing these factors together, the Court finds that A.S.'s out-of-court statements are "supported by sufficient guarantees of trustworthiness" to permit admission under Rule 807(a)(1).

A.S.'s hearsay statements to her family members are also "more probative on the point for which [they are] offered than any other evidence." Fed. R. Evid. 807(a)(2). As described above, A.S.'s deposition testimony is exceptionally uncertain and equivocal. *See* A.S. Depo. 36:1-4 ("[M]y dad got shot or something, or he shot himself. I'm not that sure."); *id.* 39:11-14 (answering that the gunshots came from "[e]ither the – the police or his gun that he probably shot himself."); *id.* 41:2-6 (testifying that she heard that her father might have shot himself "[f]rom like family members and maybe police probably").

Although this deposition testimony does not directly contradict what A.S. told family members, it shows that—whether due to A.S.'s age, trauma, faded memory after two years, or some other cause—A.S. was unable to provide clear testimony on this matter. Residual hearsay statements may be admitted under Rule 807 even where a child witness testifies if "testifying adults are able to provide information that the victim is unwilling or unable to give." *Peneaux*, 432 F.3d at 893. Therefore, the Court finds that the hearsay statements are more probative than any other evidence.

Importantly, the Court is not making a determination regarding A.S.'s credibility or the truth of her statements. Although there are indicia of trustworthiness sufficient to satisfy Rule 807, a factfinder may ultimately determine that A.S., or the testifying adults, are less credible than the officers who insist they made no such statements. At this stage in the litigation, because factual disputes must be decided in favor of the nonmovant, it is enough that the testimony is admissible to establish a genuine dispute regarding whether the City's police officers told A.S. that her father killed himself.

2. *Defendants' Intent*

Defendants' arguments that plaintiff lacks evidence that the officers actively wanted to upset A.S. However, plaintiff is not required to show that it was the officer's purpose to cause A.S. distress. It is enough that the officer lied to her "kn[owing] distress was 'certain, or substantially certain to result.'" *Ryan v. Patterson Dental Supply, Inc.*, No. CV-98-1177-HA, 2000 WL 640859, at *21 (D. Or. May 12, 2000) (quoting *McGanty*, 321 Or. at 535). "An undeclared intention of an actor is hardly susceptible to direct evidence," *id.*, but a reasonable juror could infer from the statement itself, the surrounding circumstances, and the behavior of the officers on the stand that the statement here was made knowing that A.S. was substantially certain to experience severe emotional distress from being told that her father wanted to die.

3. *Outrageousness*

"Whether conduct amounts to an actionable outrageous transgression of social norms is a fact-specific, case-by-case determination" and it is generally "the role of the jury to determine the extent of social norms." *McManus v. Auchincloss*, 271 Or. App. 765, 781, 353 P.3d 17 (2015). Nonetheless, a court may dismiss an IIED claim before it gets to the jury if the court concludes that "no reasonable jury could

25

find the defendant's conduct to have exceeded all bounds of socially tolerable harm." *Id.*; *see also Johnson v. Hawe*, 388 F.3d 676, 687 (9th Cir. 2004) ("The determination of whether conduct is outrageous is ordinarily a jury question, but the court must initially determine if reasonable minds could differ on whether the conduct was so extreme as to result in liability." (quotations and citation omitted)).  Here, defendants describe the alleged statements as "[maybe] an insensitive way to explain to a little girl what happened." Def. Mot. 35.  This is a gross mischaracterization of the allegations.  As discussed above, a reasonable jury could conclude from evidence in the record that the City's officers lied to A.S. by telling her that her father killed himself in order to deflect responsibility from themselves.  The Court cannot conclude that no reasonable jury could find such a statement, if it was made, was an outrageous transgression of social norms. Therefore, summary judgment on plaintiff's IIED claim is denied.

E.      **Negligent Infliction of Emotional Distress**

Plaintiff also brings a claim for negligent infliction of emotional distress ("NIED") on behalf of A.S. based on her observing her father's death.  Under Oregon tirt law, a bystander may recover for NIED when: "(1) the bystander observes a defendant negligently causing sudden serious bodily injury to another; (2) the bystander suffers serious emotional distress; (3) the bystander perceives the event contemporaneously, and (4) the bystander is a close family member of the person suffering the bodily injury." *Pozos Leon v. Tillamook County Sch. Dist.*, No. 3:17-00440-PK, 2018 WL 2175949, at *13 (D. Or. May 11, 2018) (citing *Philibert v. Kluser*, 360 Or. 698, 711 (2016)).  Plaintiff's claim fails the first element because there is no evidence that Dyk *negligently* caused serious bodily injury—plaintiff repeatedly argues, and the evidence shows, that Dyk *intentionally* caused Mr. Stanton's death.  In a short paragraph, plaintiff attempts to rewrite the elements, arguing that he can prevail by showing that the emotional injury was negligent, even if the bodily injury was intentional.  Pl. Resp. 42.  Plaintiff has not identified, and the Court cannot locate, any cases in which an exception has been found to the requirement that the bodily injury must be ***negligently*** caused, and the Court will not make this novel extension of Oregon law. Therefore, summary judgment is granted as to plaintiff's NIED claim.

26

## CONCLUSION

For the reasons stated herein, defendants' motion for summary judgment is GRANTED in part and DENIED in part. Defendants' motion is GRANTED as to plaintiff's First Claim, Count II (Section 1983 *Monell* liability), Third Claim (wrongful death due to negligence), and Fifth Claim (negligent infliction of emotional distress). Defendants' motion is DENIED as to plaintiff's First Claim, Count I (Section 1983 individual liability), including qualified immunity, Second Claim (wrongful death due to battery), and Fourth Claim (intentional infliction of emotional distress).

IT IS SO ORDERED.

DATED this 2nd day of June, 2026.

Adrienne Nelson
United States District Judge

27